UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                          )
UNITED STATES OF AMERICA,  )
                          )          Criminal Action
        Plaintiff,         )          No. 23-10001-ADB
                          )
v.                         )
                          )
PATRICK BAXTER,            )
                          )
        Defendant.         )
                          )
```


* * * R E D A C T E D * * *


BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


Jury Trial Day 2


October 8, 2024



John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     David G. Tobin
3    Jessica L. Soto
     United States Attorney's Office
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3392
6    david.tobin@usdoj.gov

7    On Behalf of the Defendant:
     Joseph B. Simons
8    Natalie I. Sreca
     Simons Law Office
9    10 Post Office Square
     Suite 800
10   Boston, MA 02109
     617-544-9000
11   joe@jbsimonslaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              <u>CONTENTS</u>

3

4    <u>WITNESS</u>                                                    <u>PAGE</u>

5

     BRYCE MONTOYA
6
         Direct Examination By Ms. Soto                          17
7        Cross-Examination By Mr. Simons                         57
         Redirect Examination By Ms. Soto                        85
8        Recross-Examination By Mr. Simons                       86

9    YU KAJITA

10       Direct Examination By Mr. Tobin                         89
         Cross-Examination By Mr. Simons                        129
11       Redirect Examination By Mr. Tobin                      148
         Recross-Examination By Mr. Simons                      151
12
     ███████████
13
         Direct Examination By Ms. Soto                         152
14       Cross-Examination By Ms. Sreca                         161
         Redirect Examination By Ms. Soto                       165
15
     VANESSA BAXTER
16
         Direct Examination By Mr. Simons                       167
17       Cross-Examination By Ms. Soto                          183
         Redirect Examination By Mr. Simons                     188
18

19
     <u>E X H I B I T S</u>
20

21   <u>Exhibit No</u>.              <u>Received</u>

22
        1 - 29                      15
23

24

25

```
 1                    P R O C E E D I N G S
 2          THE COURT:  I'm aware that we may charge tomorrow, and
 3    I want to make sure we have the charge in shape.  So have you
 4    guys had a chance to look at it?
 5          MR. SIMONS:  Yes, briefly on my side, but I have.
 6          THE COURT:  So when are you thinking we were going to
 7    have a charge conference?
 8          MR. SIMONS:  I think this morning.  I've looked it
 9    over.
10          THE COURT:  Okay.  We can talk again before I give the
11    charge, but I can't, you know, start writing tomorrow.
12          MR. TOBIN:  Judge, just so it's clear, for me at
13    least, is it your expectation that the arguments and charge
14    will both be presumably tomorrow morning?
15          THE COURT:  Yes.  And I am flexible.  I will take
16    suggestions on whether you want me to charge before closings or
17    charge after closings.
18          MR. TOBIN:  Okay.  Thank you.
19          THE COURT:  I mean, if we finish the evidence and we
20    can possibly get to the charge today, I'd do it if we were
21    ready.  I don't know how long you think this is going to go
22    today, but I'm also happy to charge tomorrow.  Actually, I
23    guess I prefer to charge tomorrow so I can read it over again
24    myself tonight.
25          MR. TOBIN:  Thank you.
```

1          THE COURT:  Do you have a view, assuming that we close

2     the evidence today?  Does anyone have a preference one way or

3     another about charge before close or close after charge?

4          MR. TOBIN:  I would prefer the charge tomorrow.

5          THE COURT:  No, no.  I'll do them both tomorrow, but

6     do you want to close before the charge, or do you want me to

7     charge first?

8          MR. TOBIN:  I'd like to close before the charge.

9          THE COURT:  Okay.  Sometimes it helps you because if I

10    give them the law before you close, it saves you that in your

11    closing, but I'm happy, if you want to do it all tomorrow and

12    you want to close first, it's fine.

13         MR. TOBIN:  Maybe we can talk about it later.  I must

14    be frank, I don't know if ever I had the charge before the

15    argument.  It might be a great idea.  I just need to think

16    through it.

17         THE COURT:  I do it a lot.  I won't do it today

18    because I want to read it over again tonight.  But if you

19    finish the evidence at 2:00, maybe not time for closings, but I

20    would charge them today and you could close in the morning.

21         MR. SIMONS:  I'd like to, if I could, give some more

22    input.  But I kind of like the idea, too.  I, too, don't think

23    I've had the charge before closing, but I think I like it.

24         THE COURT:  There's a tiny piece of the charge that

25    goes after closings about the deliberation piece.  That would

```
 1    go afterwards.  But I could do the legal stuff before.  It just
 2    keeps you from having --
 3              MR. SIMONS:  I think I'm in favor of it.
 4              THE COURT:  I do it a lot.  I happen to like it, but
 5    I'm very flexible.
 6              MR. SIMONS:  Okay.
 7              MR. TOBIN:  I kind of like the idea as well, but I'd
 8    like to reserve until after lunch.
 9              THE COURT:  You can decide tomorrow right before we
10    go.  It's minor revisions in the charge, like "what you heard
11    in closings" or "what you will hear in closings," right?  It's
12    minor.
13              MR. TOBIN:  Sure, thank you.
14              THE COURT:  I'm happy to -- we can decide tomorrow.
15    How about anything else on the charge, questions, comments,
16    concerns?
17              MR. SIMONS:  The only thing that jumps out at me, I
18    know we talked about the third element of the sexual
19    exploitation.
20              THE COURT:  Yes.
21              MR. SIMONS:  I do think it might be a good idea if the
22    government has one of those theories.  Not that it's our
23    biggest issue.
24              THE COURT:  I agree, it's confusing.
25              MR. TOBIN:  Yes, Judge, we don't disagree.  We would
```

1    like B.

2              THE COURT:  So I'll take out A and C?

3              MR. TOBIN:  Yes.  Otherwise, I agree with everyone,

4    that tends to be more confusing for the jury.

5              THE COURT:  Okay.

6              MR. TOBIN:  I would ask one change to that though

7    based on a subsequent instruction you're going to give.

8              THE COURT:  Yeah.

9              MR. TOBIN:  Where it reads that, "Visual depiction was

10   produced or transmitted using materials," we believe it should

11   read that "Visual depiction was produced," comma,

12   "transmitted," comma, "or stored on a device using materials

13   that had been," which I think is in keeping with the actual

14   law.  That's typically how we show the interstate connection.

15             THE COURT:  Okay.  That's fine.  Just so you know,

16   this language came right out of what you submitted.  So you

17   didn't submit it the first time.

18             MR. TOBIN:  No.

19             THE COURT:  It's fine.  I'm happy to have it.  And

20   then we'll revisit this one more time depending on the evidence

21   today if there's anything you want to add.

22             MR. SIMONS:  Nothing at this time that I can think of,

23   Your Honor.

24             MS. SOTO:  Not at this time, Your Honor.

25             THE COURT:  Okay.  All right.  So you can have the

1  next 15 minutes if there's nothing else.

2        MR. SIMONS:  Nothing from the defense, Your Honor.

3        MR. TOBIN:  Madam clerk, do we know what the status of

4  our jurors are?

5        COURTROOM CLERK:  There's a few here.

6        MR. TOBIN:  That's better than none.

7        MR. SIMONS:  Your Honor, I just want to ask the court,

8  we have an intern, Jake Marchand.  Would it be okay if he sits

9  at the table behind us while he's attending?

10        THE COURT:  Sure.

11        COURTROOM CLERK:  All rise for the jury.

12        (Jury enters the courtroom.)

13        COURTROOM CLERK:  Court is in session.  Please be

14  seated.

15        THE COURT:  Good morning, everybody.  We're going to

16  go right to opening statements.  Is the government ready?

17        MS. SOTO:  Yes, Your Honor.

18        Videos of adult men having sex with female children,

19  children masturbating, videos and pictures that were homemade

20  of his then seven-year-old ███ A.F. with her vagina on full

21  display.  The evidence will show that the defendant, Patrick

22  Baxter, had that material on a password-protected device that

23  law enforcement seized from his residence in 2021.

24        Good morning.  Let me reintroduce myself.  I'm Jessica

25  Soto.  My co-counsel David Tobin and I, with the assistance of

1    Julia Gelman, represent the United States in this matter.

2            During this trial, the government will prove beyond a

3    reasonable doubt that the defendant, Patrick Baxter, is guilty

4    of possession of child pornography, receipt of child

5    pornography, and production of child pornography, which is also

6    referred to as sexual exploitation of children.

7            How did law enforcement find the defendant's

8    collection of child pornography?  You will hear Bryce Montoya,

9    an FBI special agent, testify that in the summer of 2021, FBI

10   was working on a special operation to combat child pornography

11   on the internet.  The operation focused on an online network

12   called "Freenet."

13           Freenet users can share, discuss, receive photos and

14   videos, including child pornography.  FBI determined that the

15   user of a device at 20 Gooch Street in Melrose, Massachusetts,

16   had attempted to download child pornography on several

17   occasions in 2021.  The address was defendant's residence.  On

18   November 2, 2021, FBI executed a search warrant at that home.

19   The defendant, his wife, and his two young children were

20   inside.

21           During the search, law enforcement identified, seized,

22   and attempted on-site searches of several electronic devices.

23   The devices included a Mac -- excuse me, a MacBook laptop and a

24   Samsung solid state drive, also known as an SSD.  SSDs are

25   electronic devices that store data.  Both devices were near

1    each other in the defendant's living room.

2        FBI will testify that the SSD was encrypted.

3    Encryption is a process that scrambles data, making it

4    unreadable.  To make it readable, you need a password.  Out of

5    the eight devices that agents seized in this case, the SSD was

6    the only device that agents could not access when they were at

7    the home or shortly thereafter.  But given the evidence that

8    someone at Gooch Street had received or attempted to receive --

9    attempted to receive child pornography, FBI kept working on

10   that device.  FBI Boston sent the encrypted SSD device to a

11   specialized unit of the FBI located in Quantico, Virginia.

12   That unit works on decrypting devices, among other things.  And

13   that unit was able to crack the password of the SSD.

14       Upon decryption, agents identified two profiles on the

15   SSD, one titled "Baxter," and the other titled "Backup."  The

16   Backup account stored some data that had once been on the

17   seized MacBook laptop found next to it in the defendant's

18   living room.  The Backup account included username information,

19   search history, and files that showed it belonged to the

20   defendant.  Once investigators finally got into the defendant's

21   encrypted SSD, they realized that the Backup account contained

22   child pornography.  The SSD was the only one of the seized

23   devices with child pornography.  The SSD Backup account had

24   over 400 videos of child pornography.  There were videos of men

25   having sex with girls 15 years old and younger, oral sex,

1  vaginal sex, anal sex.  There was sadomasochism that included

2  tying up, whipping, and affixing clothes pins on the genitals

3  of a partially nude child.  There were masturbating girls.  And

4  there were children with their genitals exposed.

5      Where did all this material on the backup come from?

6  Evidence will show that the defendant received some of the

7  videos from Freenet.  Commingled with those files that he had

8  received from Freenet, there were files that the defendant

9  himself produced of ███████████.

10     The defendant's ██████████████ will testify that in

11 July of 2019, her husband, seven-year-old daughter, and

12 four-year-old son traveled to Massachusetts for a family

13 vacation.  Her family stayed with the defendant's family for

14 several days between July 3 and July 13.  Her mother will

15 identify her then seven-year-old daughter, A.F., as the girl in

16 the pictures and video on the defendant's encrypted SSD.

17     What do those files show?  On July 3 and 4, the first

18 two days ████████ was at the defendant's house, the defendant

19 took several photos of her.  In a couple she's in the doorway

20 of a bathroom nude.  There are also 16 photos taken in the

21 bedroom of a Baxter child.  The ████████████████████ is wearing

22 only a pink T shirt, with no pants or underwear.  In some of

23 those photos, ████████████ is sitting on a bed with her legs open.

24 In other photos, she's on a bed on her hands and knees, and her

25 vagina is in the center of the frame.

1    On July 11, 2019, a day and a half before her family

2    left Massachusetts, the defendant took two videos of ███████

3    in that same bedroom.  The sounds and quick glimpses in the

4    video indicate that there are multiple children in the room.

5    They're running around, shouting, being kids.  You'll also hear

6    an adult male voice who witnesses will identify as Patrick

7    Baxter.  He is addressing male children in the room, but by

8    then they're off-screen, and yet still the camera remains on

9    the ████████████████, who is in the bedroom playing, naked.

10   At one point in the video, she rolls around in the bed

11   and opens her legs wide.  The camera remains on her.  The

12   defendant also stored two pictures on the encrypted device of

13   ██████████ clothed.  He put them in the same folder that

14   contained the images and video of her partially nude.

15   Over the next couple of days, you will see and hear

16   more.  For example, you will see the SSD and the laptop and

17   learn they were manufactured outside of Massachusetts, which is

18   an element of the charged offenses.  The government expects to

19   introduce as an exhibit the collection of child pornography

20   recovered from the defendant's encrypted SSD.  They will be

21   available for your review.  Although the defendant had over 400

22   videos of child pornography on his encrypted SSD, the

23   government will not show them all to you during this trial, but

24   we will show you very short clips of a very small sample of

25   those videos so that you, yourself, can see that that is child

1    pornography.

2         This and other evidence that you'll hear during this

3    trial will prove beyond a reasonable doubt that the defendant

4    possessed, received, and produced child pornography.  And at

5    the end of this trial, the government will come before you

6    again and ask you to return the only verdict that will be

7    consistent with the law and the evidence in this case:  that

8    the defendant, Patrick Baxter, is guilty of possession of child

9    pornography, receipt of child pornography, and the sexual

10   exploitation of ████████.  Thank you.

11        THE COURT:  Does defense want to open?

12        MS. SRECA:  Yes, Your Honor.

13        THE COURT:  Go ahead.

14        MS. SRECA:  Good morning, ladies and gentlemen.  You

15   just heard from the government, from AUSA Soto what the

16   government is alleging in this case and how they intend to

17   prove it.  I'd like to touch on a couple legal instructions

18   that the judge gave you yesterday and that you'll be reminded

19   of again before you go into deliberations.

20        The first being the government's burden.  There are

21   three charges in this case, and each charge has a certain

22   number of elements that the government must prove beyond a

23   reasonable doubt.  It's helpful to think of them maybe like

24   your weekend to-do list.  You've got "clean the kitchen" on

25   your list.  And when you clean the kitchen, you do the dishes,

1    you wipe the counters, and you vacuum the floor.  You don't

2    check "clean the kitchen" off your list until you've done all

3    of those things.

4         And the same goes for each element of each of these

5    charges.  The government has to prove beyond a reasonable doubt

6    every single element of each charge before they've met their

7    burden.  And we expect that the government will not meet their

8    burden in this case.  They won't do the dishes or wipe the

9    counter.  We'll come before you again at the close of evidence

10   and explain to you which elements haven't been met, whether the

11   floor didn't get vacuumed or the dishes didn't get done, we'll

12   come before you and explain that and hope that that is helpful

13   to you as you deliberate and apply the law as the judge

14   instructs you.

15        The other instruction that the judge spent a lot of

16   time on yesterday is the presumption of innocence.  Mr. Baxter

17   is innocent until you as a group have decided that the

18   government has met their burden beyond a reasonable doubt.  We

19   ask that you hold the government accountable, hold them to

20   their burden, and before making a decision about innocence or

21   guilt that you make sure each element is met.  And if it's not,

22   we ask that you return a verdict of not guilty.  Again, we

23   expect that the government will not meet their burden, and we

24   will explain which elements are missing.

25        Now, what you just heard from AUSA Soto is difficult.

1   Child pornography is a tough subject, and it's natural to have

2   an emotional response to the things that you will see and hear

3   and have to talk about during your deliberations.  Your job as

4   the jury is to put that emotional response aside and think

5   critically about the evidence that's presented to you.

6          I ask that you do that as you hear the evidence in

7   this case and deliberate.  I ask that you remain open-minded

8   and remember that it's the government's burden, which we

9   believe will not be met, and we ask that you return a verdict

10  of not guilty when you find that elements are missing here.

11  Thank you.

12         THE COURT:  Government, are you ready for your first

13  witness?

14         MS. SOTO:  Yes, Your Honor.  Before we call the

15  witness though, we'd like to move into evidence Exhibits 1

16  through 29, which I believe are unobjected to.

17         MR. SIMONS:  That's correct, Your Honor.

18         THE COURT:  All right.  Exhibits 1 through 29 are

19  admitted.

20         (Exhibits 1 - 29 admitted into evidence.)

21         MS. SOTO:  Thank you, Your Honor.  I'd also like to

22  read the stipulation that the parties entered into in

23  previously.

24         THE COURT:  Go ahead.  Let me just tell you, a

25  stipulation is something that both sides have agreed to, so you

1   can accept it as a fact.  You don't have to decide whether it's

2   a fact or not.  You accept it as a fact.  And then you can give

3   it whatever weight you think it deserves.  You decide whether

4   it's a important fact or not important fact, but they don't

5   have to prove it for it to be established.

6          Go ahead, Ms. Soto.

7          MS. SOTO:  Thank you, Your Honor.  The United States

8   of America and the Defendant Patrick Baxter hereby stipulate

9   and agree that the following facts are true:

10          On or about January 9, 2016, the defendant, Patrick

11  Baxter, opened a Verizon FiOS account and maintained the

12  account through at least November 2, 2021.  The account

13  subscriber information included customer name of Patrick Baxter

14  and account address of 20 Gooch, Melrose, Mass, 02166-0000.

15          The IP address, 100.0.180.154, belongs to Verizon FiOS

16  and was assigned to the defendant, Patrick Baxter, starting on

17  January 13, 2021 and remained assigned to Patrick Baxter until

18  through at least November 2, 2021.

19          And this is signed by myself, Jessica L. Soto,

20  Assistant United States Attorney, the defendant, Patrick

21  Baxter, and his attorney, Natalie Sreca.  It is dated October

22  7, 2004.

23          MS. SOTO:  With that, the United States of America

24  calls Special Agent Bryce Montoya.

25          BRYCE MONTOYA, Sworn

```
 1              COURTROOM CLERK:  Can you please state your name and
 2    spell your last name for the record.
 3              THE WITNESS:  Yes.  My name is Bryce Montoya,
 4    B-r-y-c-e, M-o-n-t-o-y-a.
 5    DIRECT EXAMINATION BY MS. SOTO:
 6    Q.   Good morning.
 7    A.   Good morning.
 8    Q.   What is your highest level of education?
 9    A.   I have a Bachelor of Science degree.
10    Q.   How are you employed?
11    A.   I'm a special agent with the Federal Bureau of
12    Investigation, or FBI.
13    Q.   How long have you served as a special agent with the FBI?
14    A.   Since 2018.
15    Q.   Special Agent Montoya, do you belong to a particular unit
16    at the FBI?
17    A.   Yes.  I'm a member of the FBI Boston Child Exploitation -
18    Human Trafficking Task Force.
19    Q.   How long have you been in that unit?
20    A.   For approximately six years.
21    Q.   What are your primary duties and responsibilities as a
22    member of that unit?
23    A.   I mainly investigate the possession, receipt,
24    distribution, and production of child pornography.
25    Q.   About how many child exploitation cases have you been
```

1    involved in in that role?

2    A.    At least 100.

3    Q.    Were you employed by the FBI prior to your role as a

4    special agent?

5    A.    I was.

6    Q.    What was your position?

7    A.    I was an investigative specialist.

8    Q.    And how long did you serve as an investigative specialist?

9    A.    Approximately four years.

10    Q.    What were your duties in that position?

11    A.    I was assigned to a team that conducted surveillance of

12    national security subjects.

13    Q.    What role did you play in investigation of this case?

14    A.    I was the lead case agent.

15    Q.    What is a lead case agent?

16    A.    Lead case agent is the individual responsible for

17    conducting the investigation and moving the investigation

18    forward.

19    Q.    How did your involvement in this case begin?

20    A.    I received a lead from an FBI headquarters unit.

21    Q.    What was the nature of the lead?

22    A.    The lead stated that a specific IP address in Melrose,

23    Massachusetts was attempting to download child pornography.

24    Q.    And what is an IP address?

25    A.    An IP address is a unique string of numbers.  It

1    identifies specific devices connected to the internet and their

2    locations.

3    Q.    What if any physical address did the lead identify?

4    A.    The lead identified 20 Gooch Street, Melrose,

5    Massachusetts.

6    Q.    You said the lead identified attempts to download child

7    pornography from Freenet.  What is Freenet?

8    A.    Freenet is an internet-based peer-to-peer network.  It

9    allows users to anonymously share files, to chat on message

10   boards, and to access websites within Freenet, which are also

11   known as freesites.

12   Q.    What is a peer-to-peer network?

13   A.    A peer-to-peer network is a network of computers that are

14   connected to each other rather than a centralized server.  So

15   the computers are directly sharing files with other computers

16   without a server intermediary.

17   Q.    And how can users get files on Freenet?

18   A.    Users can get files on Freenet in a few different ways.

19   They can be shared on message boards.  Users can scroll through

20   what are called freesites.  And specifically to obtain child

21   pornography files, users have to identify a key for that file.

22   Q.    What features, if any, may aid users in obscuring their

23   identify on Freenet?

24   A.    So as I explained, if a Freenet user wants to obtain a

25   file, they have to find what is called a key, and that's a

1   unique string of numbers assigned to that file.  Freenet does

2   not work like the traditional internet where, if you want to

3   download a file, you download the entirety of the file from

4   that website.  Instead, Freenet breaks the files into what are

5   called blocks, and those blocks are distributed amongst the

6   network of peers.  So when you want to download a file, Freenet

7   takes pieces of those blocks and assembles it into one file,

8   which obscures the identity of the person requesting the file.

9   Q.   What if anything did you do with the physical address

10  after receiving the lead?

11  A.   I began to conduct surveillance.

12  Q.   What did you observe of the surveillance that you

13  conducted?

14  A.   20 Gooch Street was a single-family home.  It was a

15  multistory home.  I observed two cars at times parked and

16  unoccupied in the driveway of the residence, and I also

17  observed children's toys throughout the driveway and front yard

18  area of the residence.

19  Q.   And at some point after conducting that surveillance did

20  you apply for a search warrant in this case?

21  A.   I did.

22  Q.   Were you the affiant of the search warrant affidavit?

23  A.   Yes, I was.

24  Q.   And what was the search warrant for?

25  A.   For the residence, 20 Gooch Street, Melrose,

1  Massachusetts.

2  Q.    And did a federal magistrate judge issue that search

3  warrant?

4  A.    Yes.

5  Q.    What did you do once it was issued?

6  A.    We executed the search warrant on November 2, 2021.

7  Q.    Approximately what time did you execute the search warrant

8  on November 2, 2021?

9  A.    At approximately 6:00 a.m.

10  Q.    What were you searching for at that residence?

11  A.    Evidence of child pornography, to include evidence of

12  child pornography located on digital devices.

13  Q.    Who was involved with the execution of the search warrant

14  that day?

15  A.    Members of my unit, the FBI Child Exploitation - Human

16  Trafficking Task Force, members of the Melrose Police

17  Department, members of the New England Regional Computer

18  Forensics Laboratory, or RCFL, as well as FBI support

19  personnel, to include a photographer.

20  Q.    Special Agent Montoya, what is the RCFL?

21  A.    The RCFL, which again stands for Regional Computer

22  Forensics Laboratory, is a unit housed in the FBI, and they

23  assist agents and task force officers with the extraction of

24  digital data and the processing of digital data.

25  Q.    And what was the purpose of bringing a member of the RCFL

1    on the search of Mr. Baxter's residence?

2    A.    To make sure all evidence collected was done so in a

3    forensically sound method, as well as to potentially conduct

4    on-site previews of devices located within the residence.

5    Q.    What is an on-site preview?

6    A.    On-site preview is done while executing the search warrant

7    in an attempt to see what is on a device if we are able to open

8    the device and look in it.

9    Q.    Ms. Gelman, please display Exhibit 1.

10        Special Agent Montoya, do you recognize this photo?

11   A.    Yes.

12   Q.    What is it?

13   A.    It's a photograph of the outside of 20 Gooch Street,

14   Melrose, Massachusetts.

15        THE COURT:  Can you hold on, Ms. Soto.  Just for the

16   jurors, the ones in the front row, you have your screens right

17   in front you.  And in the back row, you have screens in the

18   armrests.  Depending on your vision preference, you can look at

19   your little screen or we have a larger screen available that we

20   can move towards you if anyone prefers that.  You can tilt it.

21        Everyone's screen up and running?  Karen is an expert

22   at screens that do not turn on.  Never happened in here before.

23   Go ahead, Ms. Soto.

24        MS. SOTO:  Thank you.

25   BY MS. SOTO:

1    Q.    I'll ask it again, Special Agent.  With respect to Exhibit

2    1, do you recognize this photo?

3    A.    I do.

4    Q.    What is it?

5    A.    It's a photograph of the outside of 20 Gooch Street,

6    Melrose, Massachusetts.

7    Q.    Is this how the residence appeared on November 2, 2021?

8    A.    Yes.

9    Q.    Can you please describe the layout of the residence?

10   A.    Yes.  It was a two-story home with attic space.  There

11   were multiple bedrooms on the second floor and one bathroom on

12   the second floor, and there was one bathroom on the first floor

13   with a kitchen and living room area.

14   Q.    On November 2, 2021 when the search warrant was executed,

15   who was at the residence?

16   A.    Patrick Baxter, his wife Vanessa Baxter, and their two

17   children, F.B., and C.B.

18   Q.    And approximately how old were the Baxter children at that

19   time?

20   A.    F.B. was approximately five years old, and C.B. was

21   approximately three years old.

22   Q.    Did you have any interaction with Patrick Baxter during

23   that day?

24   A.    I did.  I attempted to interview him.

25   Q.    Special Agent Montoya, do you see Patrick Baxter in the

 1  courtroom today?

 2  A.   I do.

 3  Q.   Can you please describe where he is seated and describe an

 4  article of clothing he is wearing.

 5  A.   Yes.  He's seated to my right, wearing a black suit and

 6  striped tie.

 7        MS. SOTO:  Your Honor, may the record reflect that

 8  Special Agent Montoya has identified the defendant Patrick

 9  Baxter?

10        THE COURT:  Any objection?

11        MR. SIMONS:  No, Your Honor.

12        THE COURT:  The record may reflect that the witness

13  has identified Patrick Baxter.

14        MS. SOTO:  Thank you, Your Honor.

15  Q.   Did the defendant remain at the house during the search?

16  A.   Not for the entirety of the search, no.

17  Q.   Where did he go?

18  A.   He stated that he had to go to work.

19  Q.   Were photographs taken during the execution of the search

20  warrant?

21  A.   Yes, there were.

22  Q.   By whom?

23  A.   An FBI photographer.

24  Q.   What was photographed?

25  A.   Entry photographs were taken before the search was

1    commenced.   Photographs were taken as evidence items were

2    located and exit photographs were taken as we left the house.

3    Q.    Have you looked at those photos?

4    A.    I have.

5    Q.    What if anything was seized during the search of the

6    defendant's residence?

7    A.    Eight digital evidence items were seized from the

8    residence.

9    Q.    Ms. Gelman, please display Exhibit 2-1.

10         What is this exhibit?

11   A.    This is evidence marker number one next to something that

12   was seized.

13   Q.    Ms. Gelman, Exhibit 2-2, please.

14         What is this?

15   A.    This shows evidence marker number two next to another item

16   of digital evidence.

17   Q.    Ms. Gelman, can we zoom in on this one.

18         Can you describe the piece of evidence, Special Agent?

19   A.    Yes, that was a Samsung solid state drive, or SSD.

20   Q.    Ms. Gelman, please display Exhibit 2-3.

21         What is this, Special Agent?

22   A.    That's evidence marker number three next to a piece of

23   evidence that was seized.

24   Q.    Was that another piece of electronic evidence?

25   A.    Yes, it was.

1    Q.    Ms. Gelman, please display Exhibit 2-4.

2          What is this?

3    A.    You can see evidence item -- evidence marker number four

4    on a box which contains another piece of digital evidence which

5    was seized.

6    Q.    Ms. Gelman, Exhibit 2-5.

7          What is this?

8    A.    Evidence marker number five next to a MacBook laptop.

9    Q.    Was this device also seized that day?

10   A.    Yes.

11   Q.    Ms. Gelman, Exhibit 2-6.

12         Special Agent, what is this?

13   A.    Evidence marker number six next to a MacBook Air laptop,

14   which was seized on November 2.

15   Q.    Ms. Gelman, please display Exhibit 2-7.

16         What is this?

17   A.    Evidence marker number seven next to an iPhone which was

18   seized that day.

19   Q.    Ms. Gelman, please display Exhibit 2-8.

20         What is this?

21   A.    That's evidence marker number eight next to another iPhone

22   which was seized during the execution of the search warrant.

23   Q.    Was the seizure of those devices that we just reviewed

24   memorialized in any way?

25   A.    Yes.

1    Q.    Ms. Gelman, please display Exhibit 3.

2          What is this, Special Agent Montoya?

3    A.    This is an evidence collected item log that is filled out

4    on-scene while executing the search warrant.

5    Q.    Was this the memorialization that you just referred to?

6    A.    Yes.

7    Q.    What information does this document contain about each

8    device?

9    A.    It states the make and model of the device, if it's

10   available to us, as well as the serial number of the device.

11   It states the location of where those devices were located.

12   And it also provides the names of the individuals who collected

13   that device and the individuals who observed the collection of

14   that device.

15   Q.    Would this document capture all of the items with the

16   evidence markers that we just saw in pictures?

17   A.    Yes.

18   Q.    And do the evidence markers correspond to the numbers on

19   this log in the first column?

20   A.    Yes.

21   Q.    Did law enforcement take any other photos at the

22   defendant's residence on November 2, 2021?

23   A.    Yes.

24   Q.    Ms. Gelman, please display Exhibit 4.

25         What is this?

```
 1   A.   That's a picture of the upstairs bathroom within the

 2   residence.

 3   Q.   And what residence are we referring to here?

 4   A.   20 Gooch Street, Melrose, Massachusetts.

 5   Q.   Ms. Gelman, please display Exhibit 5-1.

 6        What is this, Special Agent?

 7   A.   That's a photograph of F.B.'s bedroom.

 8   Q.   And for the record, can you tell us what is spelled out in

 9   this picture?

10   A.   His name, F.B., is on the wall.

11   Q.   Ms. Gelman, please display Exhibit 5-2.

12        And what is this?

13   A.   This is another image of F.B.'s bedroom just taken from a

14   different angle.

15   Q.   I'd like to return to the devices that were seized from

16   the home.

17             MS. SOTO:  Your Honor, may I approach?

18             THE COURT:  Yes.

19   Q.   Special Agent Montoya, I have placed before you several

20   exhibits.  I'd like to start with Exhibit 7, the MacBook Air

21   laptop.  Do you recognize it?

22   A.   I do.

23   Q.   What is it inside of?

24   A.   The laptop is inside of an evidence bag.

25   Q.   Can you please open that evidence bag.
```

1    A.    Yes.

2    Q.    Please take out the device.

3    A.    Yes.

4    Q.    Ms. Gelman, can we please display Exhibit 2-6.

5         Special Agent Montoya, we just looked at this picture, but

6    I wanted to ask you a few questions about this picture and the

7    device in front of you.  Is the device in front of you that you

8    just took out of the evidence bag the device captured in this

9    photo?

10   A.    Yes, it is.

11   Q.    And how do you know that?

12   A.    Comparing the serial number of the item seized to the

13   item.

14   Q.    Can you please read the serial number on the item?

15   A.    Yes.  FVFXT26EJK7G.

16   Q.    Is the place of manufacture also listed on the device?

17   A.    Yes, it is.

18   Q.    And what is that place?

19   A.    It says "Assembled in China."

20   Q.    Was anything done to this device while agents were in the

21   home on November 2, 2021?

22   A.    Yes.  An on-site preview was conducted of the device.

23   Q.    Was any child pornography found on that device that day?

24   A.    No.

25   Q.    I'd like you now to turn to the Samsung SSD in front of

```
 1   you, Exhibit 6.  What is the Samsung SSD inside of?

 2   A.    It's inside of another evidence bag.

 3   Q.    Okay.  Can you please open that evidence bag.

 4   A.    Yes.

 5   Q.    Ms. Gelman, please display Exhibit 2-2.

 6         Special Agent Montoya, is the device in front of you

 7   captured in this photo, Exhibit 2-2?

 8   A.    Yes.

 9   Q.    And how do you know that?

10   A.    Again, by comparing the serial number.

11   Q.    And you've seen a photo of the serial number of the SSD

12   captured in this photo, correct?

13   A.    Yes.

14   Q.    Can you please read the serial number on Exhibit 6.

15   A.    S5TFNJ0NA08826K.

16   Q.    And does that device identify the place of manufacture?

17   A.    It does not.

18   Q.    Have you done any research on the place of manufacture of

19   the device?

20   A.    Yes.

21   Q.    And what did you learn in that research?

22   A.    My research indicated that Samsung SSDs are manufactured

23   in Korea.

24   Q.    Was anything done to that device while agents were in the

25   home?
```

1    A.    No.

2    Q.    Why not?

3    A.    The device was encrypted.

4    Q.    Did anyone attempt to decrypt the device while at the

5    home?

6    A.    No, not to my knowledge.

7    Q.    And based on your training and experience, what does

8    encrypted mean?

9    A.    Encryption is when data housed within a storage device is

10   scrambled, and in order to unscramble that data, you need a

11   method to decrypt it, often a password or some other type of

12   means of decryption.

13   Q.    And did FBI's work on the encrypted SSD continue after the

14   execution of the search warrant?

15   A.    Yes.

16   Q.    And where was that continued work done?

17   A.    Within our building, FBI Boston, which is located in

18   Chelsea, Massachusetts.

19   Q.    And what was done?

20   A.    First I had checked the item into our FBI evidence control

21   room.  I then made a request again to the New England RCFL to

22   assist in the extraction of all the devices seized at the

23   residence and specifically the decryption of this SSD.

24   Q.    And were the efforts by the RCFL on that device, this SSD,

25   successful?

1   A.   No.

2   Q.   What did you do next with respect to the SSD?

3   A.   In consulting with the RCFL, we made the decision to

4   consult a group located within Quantico, Virginia, a FBI

5   specialized unit which assists with the decryption of locked

6   devices.

7   Q.   And to your knowledge was the unit able to decrypt the

8   SSD?

9   A.   Yes, they were.

10  Q.   And what was done once the SSD's encryption was bypassed?

11  A.   Once they provided the password to myself and members of

12  the RCFL, the RCFL was able to complete the extraction of the

13  SSD and make it available for my review.

14  Q.   What tool, if any, was used during your review of the SSD

15  data?

16  A.   I reviewed it on Magnet Axiom.

17  Q.   What is Magnet Axiom?

18  A.   Axiom is a commonly used tool by law enforcement to review

19  computer or digital devices.

20  Q.   And what does that review tool do with the data?

21  A.   It takes data from computer 1's and 0's unreadable format

22  and it parses that data into a human readable format.

23  Q.   Once that data was in that readable format, what did you

24  observe?

25  A.   I observed that there was two profiles within the SSD, and

1    it appeared it was copies of a MacBook computer.

2    Q.    Did the profiles have names?

3    A.    They did.  One was titled "Baxter," and the other profile

4    was titled "Backup."

5    Q.    And did each profile correspond to a separate account?

6    A.    Yes.

7    Q.    I want to discuss the backup account.  What email if any

8    was associated with that account?

9    A.    The email associated with the account was

10   pwbaxter@gmail.com, and it was listed as the Apple ID for that

11   backup account.

12   Q.    And what is an Apple ID?

13   A.    Apple products typically request that users register those

14   products or assign those products with an Apple ID, commonly an

15   email address, that can link your products together with your

16   Apple account.

17   Q.    And did you see that email, pwbaxter@gmail.com, on any

18   other devices from the home on November 2, 2021?

19   A.    Yes.  The Apple ID of the cell phone received from Patrick

20   Baxter was pwbaxter@gmailcom.

21   Q.    Did you at any point take any investigative steps relevant

22   to that email address?

23   A.    Yes.  A subpoena was submitted to Google.

24   Q.    And did Google respond to that subpoena?

25   A.    They did.

1    Q.    Ms. Gelman, can we display Exhibit 28.

2         Special Agent Montoya, what is this document?

3    A.    This is the return, Google subpoena return.

4    Q.    And what does this document tell us that's relevant to

5    this case?

6    A.    It states the subscriber name was Patrick Baxter.  It

7    again states the email address pwbaxter@gmail.com, and it

8    provides a recovery phone number.

9    Q.    Ms. Gelman, can we zoom in on the top part of that

10   document.

11        Is this the information you just referred to, Special

12   Agent?

13   A.    Yes.

14   Q.    And by the way, do you know the defendant's middle

15   initial?

16   A.    Yes, W.

17   Q.    With respect to search history on the Backup account on

18   the encrypted SSD, what did you observe?

19   A.    Within search history, I observed searches for an

20   elementary school in Melrose, Massachusetts, where at least one

21   of Mr. Baxter's children attended school.  I observed searches

22   related to Freenet, and I also observed searches related to

23   something called the AliExpress Flying Train Store.

24   Q.    Was there any information relevant to email?

25   A.    Yes.  I observed multiple searches within the browser

1    history for an email, an Outlook email address with a display

2    name of "Baxter, Patrick."

3    Q.    You just referred to AliExpress Flying Train Store.  What

4    is AliExpress?

5    A.    AliExpress is an online marketplace, similar to Amazon,

6    but it's based overseas out of China, I believe.

7    Q.    And what is Flying Train Store?

8    A.    Based on my open source research, it appears that the

9    AliExpress Flying Train Store is a marketplace that sells

10   lingerie, to include thongs, in children's sizes.

11   Q.    Were any applications installed on the Backup account?

12   A.    Yes.  Freenet was listed as an installed application

13   within the Mac OS or operating system.

14   Q.    And was there any evidence of Freenet activity on the

15   account?

16   A.    Yes.  Freenet was listed as a favorited bookmark within

17   Safari.  There are hundreds of messages of Frost messaging

18   board messages, and there was also a text file titled, "Read

19   Me," which outlined the installation instructions for Freenet.

20   Q.    And you referred to Frost.  What is Frost?

21   A.    Frost is Freenet's messaging board system.

22   Q.    What type of information -- what type of information do

23   users share on Frost?

24   A.    Users can share keys for child pornography.  Users can

25   communicate with each other on Frost, and users can recommend

1    freesites dedicated to child pornography on Frost.

2    Q.    Did you find any videos on the Backup account of the

3    encrypted SSD?

4    A.    Yes.

5    Q.    About how many?

6    A.    Over 620 videos total.

7    Q.    And did you watch all of those videos?

8    A.    I watched at least a portion of each of those videos.

9    Q.    Was there anything specifically you were looking for in

10   those videos?

11   A.    Yes.  I was looking for child pornography.

12   Q.    What was the nature of those videos?

13   A.    I'm sorry, of which videos?

14   Q.    You reviewed to 620 videos.

15   A.    Yes.

16   Q.    Did you identify any child pornography in those videos?

17   A.    I did.

18   Q.    And what was the nature of those videos in which you

19   identified child pornography?

20   A.    I observed videos of adult men engaging in oral, anal, and

21   vaginal sex with mostly female minor children.  I observed

22   videos of female children masturbating.  I also observed videos

23   of female children having sex with other children.

24   Q.    Were all the children in the videos engaged in sexual

25   activity?

1  A.    Yes, or displaying their genitals to the camera.

2  Q.    What was the age range of the children in those videos?

3  A.    Approximately five to 15 years old.

4  Q.    Were they wearing clothing?

5  A.    In some of the videos the children began the video clothed

6  and ended either nude or partially nude in the videos, and in

7  other videos the children were either fully nude or partially

8  nude throughout the video.

9  Q.    Sorry if I've already asked this, but about how many of

10  the over 600 videos did you determine contained child

11  pornography?

12  A.    Over 420.

13  Q.    And could you tell where the files, those videos of child

14  pornography were located?

15  A.    Yes, based on the file paths.

16  Q.    What is a file path?

17  A.    A file path allows you to see where a file is stored on a

18  computer.

19  Q.    And what was the file path information for the child

20  pornography files that you identified?

21  A.    I identified multiple file folders, the names of which

22  were PTHC, PTSC, cam whores, spy cams, as well as

23  Freenet/downloads.

24  Q.    And what did PTHC stand for?

25  A.    Based on my training and experience, it stands for preteen

1    hardcore.

2    Q.    And what does PTSC stand for?

3    A.    Again, based on my training and experience, it stands for

4    preteen soft core.

5    Q.    Ms. Gelman, I'm going to now ask you to change computers.

6    I'm also going to ask madam clerk if we can turn the screens

7    away from the gallery.

8         THE COURT:  So the jury understands we're doing this.

9    They're going to show some snippets of the pornography, and

10   it's going to be shown just to the jury and the people on this

11   side of what we call the bar, which is the thing that runs

12   across.  So the studio audience is not going to be able to see

13   it.  So we're turning down the screens and turning around the

14   big ones just to limit -- just so you and the court personnel

15   and the witness can see what's on the screen.

16        MS. SOTO:  Thank you, Your Honor.  May I proceed?

17        THE COURT:  You may.

18   Q.    Special Agent Montoya, there is a thumb drive in front of

19   you, correct?

20   A.    Yes.

21   Q.    Have you had an opportunity to review the exhibits on that

22   thumb drive?

23   A.    Yes, I have.

24   Q.    And what are the exhibits on that thumb drive?

25   A.    This is the child pornography which was located on the

1    SSD.

2    Q.    Ms. Gelman, please display Exhibit 18.

3            THE COURT:  It's not being displayed.

4            MS. SOTO:  Right.  Apologies.  Okay.  It's on the

5    flash drive.  Could I have one moment, Your Honor?

6            THE COURT:  Of course.

7            MS. SOTO:  I'm going to take back that flash drive.

8    Special Agent, members of the jury, can you see something on

9    your screen?  Yes?  Great.

10   Q.    Special Agent, do you recognize Exhibit 18?

11   A.    Yes.

12   Q.    What is it?

13   A.    This is the over 420 videos that I tagged as potential

14   child pornography.

15   Q.    And have you previously prepared descriptions of some of

16   the 400 videos?

17   A.    Yes, I have.

18           MS. SOTO:  May I approach, Your Honor?

19           THE COURT:  Yes.

20           MS. SOTO:  Thank you.

21           THE WITNESS:  Thank you.

22   Q.    Special Agent Montoya, do you see that document with the

23   descriptions before you?

24   A.    Yes.

25   Q.    And we've marked those descriptions as A for ID purposes.

 1          Those descriptions were shared with defense counsel,

 2     correct?

 3     A.   Yes.

 4     Q.   Okay.  And I'll return to them in one minute.  You

 5     mentioned the Freenet/downloads file path on the encrypted SSD.

 6     Did you review files with the Freenet/downloads file path?

 7     A.   Yes.

 8     Q.   About how many child pornography files were in that file

 9     path?

10     A.   Over 90.

11          MS. SOTO:  Now I'd like to discuss three videos in

12     that file path.  With the court's permission, I'm going to ask

13     the witness to read the descriptions agreed upon by the parties

14     that the witness has before him and I referred to a minute ago.

15          THE COURT:  Yes, that's fine.  Any objection from the

16     defense?

17          MR. SIMONS:  No, Your Honor.

18          THE COURT:  That's fine.  Go ahead.

19     Q.   Special Agent Montoya, can you please describe the first

20     video on your list identified in the Freenet file path on the

21     SSD.

22     A.   Yes.  This video is titled "Tara 8yr-vibrator and slams

23     fingers into pussy, awesome vid-July22,2007.wmv."

24          This video is approximately five minutes and 57 seconds

25     long.  This video depicts a prepubescent female child who,

1    based upon the size of her body and lack of body development,

2    appears to be approximately seven to ten years old.  She could

3    be seen sitting on a chair/couch fully nude.  The child is

4    wearing a purple and green mask over her face.  The child can

5    be observed manipulating a sex toy into her vagina and is

6    observed digitally penetrating her vagina.

7    Q.    Ms. Gelman, please play Exhibit 19.

8          (Video played.)

9    Q.    Special Agent Montoya, was that the first video you just

10   described?

11   A.    Yes.

12   Q.    Can you please describe the second video on your list.

13   A.    Yes.  This video is titled "vid_20200509_063009.mkv."

14   This video is approximately five minutes and 18 seconds long.

15   This video depicts a prepubescent child who, based upon the

16   size of her body, her facial features and slight pubic hair

17   around her genitals, appears to be approximately 11 to 13 years

18   old.  She can be observed lying on her back nude from the waist

19   down.  Adult male, whose face cannot be observed, can be seen

20   inserting his penis into the child's vagina.  The male can be

21   observed at one point applying lubricant to his penis.

22          MS. SOTO:  Ms. Gelman, please play Exhibit 20.

23          (Video played.)

24   Q.    Was that a clip from the second video you described?

25   A.    Yes.

1   Q.   Can you please describe the third video on your list

2   identified in the Freenet file path.

3   A.   Yes.  This video is titled

4   "video-33E5E3ECEB2B64664A4B9B44BEA27180-vmp4." This video is

5   approximately 34 seconds long.  This video depicts a

6   prepubescent female child who, based upon the size of her body

7   and lack of body development, appears to be approximately six

8   to eight years old.  She could be seen sitting on the ground

9   with her back up against the couch.  The child is fully nude

10  with her genitals exposed.  A fully nude adult male is standing

11  above the child and can be observed thrusting his penis into

12  the child's mouth.

13          MS. SOTO:  Ms. Gelman, please play Exhibit 21.

14          (Video played.)

15  Q.   Was that a clip from the third video you described?

16  A.   Yes.

17  Q.   Were there other child pornography videos outside the

18  Freenet file path found on the encrypted SSD?

19  A.   Yes, there were.

20  Q.   Now, I'd like to discuss three other videos that were

21  found outside of the Freenet path.  Did you also prepare

22  descriptions of those videos that you'll read to the jury?

23  A.   Yes.

24  Q.   Can you please read the first description or the fourth

25  video on your list.

1    A.    Yes.  This video is titled "BDSM01.mp4."  This video is

2    approximately 45 minutes and 32 seconds long.  This video

3    depict a prepubescent female child who, based upon lack of body

4    development and facial features, appears to be approximately

5    ten to 13 years old.  The child begins the video in a white

6    dress with her hands bound.  The child is then completely nude

7    throughout the video.  Another individual in a grim reaper

8    costume, whose face cannot be seen, is also present throughout

9    the video.  Throughout the video the child is bound in various

10   positions and is whipped in the buttocks, has clothespins

11   placed on her genitals and nipples and has the non-lit end of a

12   lit candle inserted into her anus.

13          MS. SOTO:  Ms. Gelman, please play Exhibit 22.

14          (Video played.)

15   Q.    Special Agent Montoya, were those two clips from a video

16   that you just described?

17   A.    Yes.

18   Q.    Can you describe the next video on your list.

19   A.    This video is titled "fuck_pussy_11yrs_girl.mp4."  This

20   video is approximately 54 seconds long.  This video depicts a

21   prepubescent female child whose face cannot be seen.  Based

22   upon lack of body development and the size of the child, the

23   child appears to be approximately nine to 11 years old.  The

24   child can be seen laying on her back and is nude from the belly

25   button down.  The child appears to be wearing a shirt covering

1   her chest.  An adult male whose face cannot be seen is

2   inserting his penis into the girl's vagina throughout the

3   video.

4          MS. SOTO:  Ms. Gelman, please play Exhibit 23.

5          (Video played.)

6   Q.   Was that a clip from the video you just described?

7   A.   Yes.

8   Q.   Please describe the final video on your list.

9   A.   This video is titled

10  "polarlights-vika-madras(chennai).avi."  This video is

11  approximately five minutes and 12 seconds long.  This video

12  depicts a prepubescent female child who, based upon facial

13  features, which include two missing front teeth, lack of body

14  development and body size appears to be approximately five to

15  nine years old.  She is fully nude in the video.  The child can

16  be seen performing oral sex on a male whose face cannot be

17  seen.  The adult male can be seen inserting his penis into the

18  child's vagina.

19         MS. SOTO:  Ms. Gelman, please play Exhibit 24.

20         (Video played.)

21  Q.   Was that a clip of the video you just described?

22  A.   Yes.

23  Q.   At any point in the investigation, did law enforcement

24  identify on the SSD videos taken at the Baxter residence?

25  A.   Yes.

1    Q.    And how did you know they were taken at the Baxter

2    residence?

3    A.    Based upon GPS data that was embedded within the videos.

4    Q.    Was there any other data embedded in the videos?

5    A.    Yes.  The make and model of the phone used to take the

6    videos as well as date and timestamp information of when the

7    videos were taken.

8    Q.    And what were the date stamps?

9    A.    July 11, 2019.

10    Q.    And what was the make and model of the phone?

11    A.    The videos were shot with an iPhone XS.

12    Q.    Ms. Gelman, can we please play Exhibit 25-1.

13            (Video played.)

14            MS. SOTO:  Is it up on the big one?

15            COURTROOM CLERK:  It is.

16            MS. SOTO:  Is the sound on?

17            COURTROOM CLERK:  The sound is on, yes.

18            (Video played.)

19    Q.    What do you recognize this to be, Special Agent Montoya?

20    A.    This is a video shot within the Baxter residence depicting

21    three children running around.

22    Q.    And are the children clothed?

23    A.    They're nude.

24    Q.    And how do you recognize the location of this video?

25    A.    In comparison with search warrant photographs that were

1    taken on November 2, 2021, as well as, again, from the GPS data

2    that showed that the video was taken in or around 20 Gooch

3    Street, Melrose, Massachusetts.

4    Q.    And do you recognize the adult voice in this video?

5    A.    I do.

6    Q.    Who do you recognize it to be of?

7    A.    Patrick Baxter.

8    Q.    And how do you know that?

9    A.    In comparing it with previous conversations that I've had

10   with Mr. Baxter.

11   Q.    And who is Mr. Baxter addressing in this video?

12   A.    He's addressing F.B., who you can briefly see in the

13   video.

14   Q.    When he's addressing F.B., do you see F.B. in the video?

15   A.    Briefly, yes.

16   Q.    Did you discuss these videos with any civilian during this

17   investigation?

18   A.    Yes, I did.  I discussed it with Vanessa Baxter.

19   Q.    And what was the purpose of that discussion?

20   A.    I showed her screenshots of the children's faces in order

21   to identify the three children in the video.

22   Q.    Ms. Gelman, can we please show Exhibit 25-2.

23         Special Agent Montoya, do you recognize the child in this

24   video still?

25   A.    Yes.  It's A.F.

1    Q.    I should have clarified.  Is this a still of the video

2    that we just watched?

3    A.    Yes.

4    Q.    What is A.F.'s relationship to the defendant?

5    A.    She is Patrick Baxter's ███.

6    Q.    And the other children in the video, can you identify them

7    again?

8    A.    Yes.  F.B., who is Patrick Baxter's son, and M.F. ███,

9    who is Patrick Baxter's ███.

10   Q.    You referred to finding videos.  So is there another video

11   that you found that was recorded at the Baxter residence?

12   A.    Yes, there is.

13   Q.    Ms. Gelman, can we please play Exhibit 25-3.

14         (Video played.)

15   Q.    Is this the other video you were referring to?

16   A.    Yes.

17   Q.    And do you recognize the location of this video?

18   A.    Yes.  Again, it was taken in F.B.'s bedroom.

19   Q.    Do you recognize the adult voice in this video?

20   A.    Yes, I do.  Again, it's Patrick Baxter.

21   Q.    Do you recognize the child in this video?

22   A.    Yes.  That's A.F.

23   Q.    Is she the only child in the video?

24   A.    Yes.

25   Q.    Did you hear the defendant refer to another child in the

1    video?

2    A.    Yes.  I hear him talking to M.F. ███████.

3    Q.    Is M.F. in the video?

4    A.    He is not.

5    Q.    At the point in the investigation when these videos were

6    identified, had you seen any other files featuring these

7    children on the SSD?

8    A.    I had not.

9    Q.    And did there come a point when law enforcement identified

10   images of ████████████████ A.F. on the SSD?

11   A.    Yes.

12   Q.    Was there any data associated with those images?

13   A.    Yes, there was.  Again, the make and model of the phone,

14   date and timestamp information and GPS information.

15   Q.    And what was the GPS information?

16   A.    The GPS information resolved to the vicinity of 20 Gooch

17   Street, Melrose, Massachusetts.

18   Q.    And the make and model of phone?

19   A.    All the images were taken with an iPhone XS.

20   Q.    And the date stamps?

21   A.    They were taken across two days, July 3, 2019 and July 4,

22   2019.

23   Q.    I'd like to review the images taken on July 3, 2019.

24         Ms. Gelman, can we please play 26-1.

25         Special Agent Montoya, is this one of the images taken on

1  July 3, 2019?

2  A.   Yes.

3  Q.   And do you recognize where it was taken?

4  A.   Yes.  That's the bathroom in the upstairs of the Baxter

5  residence.

6  Q.   And for the record, can you please describe what this

7  picture or image depicts.

8  A.   Yes.  It's a female child exiting the bathroom.  She

9  appears to have a shirt covering her face, and her vagina is

10  exposed.

11  Q.   Ms. Gelman, can we please display 26-2.

12       Is this another July 3, 2019 photo?

13  A.   Yes.

14  Q.   Do you recognize the room?

15  A.   Yes.  Again, it's the bathroom on the second floor of the

16  Baxter residence.

17  Q.   And for the record, can you please briefly describe what

18  this picture depicts.

19  A.   Yes.  This picture is a closer view of the same child

20  exiting the bathroom with her vagina exposed.

21  Q.   I'd now like to review the images taken on July 4, 2019.

22       Ms. Gelman, please display Exhibit 27-1.

23       Is this one of the images that metadata indicated was

24  taken on July 4, 2019?

25  A.   Yes.

1    Q.    And do you recognize the room?

2    A.    Yes.   This is F.B.'s room.

3    Q.    And for the record, please describe what this image

4    depicts.

5    A.    This image depicts a female child standing on a bed with

6    her leg up, wearing a pink shirt, exposing her vagina.

7    Q.    Ms. Gelman, Exhibit 27-2.

8          Another one from July 4, 2019?

9    A.    Yes.

10   Q.    For the record, please describe what this image depicts.

11   A.    Again, this depicts a prepubescent female child standing

12   on a bed, her leg appears to be kicked up, and she's wearing a

13   pink shirt.

14   Q.    Exhibit 27-3.

15         For the record, please describe the image in front of you.

16   A.    This is another image of the prepubescent female child

17   standing on a bed with her leg up, exposing her vagina.   She's

18   wearing a pink shirt.

19   Q.    Exhibit 27-4, Ms. Gelman.

20         For the record, do you see the child's face in this image?

21   A.    Yes.

22   Q.    And do you recognize this child, Special Agent Montoya?

23   A.    Yes.   That's A.F., wearing a pink shirt.

24   Q.    Can you please briefly describe the image.

25   A.    Yes.   A.F. is on the bed wearing a pink shirt with no

1   pants on and socks.  And in the background near the doorway of

2   the image you can see another child.

3   Q.   And have you been able to identify the other child in this

4   picture?

5   A.   Yes.  M.F. ██████, ████████.

6   Q.   Ms. Gelman, Exhibit 27-5.

7        For the record, please briefly describe this image.

8   A.   This is another picture of A.F. sitting on the bed wearing

9   a pink shirt with no pants on.

10  Q.   27-6.

11       Please describe the image.

12  A.   Picture of A.F. wearing a pink shirt, with no pants on,

13  with her leg up, exposing her vagina.

14  Q.   Exhibit 28-7, please.  I'm sorry.  Can you please show

15  Exhibit 27-7.

16       Can you please describe the image.

17  A.   It's an image of a prepubescent female child wearing a

18  pink shirt, on her knees with no pants on, exposing her vagina.

19  Q.   Ms. Gelman, please show Exhibit 27-8.

20       Please describe this image.

21  A.   This is an image of a prepubescent female child on a bed

22  on her knees, wearing a pink shirt with no pants on, exposing

23  her vagina.

24  Q.   Ms. Gelman, Exhibit 27-9.

25       For the record, please describe.

1   A.   A video of a female prepubescent female child on a bed on

2   her knees, wearing a pink shirt, with her vagina exposed.

3   Q.   You said "video" of the child.

4   A.   I'm sorry.  An image.

5   Q.   Thank you.  Ms. Gelman, Exhibit 27-10.

6        Please describe this image for the record.

7   A.   This is an image of prepubescent female child in a pink

8   shirt.  The image appears to be taken up.  She's not wearing

9   any pants and is exposing her vagina, and in the back of the

10  image, on the wall, you can see the letters "GAN."

11  Q.   Ms. Gelman, Exhibit 27-11.

12       For the record, please describe.

13  A.   This is a prepubescent female child with a pink shirt on,

14  not wearing any pants, exposing her vagina.  And again in the

15  background of the wall you can see "GAN," the letters "GAN."

16  Q.   27-12, Ms. Gelman.

17       For the record, please describe the image.

18  A.   A prepubescent female child wearing a pink shirt with no

19  pants on, exposing her vagina.  And you can partially see the

20  letters "GAN" on the wall behind her.

21  Q.   Ms. Gelman, Exhibit 27-13.

22       For the record, can you please describe that.

23  A.   A prepubescent female child wearing a pink shirt with no

24  pants on, exposing her vagina, and you can see the partial

25  letters "G" and "A" on the wall behind her.

1  Q.   Ms. Gelman, 27-14.

2       For the record, please describe the image.

3  A.   A prepubescent female child wearing a pink shirt with no

4  pants on, exposing her vagina, and you can see the letters "G"

5  and "A" on the wall behind her.

6  Q.   Exhibit 27-15, please.

7       For the record, please describe.

8  A.   Prepubescent female child wearing a pink shirt with no

9  pants on.  Her vagina is exposed.  And on the wall behind her

10 you can partially see the letters "EGA."

11 Q.   Ms. Gelman, Exhibit 27-16.

12      For the record, please describe.

13 A.   Prepubescent female child with a pink shirt on, no pants,

14 exposing her vagina.  And on the wall behind her you can see

15 the letters "NEGAN."

16      MS. SOTO:  I'm going to ask Ms. Gelman to switch back

17 to the other computer.  Madam Clerk, we can turn the screens of

18 the gallery and the parties.

19      THE COURT:  If you guys want to stand up and stretch,

20 move around a little while they're moving the equipment around,

21 go ahead.  You're free to move about the cabin.

22 BY MS. SOTO:

23 Q.   Special Agent Montoya, were any photos of A.F. fully

24 clothed identified on the SSD in the Backup account?

25 A.   Yes.

1    Q.   Can you please describe them briefly.

2    A.   One image is of A.F., just A.F.'s face, and there's

3    another image of A.F. with Mr. Baxter's daughter.

4    Q.   And was there data relevant to the images that you

5    identified?

6    A.   Yes, there was.

7    Q.   And what did that data indicate?

8    A.   The data indicated that the photos were taken with an

9    iPhone XS and provided the GPS location coordinates for where

10   those photographs were taken as well as date and timestamp

11   information.

12   Q.   And what was the GPS information?

13   A.   The pictures appear to have been taken in or around the

14   vicinity of 20 Gooch Street, Melrose, Massachusetts.

15   Q.   And in terms of date, what was the month and year?

16   A.   July of 2019.

17   Q.   Ms. Gelman, can we please show Exhibit 16-1.

18        Is this one of the images you were referring to, Special

19   Agent Montoya?

20   A.   Yes.

21   Q.   And what is it?

22   A.   It's an image of A.F.

23   Q.   And is she clothed in this image?

24   A.   She is.

25   Q.   Ms. Gelman, Exhibit 16-2, please.

1          Is this another of the images you were referring to?

2    A.    Yes.

3    Q.    And what does it show?

4    A.    It shows A.F. next to ▮▮▮▮

5    Q.    Was there any data identified regarding the device used to

6    take this photo?

7    A.    Yes.  This photo was taken with an iPhone XS.

8    Q.    That's the same make and model that took the other child

9    pornography images of A.F., correct?

10   A.    Yes.

11   Q.    Is the iPhone manufactured outside of Massachusetts?

12   A.    Yes.

13   Q.    Did you locate an iPhone XS during the search warrant

14   execution at the defendant's residence in November 2021?

15   A.    No.

16   Q.    Did you seek information relevant to an iPhone XS device

17   as part of the investigation?

18   A.    Yes.  The subpoena was submitted to Apple for device

19   history.

20   Q.    And did Apple respond to that subpoena?

21   A.    They did.

22   Q.    Ms. Gelman, Exhibit 29, please.

23         What is this exhibit?

24   A.    This is the subpoena return from Apple.

25   Q.    How do you recognize it?

1    A.    I'm sorry?

2    Q.    How do you recognize it?

3    A.    I've seen it before.

4    Q.    Okay.  Ms. Gelman, can we please go to the first sheet and

5    highlight row 23 or zoom into it.  Highlighting is even better.

6         Special Agent Montoya, what relevant information, if any,

7    does this row contain to this investigation?

8    A.    If you could scroll to the right.  I believe it's the row

9    below the highlighted row, but yeah.

10   Q.    Sorry.  So you're saying that the relevant row is row 24?

11   A.    Yes.

12   Q.    Thank you.  Ms. Gelman, can we highlight row 24.  Thank

13   you.

14        And going over to column F, Special Agent, what relevant

15   information is in column F?

16   A.    Column F shows a purchase date of December 23, 2018.

17   Q.    And does this indicate what was purchased on that date?

18   A.    Yes.  If you look at column G, it indicates that an iPhone

19   XS in space gray was purchased on that date.

20   Q.    Okay.  And do we know the customer that purchased the

21   iPhone XS on that date?

22   A.    Yes.  If you could scroll to the right a little bit more,

23   it lists the customer name as Patrick Baxter, and if you keep

24   going, it lists the email address of pwbaxter@gmail.com.

25   Q.    Any other relevant information in this document?

1    A.    Yes.  If you scroll right, it lists the customer address

2    in columns P, Q, and R.

3    Q.    What's the customer address?

4    A.    20 Gooch Street, Melrose, Massachusetts.

5    Q.    And you said the relevant date here is December 13, 2023

6    -- sorry -- December 23.

7    A.    The relevant -- the purchase date was December 23 of 2018.

8    Q.    Thank you.  The purchase date was December 23, 2018.  And

9    that's before the child pornography pictures were taken of

10   A.F., correct?

11   A.    Yes.  Those pictures were taken in July of 2019, and this

12   phone was purchased in December of 2018.

13          MS. SOTO:  Thank you.  Your Honor, if I may have a

14   moment to confer with my co-counsel.

15          THE COURT:  Yes.

16          MS. SOTO:  Thank you.

17          No further questions for this witness from the United

18   States.  Thank you.

19          THE COURT:  Cross.

20          MR. SIMONS:  Thank you.

21   CROSS-EXAMINATION BY MR. SIMONS:

22   Q.    Good morning.

23   A.    Good morning.

24   Q.    Special Agent Montoya, you mentioned that you had gotten a

25   lead about activity on Freenet related to child pornography.

1    A.    Yes.

2    Q.    Who did you get that lead from?

3    A.    The Child Exploitation Operational Unit, which is a

4    headquarters-based unit of the FBI.

5    Q.    And was there a specific person you can identify who

6    provided you that information?

7    A.    Yes.    Task Force Officer Michael Hockwater I believe was

8    his name.

9    Q.    Is that somebody that you worked with prior to this

10   investigation?

11   A.    I've received multiple leads from him.

12   Q.    Okay.    And once you got the lead, did you continue to work

13   with him?

14   A.    I did not.

15   Q.    You mentioned that you were the lead, I think the lead

16   case agent.    Is that the wording you used?

17   A.    Yes.

18   Q.    And so does that mean you get to coordinate the

19   investigation, you decide what to look into, you decide what to

20   delegate and so on?

21   A.    Correct.

22   Q.    Okay.    How many other agents were working with you on this

23   investigation?

24   A.    Mostly myself.    Other agents assisted with the search

25   warrant or things like that, but I was mostly conducting the

1   investigation.

2   Q.   Did you personally observe anything on Freenet itself

3   prior to conducting the search warrant?

4   A.   I'm sorry, can you repeat.

5   Q.   Sure.  Did you observe any activity on Freenet prior to

6   executing the search warrant?

7   A.   I have observed Freenet in my training prior to executing

8   the search warrant, yes.

9   Q.   But with regard to this specific investigation, did you

10  personally observe any activity that was attributed to the IP

11  address that was later found out to be Patrick Baxter's?

12  A.   I personally did not.

13  Q.   Okay.  So you didn't see any activity that you would

14  allege to have been associated with that IP address yourself

15  prior to executing the search warrant?

16  A.   I received a lead, which stated that files of child

17  pornography had attempted to be downloaded from that IP address

18  from Freenet.

19  Q.   But that's from somebody else.  You did see anything like

20  that?

21  A.   Correct.

22  Q.   Okay.  And how long was the surveillance that you

23  conducted personally before you executed the search warrant?

24  A.   A few days total of surveillance.  I can't remember

25  exactly how many.

```
 1   Q.   Did that entail going personally outside of the home and
 2   looking at who goes in and who goes out?
 3   A.   Yes.  Mostly it entailed driving by the residence to see
 4   what vehicles were there and what I could observe.
 5   Q.   And typically were the same two vehicles there?
 6   A.   Yes.
 7   Q.   How long would you have been at the location -- strike
 8   that.  Did you ever stop at the location to observe rather than
 9   just driving by?
10   A.   Yes.
11   Q.   How many times?
12   A.   I don't recall.  More than once.
13   Q.   All right.  And do you know how long you would have
14   stopped for at any given time?
15   A.   Approximately a few hours.
16   Q.   And what would you do during that time period?
17   A.   I would try to observe the residence to see who was coming
18   and going from the residence.
19   Q.   By yourself or with anybody else?
20   A.   By myself.
21   Q.   All right.  So when the time came to execute the search
22   warrant, you mentioned that you brought along somebody from the
23   RCFL?
24   A.   Yes.
25   Q.   And it wasn't just the two of you, right; there were other
```

1   agents?

2   A.   Yes.

3   Q.   In fact, there were somewhere in the neighborhood of 21

4   either agents or law enforcement officers that went into the

5   home?

6   A.   That sounds correct.

7   Q.   Okay.  Again, at that time, too, you were the one

8   coordinating and leading the search of the home?

9   A.   Yes.

10  Q.   Did you also participate personally in the search of the

11  home?

12  A.   Yes.

13  Q.   And did you come upon any materials of interest, any

14  devices of interest?

15  A.   I personally did not.

16  Q.   Okay.  So you relied on what was found by some of your

17  fellow officers?

18  A.   Yes.

19  Q.   All right.  And the drive that we're talking about, the

20  one drive with the alleged child pornography, that's the SSD

21  drive?

22  A.   Yes.

23  Q.   And SSD, I think you might have explained it, but that's

24  solid state drive.  Is that right?

25  A.   Yes.

1   Q.   And that drive, I think it was shown on Exhibit 2-2, that

2   was just out in the open, right?  That was in the living room?

3   A.   Yes, on a coffee table.

4   Q.   Okay.  In between what appeared to be two seats?

5   A.   Yes.

6   Q.   And computers were out in the open as well, right?

7   A.   Yes.

8   Q.   Was there any sort of device that you found at all in the

9   Baxter residence that was hidden away?

10  A.   No, I wouldn't describe devices as hidden away.  There was

11  devices within drawers or boxes, but they were within the

12  residence.

13  Q.   Okay.  Nothing stored in an unusual place that would

14  suggest that somebody was trying to hide it?

15  A.   No.

16  Q.   Okay.  How many MacBooks all together were found in the

17  residence?

18  A.   Two.

19  Q.   Two.  And there's one that you were referring to, it seems

20  like over and over, because there was a backup of that laptop

21  to the hard drive.

22  A.   There was a -- there was a connection between the SSD and

23  the MacBook Air and what appeared to be a backup of what was on

24  the MacBook Air onto the SSD.

25  Q.   Just the MacBook Air as far as you could tell?

1    A.    Yes.

2    Q.    The other MacBook it did not appear had been connected

3    with the SSD?

4    A.    As far as we could tell, no.

5    Q.    Did you go into that other MacBook, not the Air but the

6    other one that hadn't been connected?

7    A.    Yes.

8    Q.    Did you personally look at or look into those other

9    devices, all eight devices?

10   A.    All eight devices were extracted, and I reviewed those

11   devices.

12   Q.    Were they all taken from the home?

13   A.    Yes.

14   Q.    All right.  They were all initially screened -- I forget

15   the term you used, but some sort of a preview was done at the

16   home of everything but the SSD?

17   A.    An on-site preview was conducted for devices which we

18   could get could get into on-scene.  I believe the phone seized

19   from Mr. Baxter's phone was not on-site previewed.

20   Q.    Okay.  The phone was later checked, though, somewhere

21   else, at the FBI headquarters or somewhere, right?

22   A.    Yes.

23   Q.    Okay.  Was there anything on the phone that to you

24   appeared to be child pornography?

25   A.    No.

1    Q.    Okay.  Not even from the photographs or videos that you

2    allege to be Mr. Baxter's ██████?

3    A.    Not that I can recall observing on the phone.

4    Q.    And do you remember what type of phone that Mr. Baxter had

5    when you seized it?

6    A.    I don't recall.  It was an iPhone.

7    Q.    Do you recall whether it was the same iPhone that you

8    allege took those photographs?

9    A.    It was not an iPhone XS.

10   Q.    Okay.  I understand.  With regard to the MacBook Air,

11   there were two different profiles.  Is that right?

12   A.    Yes.

13   Q.    Okay.  One of them being Patrick, one of them being

14   Vanessa?

15   A.    Yeah.

16   Q.    At some point during the execution of the search warrant

17   you had an opportunity to talk to Vanessa, right?

18   A.    I'm sorry.  Say that again.

19   Q.    Did you have an opportunity to talk to Vanessa Baxter

20   during the execution of the search warrant?

21   A.    I personally -- yes, I did, yes.

22   Q.    And perhaps fellow agents?

23   A.    Yes.

24   Q.    And maybe she was interviewed by a couple of your fellow

25   colleagues, right?

1    A.    Yes.

2    Q.    Did you become aware that Mrs. Baxter provided the

3    passwords for both of those profiles?

4    A.    Yes.

5    Q.    Okay.  Did you also become aware that she informed either

6    you or your colleagues that both Mr. and Mrs. Baxter could

7    access each other's phone with their faces?

8    A.    Yes.

9    Q.    Okay.  Now, with regard to the profiles on the SSD, I may

10   have misunderstood, but there were also two profiles on that,

11   right?

12   A.    Correct.

13   Q.    And one being called "Baxter" and one being called

14   "Backup"?

15   A.    Yes.

16   Q.    When you were describing what was found on those, the

17   files that you found relative to alleged child pornography,

18   were they on both of those profiles or just one of them?

19   A.    They were observed within the Backup profile.

20   Q.    In the Backup, okay.  So with regard to the Backup, that's

21   where you find also backups of the MacBook air?

22   A.    The Backup profile was a backup of the MacBook Air, but

23   the profile name was "Backup."

24   Q.    Okay.  What about "Baxter," what was on there?

25   A.    Again, it appeared to be a backup of the profile "Baxter."

1    Q.    Okay.  So they were both backups as far as you could tell?

2    A.    As far as I could tell, what was on the SSD was backups of

3    something that had been on a MacBook computer.

4    Q.    Other than allegedly finding this child pornography on the

5    Backup, was there any other differences between the Baxter and

6    the Backup profiles on the SSD?

7    A.    The Backup profile appeared to have a little more data.  I

8    would say the majority of the data was from the Backup profile.

9    Q.    And could you tell how frequently, for example, the

10   MacBook Air was backed up to the SSD for either profile?

11   A.    You could observe device connection history, meaning when

12   the SSD was connected to the MacBook Air.  I don't know, I

13   can't say if that means that each time it was backed up when it

14   was connected.

15   Q.    Okay.  But did it appear to you that, when looking at the

16   dates, that they were both regularly being used; meaning both

17   profiles on the SSD were both being used continuously?

18   A.    Yes.

19   Q.    Okay.  If you know, when you back up a computer that has

20   two profiles onto a hard drive, such as this SSD, would both

21   profiles be backed up onto the external hard drive?

22   A.    I'm sorry.  Can you repeat the question.

23   Q.    Sure.  So let me paint this picture.  So you've got a

24   MacBook Air, and you want to back up what you have on the

25   computer to the hard drive.  So you connect it and you do the

1    backup.  Do both profiles from the MacBook Air get backed up

2    onto the external hard drive?

3    A.   I don't the answer to that question.

4    Q.   Okay.  Understood.  Were you able to see two different

5    profiles on the SSD?

6    A.   Yes.

7    Q.   Okay.  But you just don't know if that was done somehow

8    manually or if that's automatically done.  Is that fair to say?

9    A.   Yeah.  Again, I don't know the answer to that question.

10   Q.   Okay.  Maybe outside of your technical expertise?

11   A.   Yes.

12   Q.   Okay.  With regard to the Google subpoena, obviously we

13   saw what you had received in response to a subpoena, and that

14   indicated that there was the name of Patrick Baxter and an

15   email address of pwbaxter@gmail.com.

16   A.   Yes.

17   Q.   Was there any information that, for example, Google

18   verifies an identity before it allows somebody to create an

19   account?

20   A.   Google can verify an identity.  You can set up

21   verification within your Google account.

22   Q.   Do you know in this case if that was done?

23   A.   I don't recall if it was on the subpoena return or not.  I

24   don't recall.

25   Q.   Okay.  All right.  Meaning, when you say you can have it

1  verify an account, does that mean the user creating the account

2  can ask for themselves to have to be verified?

3  A.   Yes.  You can set up something like two-factor

4  authentication or things like that to verify your account.

5  Q.   I understand.  In this instance, you're not aware of

6  whether that was done?

7  A.   No.

8  Q.   Okay.  Other than that, though, I mean, when you create a

9  Google account or gmail account, like, if I wanted to create an

10  account and I want it to say I'm Bryce Montoya, would Google

11  let me do that?

12  A.   Yes.

13  Q.   Okay.  And it could be bmontoya76@gmail.com, for example?

14  A.   Potentially.

15  Q.   Okay.  Then if you did an administrative subpoena and

16  Google came back, it would say that I'm you, right?

17  A.   It would give that name.

18  Q.   Okay.  And essentially here, you don't really have

19  anything else to go on from the Google subpoena other than the

20  name and the email address and the dates that the profile was

21  created or accessed, right?

22  A.   The Google subpoena gave us the account name and the gmail

23  address which corresponded with the gmail address that we had

24  seen in other accounts.

25  Q.   When you say "other accounts," you mean besides just an

1    email, for example?

2    A.    No.  I mean that that email address, pwbaxter@gmail.com,

3    was also associated with the Apple ID from the cell phone

4    seized from the residence, and it was also the email address

5    listed on file with Verizon related to the IP address of the

6    residence.

7    Q.    Did you also seize a phone from Vanessa Baxter?

8    A.    We did not seize a phone from Vanessa Baxter.

9    Q.    So do you know then which Apple ID, if any, was associated

10   with the phone that she was using?

11   A.    I don't recall.

12   Q.    Okay.  Is it possible that the same Apple ID could have

13   been used for her phone as well, even though she's obviously

14   not Patrick?

15   A.    It's possible.

16   Q.    Okay.  And when you log into a computer, for example, if

17   one person logs in or if the computer password is shared, you

18   wouldn't necessarily know who is logging in at any given time.

19   Is that right?

20   A.    If the password is shared, yeah, that's correct.

21   Q.    Okay.  And with regard to search history, you mentioned

22   that there was some search history about an elementary school

23   where Patrick's children or child goes to school, right?

24   A.    Yes.

25   Q.    Okay.  You can't say whether that was Mr. Baxter or his

1    wife, for example, right?

2    A.    Correct.

3    Q.    And his wife and him, as far as you know, have the same

4    children in common, right?

5    A.    Yes, as far as I know.

6    Q.    Okay.  You had been asked about these 620 videos that were

7    found on the external hard drive.  Is that the total number of

8    videos that you're aware of?

9    A.    That was the total number of videos that I had seen on the

10   SSD.

11   Q.    Okay.  Presumably from different file paths, correct?

12   A.    Correct.

13   Q.    And you said that you've watched at least a portion of all

14   of them?

15   A.    Yes.

16   Q.    How long did it take you from start, from the first day

17   that you were able to access that SSD to be able to watch clips

18   from all of them?

19   A.    I don't recall the exact timing.  I would say a few weeks

20   maybe, maybe longer, a few months.

21   Q.    And do you remember when approximately you first gained

22   access to the SSD?

23        And I guess, let me clarify, too, because I know you

24   received the physical SSD but you couldn't get in until a later

25   point.  So do you remember when you got back the SSD and you

1    were able to first log in and view the videos?

2    A.    The data from the SSD was extracted I believe in the fall

3    of 2022.

4    Q.    Okay.  And would that have been the first time that you

5    were able to log in and start to look at the videos?

6    A.    Yes.  Once the data is extracted by the RCFL, then I was

7    able to conduct my review.

8    Q.    Fall of 2022.  Would you say you had completed your review

9    by, let's say, winter of 2022?

10   A.    No.  I think the review was ongoing.  There was a lot of

11   data within the SSD, so it took quite a bit of time to go

12   through everything that was on there.

13   Q.    All right.  And other than the videos, were there a number

14   of other files, too, probably not relevant to your

15   investigation?

16   A.    Yes.

17   Q.    Did you look through any of those other files besides

18   photos and videos?

19   A.    Yes.  Again, I went through search history.  I went

20   through files.  I went through Freenet artifacts that were

21   within the device.

22   Q.    And with regard to the videos, how many different

23   locations, how many different file locations contained what you

24   would consider to be child pornography?

25   A.    Are you talking about file folders?

1    Q.    I think so, yes, file folders.

2    A.    Again, the ones that I listed earlier are the ones that I

3    recall seeing, the Freenet/downloads folder, PTHC, PTSC, cam

4    whores and spy cams.

5    Q.    Were those PTHC, PTSC, were those sub-folders, or were

6    those independent folders of the Freenet folder?

7    A.    They were independent of the Freenet/downloads folder.

8    Q.    Okay.  Did they all share sort of a parent folder or

9    folders?

10    A.    Well, they were all housed within the Backup account.  So

11    if you follow the file path, it starts with the operating

12    system, Backup.

13    Q.    Okay.  But they weren't -- other than the fact that you're

14    alleging that they were all child pornography, they weren't in

15    the same -- in other words, you can open a file and there can

16    be multiple files within, there can be multiple files within,

17    it doesn't sound like they were within the same parent file

18    system.  Is that accurate?

19    A.    They were separate folders of each other.

20    Q.    Okay.

21    A.    Can you repeat the question again?

22    Q.    Sure.  So, were each of the folders that you allege that

23    child porn was found in, were each of them just -- well, was

24    there a common parent file or folder that -- like, were they

25    all together, you open a folder and open a folder and then the

```
 1   three of those are there, or are they all completely in other
 2   locations?
 3   A.   I don't know the answer to that.
 4   Q.   Okay.  That's all right.  Let me go back to the email for
 5   a moment.  We've referenced the email address that you would
 6   attribute to Mr. Baxter.  Did you actually look inside of the
 7   gmail account?
 8   A.   I'm sorry.
 9   Q.   Did you ever open up the gmail account that was associated
10   with the pwbaxter email address?
11   A.   What do you mean by "open up"?
12   Q.   Well, did you ever go into gmail, for example, and look
13   around?
14   A.   No.
15   Q.   Presumably you would have had access to that, though,
16   right?
17   A.   It potentially could have been on some of the devices.
18   Q.   I'm sorry?
19   A.   It potentially could have been on some of the devices.  I
20   don't recall seeing the gmail account specifically related to
21   the SSD or the MacBook.
22   Q.   In other words, you could have gone to gmail, like
23   mail.google.com, you could have logged into the gmail address?
24   A.   I would have needed a search warrant to look into his
25   gmail account.
```

1    Q.    You got some search warrants in the case, right?  You

2    could have applied for one if you wanted to.

3    A.    We could have.  We did not.

4    Q.    Understood.  Certainly there are cases where you have

5    before, I'm sure?

6    A.    Yes.

7    Q.    Okay.  So you never looked at any sort of email activity

8    related to Mr. Baxter in this investigation.  Is that accurate?

9    A.    I observed email activity on the SSD not necessarily

10   related to that gmail account but related to the "Baxter,

11   Patrick" display name.  And I, again, subpoenaed Google related

12   to the IP address -- or excuse me, to the gmail account.

13   Q.    The same gmail account we're talking about or a different

14   one?

15   A.    The same one, pwbaxter@gmail.com.

16   Q.    Okay.  Did you ever look at any email activity, the

17   substance of it?

18   A.    No.

19   Q.    And nor for Mrs. Baxter?

20   A.    No.

21   Q.    Or anybody else that potentially had access to the SSD?

22   A.    No.

23   Q.    Okay.  I understand.  What about the phones?  At some

24   point you did get access to Mr. Baxter's phone, and it sounds

25   like you did not seek access to Mrs. Baxter's phone.  Is that

1    right?

2    A.    Yes.

3    Q.    So when you get access, you get a search warrant and then

4    you're legally permitted to look into the phone, right?  Is

5    that accurate?

6    A.    Yes.

7    Q.    And when you get access to the phone, do you physically

8    look into it, or do you somehow extract it and then look into

9    the data?

10   A.    The device is extracted by the RCFL, and that data is

11   provided to me to review.

12   Q.    So you're looking at essentially a full copy of the data

13   that was on the phone?

14   A.    Yes.

15   Q.    And is it true that sometimes a user can delete photos or

16   delete files on their phone so that you can't, a user couldn't

17   see the file but that you'd still find it recoverable on an

18   extraction?

19   A.    That's possible, yes.

20   Q.    Okay.  And in this particular case, is it fair to say that

21   none of the photos that were alleged to have been taken or

22   found related to child pornography, none of those were found on

23   Mr. Baxter's device, right?

24   A.    They were not.

25   Q.    Okay.  And you're not alleging that you found any

1    connection to Freenet on his device?

2    A.    Not on the phone, no.

3    Q.    Okay.  Sorry.  I should have clarified, yes, the phone.

4         With regard to the phone, were you able to access text

5    message history or text message contents, for example?

6    A.    Yes.

7    Q.    Could you have accessed email through the phone

8    extraction?

9    A.    It's possible, yes.  I don't recall if I did.

10   Q.    It wasn't your focus but perhaps you could have?

11   A.    Yes.

12   Q.    Okay.  And there's a lot of information on the extraction,

13   right?  I mean, you could see, for example, when someone turns

14   on a phone or turns off a phone, among other things?

15   A.    Potentially, yes.

16   Q.    And even sometimes you can see when a person deletes

17   something or sends a message, for example?

18   A.    Again, potentially, when they delete something.

19   Q.    Okay.  Sometimes you can even see when someone goes in

20   do-not-disturb mode?

21   A.    I don't know if you can or cannot see that on the

22   extraction parts.

23   Q.    Okay.  But this is a great deal of information that you

24   can find, right?

25   A.    Yes.

1    Q.    Okay.  All right.  Let me go back to the groupings of

2    videos that we saw.  So we saw a number of videos, I guess I

3    would classify as videos containing two people engaging in some

4    sort of sexual activity.

5        The grouping that we first saw, you're not alleging that

6    any of those were taken at the 20 Gooch Street address, right?

7    A.    No.  The videos that we played from Freenet, those were

8    not taken at 20 Gooch Street.

9    Q.    Okay.  And you're not alleging that Mr. Baxter took them

10   at all.  Is that accurate?

11   A.    Correct.

12   Q.    Okay.  So specifically, the videos that you believe to be

13   taken at 20 Gooch Street were the videos of A.F., the then

14   seven-year-old girl?

15   A.    Yes.

16   Q.    And some of them included other people as well?

17   A.    Yes.

18   Q.    Right, okay.  Did you ever have contact with her yourself?

19   Did you ever talk to the girl?

20   A.    I did not.

21   Q.    Do you know if any of your colleagues did or any other law

22   enforcement at all?

23   A.    Yes.  I submitted a request through official channels in

24   the FBI to have the family interviewed by the Royal Canadian

25   Mounted Police.

Q.   Is that just proper procedure when you're dealing with
another country?

A.   Yes.  They're not United States citizens, so it's proper
procedure to contact the law enforcement office responsible for
that territory.

Q.   And in this specific instance you didn't participate in an
interview with her?

A.   I did not.

Q.   Okay.  Did you participate in an interview with the
parents, with her parents?

A.   At a later date, yes.

Q.   Any particular reason you weren't involved in the
interview of the girl herself?

A.   No.  I had offered it to the RCMP, but they conducted the
interview.

Q.   Okay.  And as far as you know, there was no indication
from her to any of the law enforcement agents that Mr. Baxter
had -- that she had reported Mr. Baxter having taken pictures
of her?

A.   There was no indication of that, no.

Q.   Okay.  Or having done anything to touch her or anything
like that?

A.   Correct.

Q.   Okay.  Ms. Gelman, would you be so kind as to show us
Exhibit Number 16-1.

1         Mr. Montoya, the image in front of you, 16-1, you're

2    alleging that's one of the photos of A.F., right?

3    A.    Yes.

4    Q.    Okay.  And in that photo, is it fair to say that it

5    appears she might be taking the photo herself as a selfie?

6    A.    I wouldn't say that necessarily, no.

7    Q.    Okay.  When you say you wouldn't say that, is that because

8    you just can't say for sure?

9    A.    I can't say for sure, yeah.

10   Q.    Do you know if -- well, strike that.

11        Was this photo taken in close proximity, meaning within a

12   few days, of the other photos that were also taken of her in

13   the nude?

14   A.    Yes.

15   Q.    Okay.  Thank you, Ms. Gelman.

16        Just to be clear, on all of the devices, nothing that you

17   would consider child pornography was found on any of the other

18   seven devices other than the SSD?

19   A.    Correct.  The child pornography that we identified in this

20   investigation was on the SSD.

21   Q.    And with regard to the MacBook that was alleged to have

22   contained the backup or alleged to have provided the backup for

23   the SSD, nothing on there?

24   A.    Correct.

25   Q.    Okay.  Any indication that there had been and then it was

1  deleted?

2  A.   I did not see that.

3  Q.   Okay.  With regard to folder structure, I was asking some

4  questions about the SSD and where the files were.  Is it fair

5  to say that you don't know whether those file folder names were

6  created by a user or whether they were created as part of a

7  download?

8  A.   That's correct.

9  Q.   Okay.  How would one know, or is there a way to know that?

10  A.   I don't know the answer to that question.  It would depend

11  on whether, again, like you stated, if the user created that

12  file name themselves or if they did a download of a folder

13  itself.

14  Q.   Okay.  Given that the crux of this investigation comes

15  down to that external hard drive, were there ever any attempts

16  to fingerprint the hard drive to see who had touched it?

17  A.   No, there wasn't.

18  Q.   Okay.  Certainly the FBI has the capability to fingerprint

19  objects and to try to find out who touched certain objects,

20  right?

21  A.   Yes.

22  Q.   Okay.  It would have been interesting to know, for

23  example, if Mr. Baxter had never touched it, right?

24          MS. SOTO:  Objection.

25          THE COURT:  Basis?

1          MS. SOTO:  Speculation.

2          THE COURT:  Overruled.

3    A.   I'm sorry.  Can you repeat the question.

4    Q.   Sure, I'll do my best.

5          So it would have been interesting in your investigation to

6    learn -- for example, if it had been done and if Mr. Baxter

7    hadn't touched it, that would have affected your investigation,

8    right?

9    A.   I suppose, yes.

10   Q.   Okay.  All right.  Now, you mentioned that Mr. Baxter was

11   home with his two kids and his wife Vanessa during the first

12   part of the search of the home?

13   A.   Yes.

14   Q.   Do you remember about how long the search took all

15   together?

16   A.   I don't recall exactly.  It was hours.

17   Q.   Okay.  Is that common just because you're being thorough?

18   A.   Yes.

19   Q.   And presumably you have to look in every single room and

20   anywhere that a device could be contained?

21   A.   Yes.

22   Q.   Okay.  At some point you mentioned that he left and that

23   he informed either you or somebody that he had to go to work.

24   Is that right?

25   A.   Yes.

1    Q.   And at that point he wasn't under arrest, he wasn't

2    charged.  He was free to leave?

3    A.   Yes.

4    Q.   Okay.  And so during the time that he was there, did you

5    observe him doing anything, you know, attempting to try to take

6    anything from the home or obfuscate the search?

7    A.   No.  He was outside mostly.

8    Q.   And was he following instructions from yourself and other

9    agents?

10   A.   He was.

11   Q.   Okay.  And was his wife and two kids also following the

12   instructions of you and your fellow officers?

13   A.   Yes.

14   Q.   All right.  I asked you how long it took you to go through

15   all of the videos and determine which ones contained alleged

16   child pornography according to your opinion.

17        Is it fair to say, though, that you didn't actually

18   discover the photographs or videos of the ███████ until the

19   summer of this year, until about June of 2024?

20   A.   Yes.  Those files were discovered in June of 2024 by a

21   task force officer who was a member of the RCFL.

22   Q.   Do you know who that was, by chance?

23   A.   Yes.

24   Q.   What was his name?

25   A.   Yu Kajita.

1    Q.    Okay.  And he's somebody that's a police officer but able

2    to act in the capacity of an FBI task force officer?

3    A.    Yes.

4    Q.    Meaning that you had access for well over a year and a

5    half, and you didn't come across those videos or photos

6    yourself?

7    A.    I hadn't.  There was over 100,000 images within the

8    device.  I had gone through that, but I had not seen those

9    images.

10   Q.    And given the sheer number of images, at this point, as

11   you sit here, have you gone through all of those images

12   yourself?

13   A.    We've done our best to go through all of the images.

14   Q.    All right.  I understand you've done your best.  I'm not

15   trying to be negative to you specifically, but have you

16   observed all of them, or is it possible that there are still

17   some that you haven't seen?

18   A.    It's possible, but we have gone through all -- over

19   100,000 images.  So I believe we've done a thorough job in

20   going through all the images.

21   Q.    Okay.  And same with every other drive.  I know we've gone

22   over this a few times.  The other seven things did not have

23   what you consider to be child porn, but did you go through

24   every file or every image and every video file of those drives

25   or those devices?

1    A.    I would say we've gone through a majority of it, and we've

2    also run tools against those drives to see if there's known

3    child pornography within the devices.

4    Q.    Okay.  When you're conducting the investigation and

5    leading the investigation, is it fair to say that you tried, in

6    this case, to keep your investigation concealed from the

7    target, meaning from Mr. Baxter?

8    A.    I think it's fair to say that we don't discuss active

9    investigations with individuals.

10   Q.    Okay.  And I imagine among the reasons that you don't is

11   because you don't want to tip somebody off?

12   A.    Yes.

13   Q.    And as far as you're aware, is there any reason to believe

14   that Mr. Baxter found out about the investigation before the

15   search warrant was executed?

16   A.    No.

17   Q.    At some point in your investigation you noted that there

18   were two vehicles.  I think one was a leased and one was owned,

19   both in Patrick's name.  Is that right?

20   A.    Yes.

21         MR. SIMONS:  Okay.  Judge, can I have a brief moment?

22         THE COURT:  Yes.

23         MR. SIMONS:  Okay.  Excuse me a moment.

24         Thank you, Special Agent Montoya.  No further

25   questions.

1          THE COURT:  Any redirect?

2          MS. SOTO:  Just briefly.

3     REDIRECT EXAMINATION BY MS. SOTO:

4     Q.    Special Agent Montoya, defense counsel asked you about the

5     email address pwbaxter@gmail.com.  Was there any indication

6     that someone other than Patrick Baxter set up that account?

7     A.    No, there was not.

8     Q.    Or any indication that someone other than Patrick Baxter

9     used that email account?

10    A.    No, there was not.

11    Q.    You were also asked about the encrypted SSD that was found

12    in the defendant's living room.  Was there any indication that

13    Vanessa Baxter used that encrypted SSD?

14    A.    There was no evidence of Vanessa Baxter anywhere inside of

15    the SSD that we could observe.

16    Q.    So there were no email addresses that appeared tied to

17    Vanessa Baxter in that SSD?

18    A.    There were not.

19    Q.    There were no videos with her voice in them on that SSD?

20    A.    There were not.

21    Q.    No indication that Vanessa Baxter took photographs of her

22    naked █████ on that SSD?

23    A.    There was not.

24    Q.    With regards to fingerprints on the SSD that defense

25    counsel brought up, can you touch something without leaving

1    fingerprints on it?

2    A.    Yes.

3    Q.    And could you leave fingerprints on an item and then later

4    on those fingerprints are wiped away?

5    A.    Yes.

6    Q.    And also, it took time for FBI to decrypt the SSD,

7    correct?

8    A.    It took almost a year.

9    Q.    And it was then that you identified or the FBI identified

10   child pornography on the SSD, correct?

11   A.    Yes.

12   Q.    So even if there had been fingerprints on the SSD, by the

13   time you found the child pornography, they could have been

14   wiped off, correct?

15   A.    Correct.

16          MS. SOTO:  No further questions.

17          THE COURT:  Recross.

18          MR. SIMONS:  Sure.

19   RECROSS-EXAMINATION BY MR. SIMONS:

20   Q.    Just briefly to touch on a couple of those items.  With

21   regard to fingerprints, again, I know it wasn't done, but if it

22   was done, you could have tested for fingerprints prior to

23   sending it to Quantico to decrypt, right?

24   A.    You could.  I don't recall an instance in a child

25   pornography investigation where we fingerprinted digital

1    evidence items like that.

2    Q.   Okay.  But there was nothing stopping you, other than you

3    called the shots, you decided not to do that?

4    A.   Correct.

5    Q.   Okay.  And you were asked a few questions about Mrs.

6    Baxter.  Obviously she's not being charged in this case, right?

7    A.   Correct.

8    Q.   Or in any case?

9    A.   Correct.

10   Q.   You were asked at a prior proceeding, you were questioned

11   by Attorney Tobin on January 5 of 2023, at a prior proceeding,

12   you were asked if it was possible that it could have been

13   Mrs. Baxter, and you can't definitively say that?

14   A.   I don't believe it to be.

15   Q.   Okay.  But you can't say for sure?

16   A.   Correct.

17   Q.   You can't say for sure that it wasn't somebody else?

18   A.   I can just follow the facts and evidence and what we

19   observed on the device.

20           MR. SIMONS:  Okay.  No further questions.

21           THE COURT:   Hold on just one second.

22           We normally take a morning break and then -- we

23   usually take a morning break and then a lunch break later.  We

24   skipped the morning break because we got started late today and

25   I was trying to make up some time, so what I'm going to propose

1   is, we ordered your lunch for 12:00, so hopefully it's up there

2   now.  I'm going to propose a lunch break from now until 1:00,

3   and then we'll go from 1:00 to something around 3:00.  And

4   that's skipping the other break.  If anybody needs a break

5   during the afternoon, just raise your hand and we'll take it.

6   I'm just trying to make up a little bit of time.  Hopefully

7   your lunch is up there.  Karen is going to walk up with you to

8   make sure, but we're going to recess until, let's say 1:00.

9           COURTROOM CLERK:  All rise for the jury.

10          (Jury exits the courtroom.)

11          THE COURT:  You're excused.  See everyone back at

12   1:00.

13          (Recess, 12:12 p.m. - 1:04 p.m.)

14          COURTROOM CLERK:  All rise for the jury.

15          (Jury enters the courtroom.)

16          COURTROOM CLERK:  Court is in session.  Please be

17   seated.

18          We were just talking about how cold it is in here.  I

19   would ask them to warm it up for today and tomorrow, but then

20   it will be 97 degrees in here because it's the government.  So

21   this is better than that.

22          Next witness, please, Mr. Tobin or Ms. Soto.

23          MR TOBIN:  Yes, Your Honor.  The United States calls

24   detective Yu Kajita.

25          Sir, if you would be kind enough to go to the witness

1    stand and you will be sworn in as a witness.

2        YU KAJITA, Sworn

3        COURTROOM CLERK:  Can you please state your name and

4    spell your last name for the record.

5        THE WITNESS:  Yes.  Yu Kajita.  First name is spelled

6    Y-u.  Last name K-a-j-i-t-a.

7    DIRECT EXAMINATION BY MR. TOBIN:

8    Q.   Good afternoon.

9    A.   Good afternoon, sir.

10   Q.   How are you employed?

11   A.   I'm employed by Brookline Police Department.

12   Q.   In what capacity?

13   A.   I'm a detective with the detective bureau.

14   Q.   How long have you served as a police officer with the

15   Brookline Police Department?

16   A.   Since 2006.

17   Q.   How long have you served as a detective with the Brookline

18   Police Department?

19   A.   Since 2015.

20   Q.   And what are the general responsibilities of a detective?

21   A.   As a general detective, I respond to the crime scene as

22   well as collect evidence from the crime scene, conduct

23   follow-up investigations for crimes as reported to Brookline,

24   and conduct digital forensic examinations.

25   Q.   Do you have any other law enforcement roles?

1    A.    I do.

2    Q.    What is that?

3    A.    I'm currently assigned as a task force officer with the

4    FBI Boston field office.

5    Q.    And with -- I'm sorry.  Continue.  I apologize.

6    A.    I'm currently assigned specifically to the New England

7    Regional Computer Forensics Laboratory, also known as NERCFL.

8    Q.    Sir, you used the phrase "task force officer."  What is a

9    task force officer?

10   A.    I'm pretty much loaned out to the FBI to assist with any

11   ongoing investigations as well as, in regards to federal level,

12   local, state level and municipal agencies as well.

13   Q.    You also used or mentioned the New England Regional

14   Computer Forensics Laboratory, short for RCFL.  What is that?

15   A.    It is an FBI program where we assist, again, with local

16   law enforcement agencies as well as federal level, state, to

17   conduct digital forensic analysis on evidence that was

18   submitted to the FBI, as well as provide technical support on

19   the field and within the field office.

20   Q.    And how long have you been a task force officer with the

21   FBI assigned to this Regional Computer Forensics Laboratory?

22   A.    I've been assigned since 2019.

23   Q.    And as a member of the RCFL, the Regional Computer

24   Forensic Laboratory, in that role or capacity what are your

25   primary duties and responsibilities?

A.   My primary duties are to conduct forensic analysis on

submitted digital evidence such as computers, laptops,

desktops, as well as mobile devices, such as cell phones,

tablets, and even cloud data.

Q.   Detective Kajita, what training have you received in the

field of computer forensics?

A.   First, I have attended an FBI-hosted training program,

approximately 500 to 600 hours, which entails different

techniques in acquiring, recovering, and analyzing the data as

well as, in order to get the certification, I have to do a

practical exam as well as a written exam and sometimes a

presentation followed by it.

Q.   So do you have that certification?  Did you qualify for

that?

A.   Yes.

Q.   Now, the computer lab at the RCFL, is that also accredited

by a national accrediting organization?

A.   We are.

Q.   And how does that come about?  Is there an evaluation of

the laboratory?

A.   Yeah.  So our lab is accredited through ANAB, also known

as ANSI National Accreditation Board.  It is internationally

known standards where the laboratory follows the

internationally recognized standards to follow the process of

and maintaining a digital forensics laboratory.  The creditor

1    would come to the laboratory and assess our policy, procedure,

2    as well as how we run the laboratory, and also they will assess

3    our management.

4    Q.   Detective Kajita, how many different devices have you

5    forensically examined as a member of the RCFL and as a member

6    of the Brookline Police Department, approximately?

7    A.   I would say approximately 2,000 devices.

8    Q.   Sir, I'd like to ask you some questions about this case

9    specifically.

10        Were you present at the search of the defendant's Melrose

11   residence on November 2, 2021?

12   A.   I was not.

13   Q.   How did you first become involved in this investigation?

14   A.   After the execution of the search warrant, Special Agent

15   Bryce Montoya submitted a request to our lab to conduct

16   analysis of the seized item from Melrose.

17   Q.   And were you assigned the case to do the forensics?

18   A.   I was.

19   Q.   And what type of devices were you asked to conduct a

20   forensic examination on?

21   A.   They range from a laptops, cell phones, as well as

22   external hard drives.

23   Q.   For those of us who might not know, what is an external

24   hard drive?

25   A.   An external hard drive is a physical piece of device where

1    you connect -- where it stores data.  In order to save or to

2    copy that data, you have to make a physical connection to the

3    machine, such as a desktop, laptop or a mobile device like

4    phones as well.

5    Q.    After being assigned the case, did you receive all of the

6    devices that had been seized at the home during the search?

7    A.    I did.

8    Q.    May we please see Exhibit 3.

9          Do you recognize Exhibit 3?

10   A.    I do.

11   Q.    What is it?

12   A.    It's an evidence collection log that was written on

13   11-2-2021, and also these are all eight items that were

14   submitted to our lab.

15   Q.    Did you ultimately examine all eight of these items?

16   A.    I did.

17   Q.    Without reading the serial numbers, can you tell us what

18   item one is?

19   A.    It's a Toshiba disk drive.

20   Q.    Describe what a disk drive is.

21   A.    It is actually an external hard drive.  Again, the make

22   would be the Toshiba.

23   Q.    Okay.  Number two, the Samsung portable SSD.  What is

24   that?

25   A.    It's another form of an external hard drive.

1    Q.    And what does "SSD" stand for?

2    A.    Solid state drive.

3    Q.    Number three, what is the -- can you read what that is?

4    A.    Sure.  It is WD My Passport.

5    Q.    What is that?

6    A.    Another form of external hard drive.

7    Q.    And number four, please, read what it is and describe what

8    it is.

9    A.    Sure.  Apple Time Capsule.  Again, it's another form of an

10    external hard drive.

11    Q.    So one through four were all external hard drives?

12    A.    Correct.

13    Q.    Seized during the search warrant?

14    A.    Correct.

15    Q.    And what about five, what is that?

16    A.    It is Apple MacBook Pro.

17    Q.    Is that a laptop?

18    A.    Yes, it is.

19    Q.    Number six, what is that?

20    A.    Apple MacBook, hashtag, A1932.

21    Q.    And again, is that a laptop, if you will?

22    A.    It is.

23    Q.    Number seven, can you read us what that item was or is.

24    A.    It is Apple iPhone 12 Mini.

25    Q.    And number eight?

1  A.    Apple iPhone, hashtag, A1532.

2  Q.    You indicated that you have forensically examined all

3  eight of these items.  Can you please explain to us how, in

4  fact, do you forensically examine a device such as a laptop,

5  cell phone or external hard drive?  What do you do?

6  A.    We first acquire the data, whether we extract or image the

7  actual data within the device using a forensic tool.  Once we

8  acquire that data, we validate and confirm the integrity of the

9  data has not been disturbed.  And then we would use another

10  forensic tool to process that data to make it more human

11  readable in an organized fashion.

12  Q.    What is the name of the tool that you use to process the

13  data to make it in a more readable fashion?

14  A.    I use the forensic tool Magnet Axiom.

15  Q.    And the tools you used, including Magnet Axiom, that you

16  used to forensically examine these eight items, are these

17  essentially the gold standard in computer forensics?

18  A.    Yes, they are.

19  Q.    Now, what happens if a device you want to examine is

20  encrypted or password protected?

21  A.    We go through a different series of process.  We can

22  either, A, bypass the PIN or the password to acquire that data,

23  or we can try to recover the password or PIN to unlock so that

24  we can successfully acquire the data.

25  Q.    Were any of the eight seized items, the eight items on

1    this Exhibit 3, encrypted or password protected when you

2    received them?

3    A.    They were.

4    Q.    Did the case agent, Bryce Montoya, provide you with

5    passports for any of the eight devices?

6    A.    He did.

7    Q.    Was the FBI in Boston, you and the RCFL, able to

8    forensically examine initially any of these eight items?

9    A.    Yes.

10   Q.    Was there a particular item on this list, a particular

11   item that had been seized, that you were unable to forensically

12   examine?

13   A.    Out of the eight, there was one device that we were unable

14   to acquire data from.

15   Q.    What device was that?

16   A.    That was item two, Samsung Portable SSD T7.

17   Q.    And why could you not initially forensically examine that?

18   A.    The data was encrypted, and therefore my tools, it was

19   unable to translate the data into more of a human readable

20   format.

21   Q.    You either had been provided the passwords or were able to

22   get into all seven of the other devices?

23   A.    Yes.

24   Q.    All seven of those devices were examined by you.  Is that

25   true?

1    A.    Yes.

2    Q.    And with the exception of two, the Samsung Portable SSD,

3    did any of the other devices show any evidence of child

4    pornography?

5    A.    Excuse me?

6    Q.    Yes.  There were eight devices, correct?

7    A.    Correct.

8    Q.    And you were able to either -- in short order, you were

9    able to forensically examine all of them except for the Samsung

10   SSD.  Is that accurate?

11   A.    Yes.

12   Q.    Was any child pornography found on any of the other

13   devices?

14   A.    No.

15   Q.    Now let's talk a little bit about the Samsung Portable

16   SSD.  When you couldn't examine it because it was encrypted --

17   you were not provided the password.  Is that true?

18   A.    Yes.

19   Q.    What did you do with that?  What efforts did you make to

20   unencrypt it?

21   A.    We submitted a follow-up to the specialized unit down in

22   Quantico, Virginia, either, A, to recover that password or to

23   decrypt that data.

24   Q.    Now, was this specialized unit in Quantico, Virginia able

25   to determine the password for number two, the portable SSD?

1    A.    Yes.

2    Q.    Did they provide you with a password?

3    A.    Yes.

4    Q.    Did you enter the password into the SSD in an attempt to

5    open it?

6    A.    I used the password, I entered the password through the

7    forensic tool to decrypt it.

8    Q.    But the password that you were provided, the password that

9    was determined by the experts in Quantico, opened the device,

10   gave you access to the data?

11   A.    Yes.

12   Q.    What was that password?

13   A.    The password was SR20DETT.

14   Q.    Do you know, what does that password refer to?

15   A.    I do.

16   Q.    What does it refer to?

17   A.    It is a four-cylinder turbo charged engine for a specific

18   model to the Nissan.  It was manufactured in the '90s.

19   However, the engine is actually spelled SR20DET.

20   Q.    And the password has an extra "T" at the end?

21   A.    Correct.

22   Q.    And a password for an SSD, would that password be created

23   by the computer automatically or by a user using the SSD?

24   A.    That was set by the user.

25   Q.    Now, you mentioned that items one through four were

1    essentially external hard drives, including this number two,

2    the SSD.  Is that accurate?

3    A.    Yes.

4    Q.    And what did your examination of the four external hard

5    drives reveal in relation to the other items on this list?

6    A.    Well, all four items appear to be a backup of one of the

7    two laptops.

8    Q.    Now, when you say it appears to be a backup of one of the

9    two laptops, what do you mean by that?

10   A.    So a backup is when a user takes their computer and saves

11   all their settings and files that are on that data over to, in

12   this instance, an external hard drive so that they can, A, save

13   it in case something happens down the road, or they need to

14   restore that data back onto the new machine.

15   Q.    So tell us, please, if a user has a laptop and wants to

16   back up the data on that laptop to an external hard drive, an

17   SSD, what do they have to do?  How does one go about backing it

18   up, if you will?

19   A.    There are different ways.  They can use a third-party

20   program to back up that data, or they can use an operating

21   system proprietary tool in order to back the data up.

22   Q.    But do the two devices have to be connected?

23   A.    Correct.

24   Q.    By like a wire or cable or something like that?

25   A.    It can be backed up through a connection with a physical

1    device, or it could be backed up to the cloud.

2    Q.    Number two, the Samsung Portable SSD, that contained a

3    backup of one of the laptops that was also found in the house?

4    A.    Yes.

5    Q.    What laptop was backed up on the Samsung Portable SSD?

6    A.    That was item number six, the Apple MacBook.

7    Q.    I'd like to ask you some questions about your examination

8    of that Apple MacBook, number six.  Again, you did forensically

9    examine is that.  Is that true?

10    A.    Yes.

11    Q.    And you extracted the data and then you had the data put

12    through Axiom.  Is that accurate?

13    A.    Yes.

14    Q.    Now, what if any user accounts were located on that

15    device, this Apple MacBook?

16    A.    I located two user accounts.

17    Q.    What were they?

18    A.    One was Patrick Baxter, and the second was Vanessa Baxter.

19    Q.    What is a user account?

20    A.    A user account is pretty much a profile to that specific

21    user, so all their settings and files can be stored onto the

22    user account.

23    Q.    And did you have passwords for the Patrick Baxter and the

24    Vanessa Baxter user accounts on this laptop?

25    A.    Yes.

1  Q.   And did you forensically examine both the Vanessa Baxter

2  and Patrick Baxter profiles on the laptop?

3  A.   I did.

4  Q.   Did you find any child pornography during your forensic

5  examination of item six, that laptop?

6  A.   I did not.

7  Q.   I'd like to ask you some questions about item two, the

8  Samsung SSD.  Again, that had a mirror image or had backed up

9  the MacBook laptop.  Is that accurate?

10 A.   Yes.

11 Q.   Did you find any child pornography on the SSD?

12 A.   I did.

13 Q.   The SSD backed up the laptop, correct?

14 A.   Correct.

15 Q.   The SSD had child pornography on it, correct?

16 A.   Correct.

17 Q.   The laptop did not have child pornography on it.  Is that

18 true?

19 A.   Yes.

20 Q.   How can that be if the SSD has a mirror image of what was

21 on the laptop?  Why would there have been or how could you

22 explain why there would be no child pornography on the laptop?

23 A.   Well, the user could have deleted that once it was backed

24 up, or it was directly started from the hard drive.

25 Q.   I think we understand what "delete" means, but what was

1    the second part of that answer?  The user could have done what?

2    A.    So the user could have just backed up everything and

3    opened the whole program from the backup drive.

4    Q.    So that it never got put onto the -- I'm sorry.  May we

5    see Exhibit 8, please.

6          Do you recognize Exhibit 8?

7    A.    Yes.

8    Q.    What produced Exhibit 8?

9    A.    The tool, Magnet Axiom.

10   Q.    You've reviewed Exhibit 8?

11   A.    Yes.

12   Q.    And at the top it says "Artifact information."  What does

13   that reference, what is artifact information in this context?

14   A.    Artifact information pertains to the evidence that was

15   found within, from this laptop.  It contains all the

16   information regarding to the laptop that it was backed up from.

17   Q.    And does this come from the SSD, or does this come from

18   the examination of the laptop?

19   A.    Of the laptop.

20   Q.    And where it says "Computer name, Backup MacBook Pro,

21   Local Host Name, Backups MacBook Pro," what does that mean?

22   A.    So the user named his or her machine as "Backups MacBook

23   Pro."

24   Q.    And what's the significance of the information on Exhibit

25   8?

1  A.   It provides a serial number of that laptop as well as the

2  install date of the operating system, the Mac OSX and the

3  version number of 10.14.4 and, again, the install date of

4  February 7, 2019.

5  Q.   The serial number, can you read it to us off the screen?

6  A.   Sure.   FVFXT26EJK7G.

7  Q.   And, again, that serial number is on what device?

8  A.   From the laptop, item six from the evidence collection

9  log.

10          MR. TOBIN:  May I approach, Your Honor?

11          THE COURT:  Yes.

12  Q.   Do you recognize item six?

13  A.   Yes.

14  Q.   What is it?

15  A.   It is a laptop I conducted a forensic examination on.

16  Q.   Is there a serial number on that laptop?

17  A.   There is.

18  Q.   And I won't make you read it, but is it the same as what

19  you read on the artifact?

20  A.   Yes.

21  Q.   May we see Exhibit 9, please.  Do you recognize Exhibit 9?

22  A.   Yes.

23  Q.   What is it?

24  A.   It's a report that was exported from Magnet Axiom.  It

25  pertains to the connected device history to that laptop.

1    Q.   When you say, "It pertains to the connected device history
2    to that laptop," what is the connected device?
3    A.   Any media storage device.  So in this instance there was
4    one device with the serial number marked on column F, indicates
5    30-day connection history regarding to that one specific
6    portable hard drive.
7    Q.   So does this spreadsheet show when and how often the SSD
8    and the laptop were connected?
9    A.   Yes, it does.
10   Q.   And you mentioned the serial number.  The serial number is
11   the same on all of these entries, one through 19.  Is that
12   true?
13   A.   Two through 19, yes.
14   Q.   Two through 19, I apologize.  And again, that serial
15   number is for which of the two devices?
16   A.   That was the Samsung SSD drive.
17   Q.   So the connection start date and time in UTC, all of these
18   dates and all of these times the two of these devices were
19   connected?
20   A.   Yes.  Actually, this was recorded in Eastern Time
21   Standard.
22   Q.   Now, what period -- we'll get to that in just a moment,
23   but what period -- you say this is a 30-day window?
24   A.   Yes.
25   Q.   What are those 30 days?

1    A.    Starting from October 2, 2021, all the way through

2    November 1, 2021.

3    Q.    And does the Axiom tool only allow you to get those

4    connections from the preceding 30 days?

5    A.    Yes.

6    Q.    Just, if we can look at row number two, for instance, if

7    we can highlight that.

8         Now, what is the date and time on row number two?

9    A.    October 30, 2021 at 10:20 p.m. and 47 seconds.

10   Q.    I think you mentioned this a moment ago.  Is that in

11   Eastern Standard Time, or is that in some other timing

12   convention?

13   A.    It is in Eastern Standard Time.

14   Q.    So on October 30, 2021 at 10:20 in the evening, those two

15   devices, the laptop and the SSD, were connected?

16   A.    Yes.

17   Q.    Does this tell us what took place when they were

18   connected?

19   A.    It does not.  Just the connection date and time.

20   Q.    In order to back up what's on the laptop, it would have to

21   be connected to the SSD?

22   A.    Correct.

23   Q.    Now, if there is something on the SSD that is stored that

24   the user wants to look at, there's no screen on the SSD.  Isn't

25   that true?

1   A.   Correct.

2   Q.   It's like a small little box?

3   A.   Yes.

4   Q.   So if there's something you really want to see on the SSD,

5   what do you have to do to be able to view a video or a picture?

6   A.   Connect it to a device with a screen.

7   Q.   Like a laptop?

8   A.   Yes.

9   Q.   So again, using number one, October 30, 2021 at 10:20, we

10  know the two devices were connected, but we don't know if

11  something was being backed up or something was being viewed

12  from the SSD.  Is that true?

13  A.   Yes.

14  Q.   Let me have just a moment.

15       Could you look at and please highlight, if you would,

16  Ms. Gelman, row 15.

17       What does row 15 tell us?

18  A.   The SSD drive was connected to the laptop on November 1,

19  2021 at 9:03 p.m.

20  Q.   To the best of your knowledge, that was the night before

21  the execution of the search warrant the next morning?

22  A.   Yes.

23  Q.   Somebody was on that SSD, connecting it to the laptop?

24  A.   Yes.

25  Q.   Thank you.  Now talking again about the Samsung SSD, how

1    many profiles were found on that?

2    A.    I found two profiles.

3    Q.    And what were they labeled or named?

4    A.    One was identified as "Backup" and the second one was

5    "Baxter."

6    Q.    Would the computer have given those profiles those names,

7    or would a computer user have chosen those names for the

8    profiles?

9    A.    It would be the computer user.

10   Q.    And, again, on the SSD, you found two profiles, "Baxter"

11   and "Backup."  And these had been backed up from what device?

12   A.    From the laptop.

13   Q.    The Apple MacBook found in the living room?

14   A.    Yes.

15   Q.    May we see Exhibit 10, please.

16         Do you recognize Exhibit 10?

17   A.    I do.

18   Q.    What data or information is contained on Exhibit 10?

19   A.    There is two data.  One is going to be the account

20   information for Backup, and the bottom portion is going to be

21   the account information for Baxter.

22   Q.    Let's take the bottom one first.  If you could highlight

23   that.

24         So this is the information related to the Baxter profile.

25   Is that true?

1  A.   Yes.

2  Q.   I see something here that says, "Created date and time."

3  Can you read that to us?

4  A.   Sure.  February 27, 2019, at 3:13 am.

5  Q.   What is the significance of that date and time; what

6  happened then?

7  A.   When that user profile was created.

8  Q.   And that would have been created on the laptop.  Is that

9  accurate?

10  A.   Yes.

11  Q.   And where it says, "Source" at the bottom, we see some

12  blue printing.  I'm not going to ask you to read it, but what,

13  essentially, information is that?

14  A.   That information gives you the file path or where this

15  user profile information is stored.

16  Q.   Can we go to the top half of this document.

17       Again, looking at the top half now, "User ID 501 Backup,"

18  again, that name "Backup" for that account information, that

19  profile, if you will, would have been created by the user?

20  A.   Yes.

21  Q.   And do we have a created date and time?

22  A.   It was created February 7, 2019 at 5:02 p.m.

23  Q.   And again, where it says "Source" at the bottom and

24  there's blue printing, what information does that tell us?

25  A.   Where the account information Backup is stored on the

1    laptop.

2    Q.    And if we can go and see the entire document in full.

3    "Backup" at the top, "Baxter," both separate profiles, correct?

4    A.    Yes.

5    Q.    Both moved from the laptop onto the SSD?

6    A.    Yes.

7    Q.    And did you find child pornography on either of these

8    profiles?

9    A.    I did.

10   Q.    Which profile contained the child pornography?

11   A.    Under the username "Backup."

12   Q.    Now, using your forensic tool, the tools you used, let's

13   focus for a moment on Backup, where the child pornography was

14   found.  The forensic tool gives you access to what sort of data

15   or information on the Backup profile?

16   A.    It was able to provide browser information as well as user

17   information, data that was stored on the laptop, such as media,

18   media files, such as pictures and video files.

19   Q.    May we see Exhibit 12, please.

20         Do you recognize Exhibit 12?

21   A.    I do.

22   Q.    And is this from the Axiom report, if you will, the

23   forensic tool of the Baxter backup?

24   A.    Yes.

25   Q.    Can you tell us what information is contained on this

1   Exhibit 12?

2   A.    So this is information regarding to an Apple ID tied to

3   the user Backup.

4   Q.    And is that Apple ID shown on this Exhibit 12?

5   A.    Yes.

6   Q.    And is that next to "Username"?

7   A.    Yes, it is.

8   Q.    Can you tell us then what the Apple ID associated with

9   this profile is?

10  A.    It was pwbaxter@gmail.com.

11  Q.    Who inputs the username?  Does the computer do that

12  automatically, or does the user do that?

13  A.    The user.

14  Q.    And again, if we go to "Account added date and time,"

15  what's that information?

16  A.    That is when the Apple ID was added to the user profile

17  Backup.

18  Q.    And when did that happen in this instance?

19  A.    February 18, 2019 at 12:48 p.m.

20  Q.    May we go to Exhibit 13, please.  Do you recognize Exhibit

21  13?

22  A.    I do.

23  Q.    Is this also from the Axiom report of your forensic

24  evaluation?

25  A.    Yes.

1   Q.   Does this also pertain to the Backup profile?

2   A.   Yes, it does.

3   Q.   And can you tell us what information is on this of

4   significance?

5   A.   This is the artifact information regarding to the use of

6   FireFox browser.

7   Q.   And according to this information -- well, let me ask you,

8   it says, "Title, Male, Baxter, Patrick, Stash, Outlook."  What

9   does that mean?

10  A.   So the user accessed the Outlook 365 inbox, and that title

11  is actually the title of the web page that the user had

12  accessed.

13  Q.   So while on the Backup profile, somebody checked the

14  Patrick Baxter Outlook?

15  A.   Email account, yes.

16  Q.   Yes.  Okay.  Could we look at Exhibit 11, please, I

17  believe we have two pages, the first page.

18       What is Exhibit 11?

19  A.   This is a recreation of the account Backup.  So when the

20  user Backup logs into its profile, it is what is presented if

21  you were to log in as Backup.

22  Q.   On the right-hand side there are a bunch of files and/or

23  folders.  What are those?

24  A.   Those are folders saved by the user.

25  Q.   May I have the second page of Exhibit 11.  If we could go

1    out from that.  Thank you, Ms. Gelman.

2        Do you recognize what's on page 2 of Exhibit 11?

3    A.    Yes.

4    Q.    Is this just a blowup of the right-hand side of what we

5    had seen on page 1?

6    A.    Yes.

7    Q.    And, again, now that we can see it a little bit more

8    clearly, can you explain to the ladies and gentlemen of the

9    jury what these are and what they represent?

10   A.    So the icon that's blue is a folder where a user can store

11   data or files within that folder.

12   Q.    And can you read the names of these folders?

13   A.    Starting from the top right, "Asian," "Documen,"

14   "Freenet," "Frost," "New," "Russian P," "Tara," "Uploads" and

15   "White PR."

16   Q.    Were there other folders, if you will, on the Backup that

17   were not shown visibly on this entry screen?

18   A.    Yes.

19   Q.    And can you tell us, have you had an opportunity to

20   know -- strike that.  One of these is a folder for Freenet.

21   What is Freenet?

22   A.    It is a peer-to-peer file-sharing program.

23   Q.    In which individual users can share pictures, videos, and

24   other sort of media, I think the term is?

25   A.    Yes.

1    Q.    Do you know what was in the file "Tara" here?

2    A.    Series of known child pornography.

3    Q.    Thank you.  May we have Exhibit 14.1.  Thank you.

4          Do you recognize Exhibit 14.1?

5    A.    I do.

6    Q.    What is depicted on Exhibit 14.1?

7    A.    These are files that were saved under the user Backup or

8    the folder resided on the desktop, and the folder name was

9    "Freenet."  Within that Freenet folder, this was a sub-folder

10   called "Downloads."

11   Q.    So this is from the SSD?

12   A.    Yes.

13   Q.    It is from the Backup profile?

14   A.    Yes.

15   Q.    This is from the Freenet folder?

16   A.    Yes.

17   Q.    And within the Freenet folder there was a sub-folder named

18   "Downloads."

19   A.    Yes.

20   Q.    What information is reflected here in this spreadsheet?

21   A.    These are the files that were saved, downloaded from

22   Freenet.

23   Q.    I'd like to go over at least one of these.  Can we

24   highlight row 65, please.  So what is in column A?

25   A.    Name of the file.

1    Q.    And what is the name of the file?

2    A.    "Tara 8YR-vibrator and slams finger into pussy awesome

3    vid-July 222007.wmv."

4    Q.    "Wmv," what does that stand for?

5    A.    Windows media video.

6    Q.    Is that a video or a still image?

7    A.    Video file.

8    Q.    And the video file is in this location on the SSD?

9    A.    Yes.

10   Q.    And under column B, we have a lot of information, also

11   including part of that as Tara 8YR and go on with the name you

12   just read.  What information is depicted in column B?

13   A.    This is the file path where the file is residing.

14   Q.    And can you explain to us even basically what the

15   different information that's significant or relevant in the

16   file path is here?

17   A.    It tells you where to find this file.  So that's pretty

18   much like an address to that file.

19   Q.    I note that -- or will you note that it's

20   /desktop/Freenet/downloads/ and the name of that actual file.

21   Is that true?

22   A.    Yes.

23   Q.    And, again, all of these -- again, can we go to the bottom

24   to see how many there are.

25          And how many are there, approximately?

1    A.   Approximately 116 files.

2    Q.   And all of these were from Freenet?

3    A.   Yes.

4    Q.   If we look at -- we're not going to, but if we look at

5    each and every column B, to follow the file path, they will all

6    say "Freenet downloads."  Is that true?

7    A.   Yes.

8    Q.   So where did these videos come from?

9    A.   From Freenet.

10   Q.   They were downloaded from Freenet?

11   A.   Correct.

12   Q.   And, again, this is all on the SSD?

13   A.   Yes.

14   Q.   Which was a mirror image of what was taken from the

15   laptop?

16   A.   Correct.

17   Q.   So we can take this off the screen, please.

18        I don't want to show child pornography to the jury again,

19   so let me ask you, are you aware that earlier today Special

20   Agent Montoya showed the jury three videos taken from the

21   sub-folder downloads within the Freenet folder?

22   A.   Yes.

23   Q.   If we could look at Exhibits 14, 14-2, 14-3 and 14-4.

24        Let's start with 14-2.  What information is contained in

25   4-2?

1    A.    It contains the file name, the date it was saved onto the

2    laptop, as well as the file size and the location of where this

3    file resides.

4    Q.    So is this the metadata for one of the three videos from

5    Freenet that your colleague showed the jury earlier today?

6    A.    Yes.

7    Q.    And the file name is at the very top under "Artifact

8    Information."  Is that true?

9    A.    Yes.

10   Q.    And again, read it for us, please, just for the record.

11   A.    "Tara 8-vibrator and slams finger into pussy awesome

12   vid-July 2022,2007.wmv."

13   Q.    So that's the name of that file?

14   A.    Correct.

15   Q.    Now, is there any information on this document that tell

16   -- any metadata on this document that tells us when this might

17   have been downloaded onto the laptop?

18   A.    Yes, it would be the Created Date.

19   Q.    And what is the created date?

20   A.    October 29, 2021 at 11:02 p.m.

21   Q.    That is when it was taken from Freenet onto the laptop?

22   A.    Correct.

23   Q.    And can you tell us this.  Is that in Eastern Standard

24   Time or in some other timing convention?

25   A.    Based on this, I'm not sure whether it was UTC or Eastern

1   Time Standard.

2   Q.   Well, you mentioned UTC.  What is UTC?

3   A.   It stands for Universal Coordinated Time or also known as

4   Greenwich Mean Time.

5   Q.   And why do some computer forensic tools give it to you in

6   Greenwich Mean Time, otherwise UTC?

7   A.   It is a standard means to set the timer on the world, so

8   not all information are going to be stored on local time.

9   Therefore, you have to calculate the offset depending on where

10  you reside or where this device was, based on time zone.

11  Q.   A standard convention used in this field?

12  A.   Yes.

13  Q.   Can we look at 14.3, please.  Again, what information is

14  contained on 14.3?

15  A.   The metadata information regarding to this file.

16  Q.   Again, I'm sorry?  Again, I apologize.

17  A.   Regarding to the file name "vid_20200509_063009.mkv."

18  Q.   Again, this is one of the three videos that your

19  colleagues showed the jury this morning from the Freenet

20  folder?

21  A.   Yes.

22  Q.   And the Created Date and Time, when was this downloaded

23  from Freenet onto the computer?

24  A.   October 5, 2021 at 8:07 p.m.

25  Q.   If we could go to 14.4.  Similarly can you tell us what

1    information is contained on 14.4?

2    A.    It would be the metadata information regarding the video

3    file.

4    Q.    And, again, for one of the files that Bryce Montoya showed

5    the jury today from Freenet?

6    A.    Yes.

7    Q.    And what is the Created Date for that?

8    A.    It's going to be October 18, 2021 at 9:50 p.m.

9    Q.    We've used the term or you used the term "metadata."

10   Perhaps you could tell us what that means specifically.

11   A.    Metadata is actually information regarding the file, so

12   data about data.

13   Q.    Okay.  Could we go to Exhibit 15, please, Ms. Gelman.

14        Do you recognize Exhibit 15?

15   A.    I do.

16   Q.    What information is contained in Exhibit 15?

17   A.    These are files that are saved under user Backup within

18   the folder Downloads.

19   Q.    So this is from the SSD?

20   A.    Yes.

21   Q.    Which has the mirror image from what used to be on the

22   computer?

23   A.    Yes.

24   Q.    This is in the Backup profile?

25   A.    Yes.

1   Q.   Previously we talked about the folder called "Freenet,"

2   correct?

3   A.   Yes.

4   Q.   Is this a different folder?

5   A.   Yes.

6   Q.   And what is this folder called?

7   A.   Ms. Gelman, if you could, if you could scroll to your

8   right.  Keep going, keep going.

9   Q.   A lot of data on this report, isn't there?

10  A.   Yes.  Right there.

11  Q.   Okay.  So what folder is this from?

12  A.   It's in the folder Downloads.

13  Q.   Again, just so it's clear, we haven't looked at the

14  Downloads folder yet, have we?

15  A.   No, we have not.

16  Q.   We looked at the Freenet folder and the sub-folder of

17  downloads, but this is not a sub-folder of Freenet.  This is

18  its own folder?

19  A.   Yes.

20  Q.   On the Backup profile, correct?

21  A.   Yes.

22  Q.   Great.  Now, again not wanting to show more pornography,

23  you are aware that your colleague, Special Agent Bryce Montoya,

24  showed the gentlemen and ladies of the jury earlier today two

25  pictures of A.F. in the bathroom door.  Is that accurate?

1  A.   Yes.

2  Q.   And are those two pictures listed here in the Downloads

3  folder?

4  A.   Yes.

5  Q.   I'd like you please, if you would, Ms. Gelman, to

6  highlight rows 123 and 137.  So let's look at 123 first.

7       Again, this is one of the two images of the seven-year-old

8  girl naked in the bathroom door.  Is that your understanding?

9  A.   Yes.

10  Q.   Okay.  The information here is the metadata, highlighted

11  on row 123 is the metadata for one of those two pictures.  Is

12  that accurate?

13  A.   Yes.

14  Q.   Does this metadata record when this bathroom picture was

15  taken?

16  A.   Yes, it does.

17  Q.   Would that be in column K?

18  A.   If you could scroll to column K, please.

19  Q.   Yes, if we could scroll, please.

20  A.   Yes, it is.

21  Q.   Okay.  So tell us, according -- and this is all from the

22  Axiom report, the gold standard tool that you use to analyze or

23  look at forensic data?

24  A.   Yes.

25  Q.   So when was this one picture from the bathroom taken?

1   A.    So item 123 was captured, the photo was taken on July 3,

2   2019 at 7:09 p.m. local time.

3   Q.    Eastern Standard?

4   A.    Yes.

5   Q.    Does the metadata also record where the two photos were

6   taken, specifically?  We know when, but now, where were they

7   taken?

8   A.    Yes.

9   Q.    What columns reflect that information?

10  A.    It would be under column T and column V.

11  Q.    What information specifically is maintained in columns T

12  and V?

13  A.    It provides a latitude and longitude of where this picture

14  was taken.

15  Q.    And that information actually comes from -- the cell phone

16  records that, does it not, that takes the picture?

17  A.    From the device, yes.

18  Q.    From the device, okay.  And can you tell us, please, have

19  you looked into what that longitude and latitude, where that

20  comes back to?

21  A.    Yes.

22  Q.    And where does it come back to?

23  A.    In the area of Gooch Street, Melrose, Massachusetts.

24  Q.    Does this metadata also tell us what device actually took

25  this photograph?

1    A.    It does.

2    Q.    And what columns tell us that?

3    A.    That would be column O and P.

4    Q.    And what information, what device, according to this, took

5    that image?

6    A.    It was from Apple iPhone XS model.

7    Q.    Again, if we can quickly go to 137.  All of the

8    information you've just talked about for 123, does it also

9    appear at 137 for the second photograph of the child in the

10   bathroom door?

11   A.    Yes.

12   Q.    And column C, we have the date.  Is that true?

13   A.    Yes.

14   Q.    And in column K we have when it was taken.  Is that

15   accurate?

16   A.    Correct.

17   Q.    And in this instance it's taken at what time?

18   A.    7:07 p.m. on July 3, 2019.

19   Q.    At 19:09:45?

20   A.    Yes.

21   Q.    So immediately, essentially one second before the other

22   photo.  Is that true?

23   A.    Yes.

24   Q.    And again, does the metadata for this second photo at 137

25   record where they were taken at T and V?

1    A.    Yes, it does.

2    Q.    And it's the same, isn't it true?

3    A.    Yes.

4    Q.    The longitude and latitude comes back to Gooch Street?

5    A.    Yes.

6    Q.    And, again, the device that took it is also reflected here

7    in O and P.  Is that true?

8    A.    Correct.

9    Q.    And that device is what?

10   A.    Apple iPhone XS model.

11   Q.    Thank you.  We can take that off the screen for a moment.

12         Detective Kajita, again, are you aware that Special Agent

13   Montoya showed the jury 16 photographs of a naked or semi-naked

14   A.F. in her ███████ bedroom at the defendant's house?  You're

15   aware he showed them to the jury today.  Is that true?

16   A.    Yes.

17   Q.    Were those 16 photos also found on the Downloads folder in

18   the Backup profile on the Samsung SSD?

19   A.    Yes.

20   Q.    Again, Ms. Gelman, if we can go back to that last exhibit.

21         Is there an entry on this spreadsheet for all 16 of those

22   images?

23   A.    Yes, there are.

24   Q.    May we look at or highlight rows 122 through 127, with the

25   exception of row 123, which we've just looked at as one of the

1    bathroom pictures.  Again, the "jpg" stands for what?

2    A.    Joint photographic expert group, also known as a jpeg.

3    Q.    Does that mean that's a picture or a video?

4    A.    Picture, still photo.

5    Q.    And, again, we're looking at 122, 124, 125, 126, and 127,

6    that is some subset of the 16?

7    A.    Correct.

8    Q.    But all 16 are here?

9    A.    Yes.

10   Q.    And if we can -- okay.  At 122, let's talk about the

11   metadata for 122.  Can you tell us what information is

12   contained in column K?

13   A.    The date when the picture was taken.

14   Q.    Which was?

15   A.    Item 122 was taken on July 4, 2019, at 18:59 hours.

16   Q.    Is that 6:59, almost 7:00?

17   A.    Yes.

18   Q.    P.M.?

19   A.    P.M.

20   Q.    18:59 is sort of a military time?

21   A.    Correct.

22   Q.    Does the metadata for that picture -- actually, before we

23   get to the metadata for that picture, the other pictures in

24   this sequence that are highlighted, the times are all in rapid

25   succession around that time, 18:59:56.  Is that accurate?

1    A.    Yes.

2    Q.    Okay.  So, again, focusing on 122, is there data here,

3    metadata that tells us where the picture was taken?

4    A.    Yes, it does.

5    Q.    And is that at T and V again?

6    A.    Yes.

7    Q.    And you've looked up this longitude and latitude?

8    A.    Yes.

9    Q.    And where is the location where the picture was taken?

10   A.    In the area of Gooch Street, Melrose, Massachusetts.

11   Q.    And does the metadata for this also show what device took

12   that picture?

13   A.    It does.

14   Q.    And where is that found?

15   A.    On column O and P.

16   Q.    And what device took that specific image?

17   A.    Apple iPhone XS.

18   Q.    If we just look at the data on the screen right now, all

19   of the highlighted images, all the naked pictures of A.F. were

20   taken with the iPhone XS.  Is that true?

21   A.    Yes.

22   Q.    And they were all taken at the same location, longitude

23   and latitude coming down to Gooch Street.  Is that true?

24   A.    Yes.

25   Q.    And the date and time they were taken, again -- can we go

 1    to K, please.  K tells us when they were taken.  Is that

 2    accurate?

 3    A.    Yes.

 4    Q.    And they were all on July 4, 2019 all at approximately

 5    about 1900 hours?

 6    A.    Yes.

 7    Q.    And the other -- we've only looked at five here, but

 8    there's 11 other entries that we're not going to go through,

 9    but they all have essentially -- not essentially -- they all

10    have the same information, though the time may be off a second

11    or two from these?

12    A.    Yes.

13              MR. TOBIN:  We can take that down for a moment,

14    please.

15    Q.    Detective Kajita, are you aware that earlier today your

16    colleague, Special Agent Montoya, showed to the jury two videos

17    that showed A.F. and other children naked in the upstairs of

18    the defendant's home?

19    A.    Yes.

20    Q.    Did you find those two individuals on the Samsung SSD in

21    the Backup profile?

22    A.    I did.

23    Q.    And, again, do they have all of the same metadata that

24    we've just seen for the 16 photos and the two bathroom photos?

25    A.    One of the files had all the information -- similar

1    information to the still photos.

2    Q.   And the other one did not have quite as much information?

3    A.   Correct.

4    Q.   Why is that?

5    A.   Could have been different reasons, whether, A, it was

6    edited by the user or the function was disabled by the user.

7    Q.   But those two videos were all taken in Gooch Street.  Is

8    that accurate?

9    A.   Yes.

10   Q.   Based on the data that we have from the profile or from

11   the information, the artifacts?

12   A.   Yes.

13   Q.   Okay.  Could we look at Exhibit 16.1, please.  16.1 is

14   obviously a picture of a young girl.  Did you locate this

15   photograph in the SSD backup hard drive?

16   A.   Yes.

17   Q.   And where was it specifically, in which folder?

18   A.   In the Downloads folder under user Backup.

19   Q.   And is that the same folder where the 16 pictures of this

20   child is found naked?

21   A.   Yes.

22   Q.   And is that the same SSD where the two videos of this

23   child found naked was located?

24   A.   Yes.

25   Q.   And is that the same SSD where the two naked pictures of

1  this child in the bathroom door was found?

2  A.   Yes.

3  Q.   Okay.  Was this image found in any other seized device?

4  A.   Yes.

5  Q.   Where was it found?

6  A.   It was in the Apple MacBook, which we referenced as item

7  number 6 previously.

8  Q.   So the user moved it from the Apple iBook or Apple laptop

9  onto the SSD?

10  A.   Yes.

11  Q.   Along with the pornographic images?

12  A.   Yes.

13  Q.   Can we go to the next photograph, please.  The next

14  exhibit, 16.2, this, again, is a picture of a girl, a younger

15  baby.  Is that accurate?

16  A.   Yes.

17  Q.   Did you find this during your forensic examination of the

18  SSD?

19  A.   Yes, I did.

20  Q.   Where did you find that?

21  A.   Again, in the user Backup in the folder Downloads.

22  Q.   And was that with the pornography that we've gone over at

23  some length today?

24  A.   Yes.

25  Q.   Thank you.  May we have Exhibit 17.

1      And did you find this during your forensic examination of

2  the eight items?

3  A.    I did.

4  Q.    Where was this located?

5  A.    This was actually located from the laptop.

6  Q.    Was it located on the SSD?

7  A.    I did not find that in the SSD drive.

8  Q.    The user did not transfer this from the laptop to the SSD?

9  A.    Correct.

10         MR. TOBIN:  May I have a moment, Your Honor?

11         THE COURT:  Sure.

12         MR. TOBIN:  I have no further questions, but please

13  remain seated.

14         THE COURT:  Cross.

15         MR. SIMONS:  Yes.

16  CROSS-EXAMINATION BY MR. SIMONS:

17  Q.    Good afternoon.

18  A.    Good afternoon, counsel.

19  Q.    Detective Kajita, is it fair to say you were not involved

20  with the preliminary stages of the investigation up and to

21  including the search warrant execution?

22  A.    Yes.

23  Q.    So who were you contacted by at the FBI to be involved in

24  this?

25  A.    So the case agent, Special Agent Montoya, submitted a

1    request to the New England Forensics Laboratory to conduct a

2    follow-up investigation.

3    Q.    Are you one of a number of people that can do forensic

4    extractions?

5    A.    Yes.

6    Q.    Does it just get randomly assigned to somebody that's

7    available?

8    A.    Yes.

9    Q.    Okay.  Had you ever done work with Special Agent Montoya

10   before this case?

11   A.    I believe I did.  I'm not quite sure.

12   Q.    Okay.  So with regard to the eight devices, you saw that

13   list of eight different devices, did you personally observe or

14   extract each of those devices?

15   A.    Yes.

16   Q.    Did you look in every image or every video from each of

17   those devices?

18   A.    Every image?

19   Q.    Yes.

20   A.    There were a lot of files, so no, I did not.

21   Q.    And was one of your jobs to determine if you believed that

22   there was child pornography on any of those devices?

23   A.    It was not my job, no.

24   Q.    Were you reporting to Special Agent Montoya whether you

25   believed that you found any of those files?

1    A.    The initial request was to create a copy of the forensics

2    report and provide it to Special Agent Montoya for his

3    investigative review.

4    Q.    Were you tasked at all with trying to find images or

5    videos that you believed contained child pornography?

6    A.    No.

7    Q.    So you created an extraction -- let me ask you this.  Is a

8    mirror image and an extraction, are those two different things?

9    A.    Yes.

10   Q.    Can you describe what each of them are?

11   A.    So extraction is a process of where I take the data, and

12   using a forensic method, to copy it over in a forensic sound

13   state.  Mirror image is just a type of a copying process.

14   Q.    And why would you choose one method over the other?  Do

15   you have to choose one method or the other?

16   A.    Depends on the status of the device or the capabilities

17   available.

18   Q.    And for each of these devices did you do the same method?

19   A.    Depending on the device, each extraction or imaging is

20   different.  For example, a phone uses a different tool when it

21   comes to comparing with laptops or hard drives.

22   Q.    Okay.  Was there any indication that any of the

23   photographs or videos that you believe were contained --

24   sorry -- were taken in the Gooch Street area, was there any

25   indication that any of those were uploaded to Freenet or to any

1    other internet site?

2    A.    Not to my understanding, no.

3    Q.    Okay.  Is that something that you would have expected to

4    be able to find?

5              MR. TOBIN:  Objection.

6              THE COURT:  Basis?

7              MR. TOBIN:  Relevance.

8              THE COURT:  Overruled.

9    Q.    Would you have expected to be able to see that in the

10   computer extractions or the hard drive extractions?

11   A.    Without understanding the nature of the case or the depth,

12   in-depth part of the investigation, I would not have known

13   initially.

14   Q.    What do you mean "initially"?

15   A.    So without understanding the whole investigations, I was

16   tasked to do a technical review of the information.

17   Q.    So am I to understand that it would be possible for

18   somebody to determine if those files were uploaded, but you

19   didn't take those steps?

20   A.    No, I did not.

21   Q.    But it would be possible, as far as you know?

22   A.    I'm not quite sure how Freenet exactly works in regards to

23   upload.

24   Q.    Have you ever used Freenet?

25   A.    No, I have not.

1    Q.    Okay.  So when you talked a little bit about items that

2    were found in a Freenet downloads folder, is it fair to say

3    that you can't tell this jury that anything was downloaded from

4    Freenet?

5    A.    No.  There are other information regarding to potential

6    download from Freenet from other artifacts, such as a browser

7    history.

8    Q.    Okay.  But you have not seen any evidence directly from

9    Freenet that any of these items at all were downloaded from

10   Freenet?

11   A.    No.

12   Q.    Okay.  Obviously we can see what the file names are, and

13   I'm sure that's part of your calculus, right?

14   A.    Yes.

15   Q.    Okay.  Now, with regard to the extraction, I know Attorney

16   Tobin had asked you why wasn't there an exact copy of

17   everything on the MacBook Air as there was on the SSD.  You

18   mentioned one of the things could be that a user deleted items

19   after they were backed up?

20   A.    Yes.

21   Q.    Is it fair to say that when you're doing an extraction and

22   a forensic review of a device, you sometimes can retrieve

23   deleted items?

24   A.    Yes, you can.

25   Q.    Okay.  In this particular instance, did you come across

1  any evidence that led you to believe that there had been child

2  pornography files deleted from that MacBook?

3  A.    Sorry, can you repeat that question, please.

4  Q.    Sure.  Let me ask it a different way.  Did you see any

5  evidence that what you believed to be child pornography was

6  ever on the MacBook Air and then deleted?

7  A.    I did not find that from the laptop.

8  Q.    Okay.  All right.  And some of these images you believe

9  were created a day or a few days before the search warrant was

10  executed, right?

11  A.    Correct.

12  Q.    Okay.  In other words, if something was written over,

13  there wouldn't have been much time to try to write over enough

14  data to get rid of it completely?

15  A.    Yes.

16  Q.    Okay.  With regard to the dates, by the way, how do you

17  determine whether or not the dates that are listed on those

18  extractions are accurate?

19  A.    I don't understand your question.

20  Q.    So we can see dates and times that files were created or

21  modified, right?

22  A.    Yes.

23  Q.    How do you know those dates and times were accurate?  How

24  do you know that the computer says it's -- I don't know --

25  let's say October 8.  How do you know that the computer was

1    accurate that it was actually October 8?

2    A.    There are different reasons.  The time that was set on the

3    computer as well as any modification or creation of a file is

4    recorded on the system from the computer.

5    Q.    Can you elaborate?  I'm not sure I understand.

6    A.    So you asked how a timestamp is written on the data.  So

7    one way is, the system has to have a date and time.  So all of

8    us have a computer where a date and time is automatically set.

9    Once that's set and then you -- and then any activity you do

10    from that computer is recorded by the timestamp on the machine.

11    Q.    I see.  But that's assuming that the time and date were

12    automatically set.  That's not always the case, right?

13    A.    Yes.

14    Q.    "Yes," meaning it's not always the case?

15    A.    Yes, majority of the time it is the case when you set up a

16    computer, it's asking for the time zone.  And also, it is also

17    connecting to the internet where it's pulling all that data and

18    time from.

19    Q.    But there's some level of user decisionmaking, right?

20    Somebody would have to say, This is the time zone I'm in.  I

21    want this to be automatically updated.

22    A.    Correct.

23    Q.    And that's not always the case, right?

24    A.    Yes, that is not always the case.

25    Q.    Okay.  With regard to your handling of the SSD, the hard

1    drive in question, you had it and you weren't able to get in

2    yourself?

3    A.    Correct.

4    Q.    What did you do to try to get in?

5    A.    So when I acquired the data, I immediately noticed that it

6    was encrypted, so there was no any other attempts based on the

7    encryption.

8    Q.    Once you find that it's encrypted, you don't try again?

9    A.    I don't have the means or the tools to brute-force recover

10    the password at my lab.

11    Q.    So then you have to find somebody else who can?

12    A.    Yes.

13    Q.    And how did it come to be that you sent this or it got

14    sent to Quantico?

15    A.    So the data was saved on an FBI secured network.  Once the

16    data was acquired and a follow-up was conducted from Special

17    Agent Montoya to the specialized unit in Quantico, they were

18    given access into our server.

19    Q.    So did the drive actually go to Quantico?

20    A.    It did not.

21    Q.    So did it stay in your possession?

22    A.    Yes.

23    Q.    And so whoever at Quantico, they just saw an extraction of

24    that, essentially?

25    A.    The extracted image.

1    Q.    Okay.  So you were able to make an extracted image even
2    though it's encrypted?
3    A.    Yes.
4    Q.    Does that just mean that you can't really see what's
5    inside it?
6    A.    Correct.
7    Q.    All right.  Do you know what they do at Quantico?  Did you
8    know how they found the password?
9    A.    That is their specialized technique.  However they recover
10    the password, it was not shared to our lab.
11    Q.    Okay.  At some point you hear back from Quantico and they
12    tell you they've got a password?
13    A.    Yes.
14    Q.    You said you entered it onto -- how did you enter it?
15    Where did you put it in?
16    A.    I put it in through my forensic tool.
17    Q.    And as far as you understand, the password they recovered
18    would be the password that a user would input to the computer
19    when it's connected to the drive?
20    A.    It was used to decrypt that data, not so much on, the user
21    account was not specified from the Quantico headquarters.
22    Q.    Just to be clear then, does that mean the password you
23    talked about, the SP -- sorry -- SP20DETT, that's not
24    necessarily the password that the user would have used?
25    A.    That would be SR20DETT, that was set by the user.

1    Q.    That would have been set by the user?

2    A.    Correct.

3    Q.    Okay.  You said you knew that had to do with a

4    four-cylinder engine that was used in the Nissans in the '90s?

5    A.    Yes.

6    Q.    Are you a car guy?

7    A.    Not really.

8    Q.    How did you find that out?

9    A.    A simple Google search.

10   Q.    Okay.  So you were interested to know where that came

11   from?

12   A.    Yeah.

13   Q.    Okay.  Any evidence that Mr. Baxter ever had a Nissan or

14   any interest in Nissans?

15   A.    Not that I'm aware of.

16   Q.    Okay.  There were two phones that you looked at, right?

17   A.    Yes.

18   Q.    Do you know whether either of them were used by Vanessa

19   Baxter?

20   A.    I believe the item iPhone 5C was used by Ms. Baxter.

21   Q.    Okay.  And other than creating an image or a backup of

22   those two phones, did you look through them to see what they

23   contained?

24   A.    Yes.

25   Q.    Okay.  Because earlier I had asked if you looked through

1    all the photo and video files from all the devices.  You said

2    no.  How did you decide what to look for and when to look?

3    A.    So I didn't -- when I answered that question, it was more

4    did I look at every bit of data that was on the device.  No, I

5    did not look at every single photo that was submitted to us all

6    eight devices.  I did scan through some of items so that I can

7    report back to the Special Agent Montoya, or if there's any

8    follow-up questions from Special Agent Montoya, I would review

9    the content.

10   Q.    And did that occur, did Special Agent Montoya ask you to

11   take a look at some of the devices further than you had already

12   done on your own?

13   A.    At a later time, yes.

14   Q.    Who maintained the devices from the time that you had made

15   the backups?

16   A.    It was under my custody.

17   Q.    Okay.  And does that remain true up to the point of this

18   trial?

19   A.    No.  And then it gets checked back into the FBI evidence

20   control facility where they maintain all of the evidence from

21   the FBI Boston field office.

22   Q.    While you're maintaining the SSD, how does Special Agent

23   Montoya come to be able to access it?  Do you make a copy for

24   him?

25   A.    Of the process report or the physical drive?

1  Q.    Well, of the contents of the physical drive.

2  A.    Yes, I created a working copy for him to review everything

3  that was done to that point.

4  Q.    Okay.  With regard to some of those extraction reports

5  that you had or some of those Excel files that we looked at

6  earlier, there was a number of different dates, like creation

7  date, last accessed, modified.  So any given file, for example,

8  you can often see when it was first created, when it was

9  modified, when it was last opened up.  Is that right?

10 A.    Yes.

11 Q.    And is that typically the case for most video files and

12 photo files?

13 A.    Most files, yes.

14 Q.    Okay.  Both for the external hard drives and for the

15 computer?

16 A.    Yes.

17 Q.    Okay.  All right.  When somebody is backing up a MacBook,

18 for example, and there are two user profiles, does the backup

19 automatically back up both users files?

20 A.    It depends on the user.  If the user selects to back up

21 the entirety of the hard drive of the computer, yes.  If the

22 user selects only one user account, then just the one user

23 account.

24 Q.    So it would be possible then for one user of a shared

25 computer to do backups of the entirety of the computer?

1  A.   Yes.

2  Q.   Okay.  And then would it be fair to say that there would

3  be only one user or Apple ID attributed to that external hard

4  drive?

5  A.   I believe it depends on the circumstances.  For this

6  instance, the SSD drive had two user profiles.  Again, I can't

7  speak to how, but I believe it is possible that you can save --

8  to save or backup two users' account information and then still

9  just back up that one user account.

10 Q.   One of the last exhibits that we were looking at was an

11 Excel spreadsheet that I believe you attributed to be a Freenet

12 download file folder.  And there were some photographs that

13 Attorney Tobin asked you about that were taken allegedly at

14 Mr. Baxter's house.  Do you recall that?

15 A.   Yes.

16 Q.   And you can see dates of creation, for example, right?

17 A.   Yes.

18 Q.   Was there any evidence from where those photos came before

19 they ended up in that file folder?

20 A.   No.  It only stated where that file resides and the make

21 and model the photo was captured from.

22 Q.   Okay.  The initial creation of the --

23 A.   Photo, yes.

24 Q.   And is it fair to say there was no corresponding

25 information on the laptop that would show you that it was taken

1    from, like moved from the laptop to the external hard drive?

2    A.    I did not find an artifact pertaining to that information.

3    Q.    And when you say "artifact," that is some piece of

4    evidence from the computer that would give you a clue as to

5    when or how or where something was moved?

6    A.    Yes.

7    Q.    All right.  And, again, going back to my earlier question,

8    would that also include sometimes deleted or recently deleted

9    files?

10   A.    Yes.

11   Q.    All right.  So, for example, if someone were to take a

12   file from the laptop, move it to a file within the external

13   hard drive and then delete the file from the laptop, you might

14   expect to recover information both from the external hard

15   drive, that you can see it in the external hard drive where it

16   was moved, but also you might expect to see some evidence from

17   the laptop as to where it came from or even that it was

18   recently deleted?

19   A.    Yes.

20   Q.    Okay.  Ms. Gelman, can I ask you to bring up Exhibit 11,

21   please.  Thank you.

22        I just wanted to ask you about this.  I may have

23   misunderstood, but I think you said this was a recreation of a

24   desktop.  Is that right?

25   A.    So Axiom, yes, it's a recreation.  Based on all the

 1    artifacts that was on the user setting, the tool was able to

 2    produce a graphic version of what the desktop would look like

 3    if the user were to log in.

 4    Q.    Is this from the computer or from the SSD?

 5    A.    From the SSD that was backed up from the laptop.

 6    Q.    When somebody, when a user connects the SSD to a laptop,

 7    would they actually see this, or is this just a manufactured

 8    picture to make it easy for people to understand what's on the

 9    SSD?

10    A.    So I believe there was another exhibit prior to this that

11    had all the user information, and that information is the -- it

12    saves all the user settings.  So if I were to restore that SSD

13    drive onto the MacBook and sign in under the user Backup, this

14    is what I should see if I were to log in to that user.

15    Q.    In other words, this would be what you'd expect to be a

16    mirror image of a laptop backup if nobody manipulated anything

17    else?

18    A.    It should be, yes.

19    Q.    Okay.  But when you look at the laptop, that did not

20    contain what you believed to be child pornography, it didn't

21    look exactly like this.  Is that right?

22    A.    Correct.

23    Q.    File folders were different, the desktop was different?

24    A.    Yes.

25    Q.    Okay.  So nobody would ever have seen this exact image if

1    you or somebody had not created it for the purpose of

2    illustration, right?

3    A.    I don't understand your question.  Sorry.

4    Q.    What we're seeing now, Exhibit 11, did that ever exist in

5    reality as far as you know, like as pictured exactly as

6    pictured?

7    A.    No.

8    Q.    Okay.  Even the background, this beautiful flower, did you

9    pick that?

10   A.    No.  It was set by the user.

11   Q.    When you say "the user," the user of --

12   A.    Backup, the user account Backup.

13   Q.    Okay.  The user Backup that was only contained within the

14   SSD?

15   A.    Yes.

16   Q.    Okay.  Understood.  Do you know whether or not the backup

17   was used as a -- well, let me strike that.

18        Do you know when somebody was connecting the laptop to the

19   SSD, was it always physically connected, or could it have been

20   connected by WiFi?

21   A.    It was physically connected.

22   Q.    Every single time?

23   A.    Yes.

24   Q.    All right.  And that's something that you can tell when

25   you're doing the evaluation of the mirror image of the

1    extraction?

2    A.    Based on the earlier exhibit of connection history, device

3    history, it shows that you had to physically connect the hard

4    drive onto a computer.

5    Q.    Okay.  Thank you, Ms. Gelman.

6          Are you aware that there was somewhere in the neighborhood

7    of 100,000 photographs on the SSD drive?

8    A.    Yes.

9    Q.    I presume you probably didn't see nearly that number.  Is

10   that accurate?

11   A.    I didn't check every single file that was stored on that

12   drive, yes.

13   Q.    And those files were contained over how many different --

14   sorry.  Those photos were contained over how many different

15   files, file folders?

16   A.    I believe, top of my head, approximately three or four

17   folders.

18   Q.    Okay.  With regard to the Freenet Downloads folder, do you

19   remember approximately how many video or picture files were

20   contained in that?

21   A.    I believe there was 116 files.

22          MR. SIMONS:  Okay.  Can I just have a moment, Your

23   Honor?

24          THE COURT:  Yes.

25          MR. SIMONS:  All right.  Excuse me.  Just one or two

1    more.

2    Q.    Is it fair to say that the laptop contained two user

3    profiles and so did the SSD drive, right?

4    A.    Yes.

5    Q.    But they weren't the same -- they had different names

6    anyway?

7    A.    Correct.

8    Q.    And so when I asked you before about whether or not

9    backing up the laptop to the SSD, whether it would encompass

10    both user profiles, is it fair to say you wouldn't necessarily

11    know whether they were both backed up or whether one was backed

12    up to the SSD?

13    A.    Correct.

14    Q.    Okay.  Is there any reason why the two profiles in the SSD

15    would not replicate the two user profiles on the computer?

16    A.    I believe it's based on the backup method and the tools

17    that was used to back up.

18    Q.    Can you elaborate on that?

19    A.    So, again, depending on the user, how they backed up the

20    profile, they could use a third-party application to actually

21    start the computer from that SSD drive and then boot into that

22    user profile from the backup state on the SSD drive.

23    Q.    Okay.  Sounds like you said somebody could do that.  Is

24    there any evidence that somebody did do that?

25    A.    I don't have -- I don't have the --

1    Q.   I mean, you can't say definitively that somebody ever did

2    that.  Is that fair to say?

3    A.   Correct.

4    Q.   Just going back to the methods of backup, presumably

5    you're familiar with the Mac or Apple way of using Time Machine

6    to backup a computer?

7    A.   Yes.

8    Q.   And essentially, is it fair to say that that's a way that

9    it's a native Apple method to back up a computer to a hard

10   drive, just sort of backs up the whole thing?

11   A.   Yes.

12   Q.   But there's also other ways to back up a computer that

13   somebody could just use an external hard drive to manually

14   bring over files?

15   A.   Yes.

16   Q.   Can you tell in this instance with the SSD whether one of

17   those method were used or whether it was a different method?

18   A.   Through -- so I did find an artifact pertaining to

19   potential use of a program called Carbon Copy Cloner.

20   Q.   Is that similar to Time Machine?

21   A.   I believe it's a little different.  The user can, again,

22   unlike Time Machine, you can actually copy the content or the

23   user information to a hard drive and start the computer from

24   that hard drive.  You can also encrypt that user information

25   through that program.

1    Q.    On the files that you found on the SSD, is there a way for

2    you to tell whether an individual file was dragged from one

3    location on the computer to the hard drive or whether it was

4    part of an overall backup?

5    A.    I did not find artifact pertaining to the copy of

6    individual files.

7    Q.    Does that mean that your belief is that the laptop would

8    have been backed up as a whole?

9    A.    Yes.

10           MR. SIMONS:  Okay.  Thank you very much.

11           MR. TOBIN:  A few questions, Your Honor, if I might.

12   REDIRECT EXAMINATION BY MR. TOBIN:

13   Q.    Can we pull up, please, Exhibit 14.1, please.

14         Sir, this is Exhibit 14.1.  We've seen it before.  Do you

15   agree?

16   A.    Yes.

17   Q.    These are the images in the Freenet folder, sub-folder

18   Downloads, correct?

19   A.    Correct.

20   Q.    We've gone over at some length the information on B, is

21   the file path?

22   A.    Yes.

23   Q.    And is it your testimony or was it your testimony that

24   these images, these videos, more than 100, were downloaded from

25   Freenet?

1    A.    Yes.

2    Q.    Now, can we go back to, I think it's Exhibit 11 with that

3    pretty flower on the front of it.  There has been some

4    questions on cross-examination about this.

5         Now, your testimony is that the data, the two profiles

6    that at some point had been on the laptop, were transferred or

7    backed up onto the SSD.  Is that accurate?

8    A.    Yes.

9    Q.    Once that is accomplished and everything is on the SSD,

10   the laptop can still be accessed, can't it?

11   A.    Yes, it can.

12   Q.    And what's on the laptop can be changed; isn't that

13   accurate?

14   A.    Yes.

15   Q.    Things can be erased?

16   A.    Correct.

17   Q.    Things can be added?

18   A.    Yes.

19   Q.    Folders can be added and taken off?

20   A.    Correct.

21   Q.    None of that would reflect it on the SSD, which is just

22   sitting over here.  It hasn't updated or hasn't taken what the

23   changes are, it doesn't automatically go onto the SSD?

24   A.    Correct.

25   Q.    So the SSD essentially has something that was static.  So

1    let's look at Exhibit 11.  What is Exhibit 11?

2    A.    This is a visualization of the desktop for the user

3    Backup.

4    Q.    And that is the visualization of what it would have looked

5    at at the time the backup was done?

6    A.    Correct.

7    Q.    And if that changed because of what the user chose to do,

8    if you then look at the laptop after the change is made, it

9    will look different?

10   A.    Correct.

11   Q.    Let me just have a moment, please.

12         Just so maybe we understand the delineation of roles, the

13   case agent, the lead case agent was who?

14   A.    Special Agent Bryce Montoya.

15   Q.    And your role in the investigation was as the forensic

16   investigator?

17   A.    Examiner, yes.

18   Q.    Examiner, excuse me.  And the way the FBI does it, your

19   role is to make the data available to the case agent.  Is that

20   true?

21   A.    Yes.

22   Q.    You're to use the various tools to unlock, and you use

23   that program to make it user friendly for the case agent?

24   A.    Correct.

25   Q.    So it would be the case agent that primarily is looking at

1    all of the actual pictures and videos.  That wasn't your role.

2    Isn't that true?

3    A.    Correct.

4    Q.    At some point, you went back and looked at what was

5    actually extracted from this.  Isn't that true?

6    A.    Yes.

7    Q.    And it was you that found some of these images that were

8    taken, the pornographic images taken actually on Gooch Street?

9    A.    Yes.

10    Q.    And of course you notified the case agent?

11    A.    Correct.

12    Q.    And we're here today?

13    A.    Yes.

14            MR. TOBIN:  Thank you.

15            MR. SIMONS:  Just briefly.

16    RECROSS-EXAMINATION BY MR. SIMONS:

17    Q.    Is it fair to say that there was no evidence of Freenet

18    being downloaded onto the laptop computer?

19    A.    I did not see artifact pertaining to download of Freenet.

20    Q.    Okay.  Not even deleted files or anything like that?

21    A.    No.

22            MR. SIMONS:  Okay.  Thank you.

23            MR. TOBIN:  One follow-up on that?

24            THE COURT:  No.  Direct, redirect, cross, recross.

25    You're excused.

```
 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  Next witness, please.

 3              MS. SOTO:  United States calls Amy ████████.

 4         AMY ████████, Sworn

 5              COURTROOM CLERK:  You can be seated.  Can you please

 6    state your name and spell your last name for the record.

 7              THE WITNESS:  Amy ████████, ████████████████.

 8              COURTROOM CLERK:  Thank you.

 9    DIRECT EXAMINATION BY MS. SOTO:

10    Q.   Good afternoon, Ms. ████████.  Where do you live?

11    A.   West Kelowna, BC, Canada.

12    Q.   And do you live with anyone there?

13    A.   I do.  My spouse and our two children.

14    Q.   What are the names and ages of your children?

15    A.   A.F. is 12 and M.F. is ten.

16    Q.   How long have you lived in Canada?

17    A.   My whole life.

18    Q.   Are you employed?

19    A.   I am.

20    Q.   Where?

21    A.   The Okanagan Regional Library.

22    Q.   How long have you been --

23    A.   Nine years there.

24    Q.   And what's your role?

25    A.   I'm a librarian.  Most days anyway.
```

1   Q.   Ms. ██████, do you know the defendant in this case?

2   A.   I do.

3   Q.   Who is he?

4   A.   He's my ████████████, Patrick Baxter.

5   Q.   Approximately how long have you known the defendant?

6   A.   17 years, 18.

7   Q.   And what is your relationship to him?  What is your

8   familial relationship?

9   A.   He's my ████████████.

10  Q.   And how is he your ████████████?  Who is he married to?

11  A.   He's married to my ████████████.

12  Q.   Are you aware of any interests or hobbies of Mr. Baxter?

13  A.   Patrick likes cars and gadgets.

14  Q.   And how do you know that?

15  A.   We visit each other every few years.

16  Q.   Directing your attention to July 2019, Ms. ██████, in

17  July 2019 did you take a vacation?

18  A.   Yes, yes.

19  Q.   Where did you go?

20  A.   We flew into Boston, and we stayed with the Baxters in

21  Melrose, and then we spent some time in Pittsfield with ██

22  ████████████ and then came back to Melrose.

23  Q.   What was the purpose of the trip?

24  A.   Family visiting.

25  Q.   Do you recall the dates of the trip?

1    A.    Yes.  We flew in the third of July and we left the 13th of

2    July.

3    Q.    And you referred to "we."  Did anyone in your family join

4    you on that vacation?

5    A.    Yes, my spouse and our children.

6    Q.    Were your children excited about the trip?

7    A.    Very excited to play with ████████████.

8    Q.    How old was your son at the time of the trip?

9    A.    Five.

10    Q.    And how old was your ████████ at the time of the trip?

11    A.    Seven.

12    Q.    Ms. Gelman, can we please display Exhibit 16-1.

13         Ms. ██████, do you recognize the child in this photo?

14    A.    Yes.  That's my ████████ A.F.

15    Q.    And is this how she appeared during the time of your July

16    2019 trip to Massachusetts?

17    A.    Yes.

18    Q.    Can we take that down, please.

19         Ms. ██████, you referred to spending time in Melrose,

20    Massachusetts during the trip?

21    A.    Mm-hmm.

22    Q.    And staying at the Baxter residence?

23    A.    (Nods.)

24    Q.    Who was at the Baxter residence at the time that you

25    stayed there in July 2019?

```
1    A.    Patrick, Vanessa, F.B., and C.B.

2    Q.    And who are F.B. and C.B.?

3    A.    Patrick and Vanessa's children.

4    Q.    Ms. Gelman, 16-2.

5          Ms. ██████, do you recognize the children in this photo?

6    A.    I do.  It's my daughter A.F. and my ████ C.B.

7    Q.    And C.B. is a nickname for C.B.?

8    A.    C.B.

9    Q.    For C.B.  Thank you.  Do you know where this photo was

10   taken?

11   A.    Yes.  It's the Baxter's living room.

12   Q.    Do you recall approximately when it was taken?

13   A.    It would have been during our trip in July.

14   Q.    That's July 2019?

15   A.    Yes.

16   Q.    Ms. Gelman, can we please display Exhibit 17.

17         Ms. ██████, do you recognize the people in this photo?

18   A.    Yes.  It's me, my spouse John, our children A.F. and M.F.,

19   and my ██████ F.B.

20   Q.    And can you distinguish between F.B. and M.F. here?  Seems

21   to be two male children.

22   A.    Yes.  F.B. has brown hair and he's sitting closest to the

23   camera.

24   Q.    Do you know where this photo was taken?

25   A.    Yes.  This was the Baxter's back yard.
```

1    Q.    And do you know when this photo was taken?

2    A.    Yes.  It was the last day we were there, the 13th of July.

3    Q.    During your trip to Massachusetts, did you bring a

4    cellular device with you?

5    A.    I did.

6    Q.    Do you recall what type of device it was?

7    A.    Yes.  It was a Samsung Nexus.

8    Q.    Did your husband bring a cellular device with him on this

9    trip?

10   A.    He did.

11   Q.    Do you recall what type of device it was?

12   A.    His was also a Samsung.

13   Q.    During this trip did you observe Mr. Baxter with a

14   cellular device?

15   A.    Yes.

16   Q.    Do you recall what type of device?

17   A.    An Apple phone.

18   Q.    At any point during the trip did you see either of your

19   children using phones to take photographs?

20   A.    No, not that I recall.

21   Q.    How about the Baxter children?

22   A.    No.

23   Q.    I'm now going to ask Ms. Gelman to switch computers.

24         Madam clerk, if we could turn the screen.

25         Ms. ██████, while you were staying at the Baxter home in

```
 1   July 2019, did your children bathe in the Baxter home?

 2   A.   Yes.

 3   Q.   And at that point in their lives were adults assisting

 4   them with bath time?

 5   A.   Yes.

 6   Q.   On this trip who would have been those adults?

 7   A.   Yes, we all assisted at one point.  So myself, John,

 8   Patrick and Vanessa.

 9   Q.   Ms. Gelman, can we please see 26-1.  Please take that

10   down.

11        Ms. ██████, do you recognize the location of the picture

12   that was just on your screen?

13   A.   Yes.  That's the Baxter's upstairs bathroom.

14   Q.   Do you recognize the child in that picture?

15   A.   Yes.  That's my ██████ A.F.

16   Q.   Did you take this picture?

17   A.   No, I did not.

18   Q.   When was the first time you saw the picture?

19   A.   When the RCMP showed it to me in August of this year.

20   Q.   What's the RCMP?

21   A.   That's the Royal Canadian Mounted Police.

22   Q.   Law enforcement located in Canada?

23   A.   Yes.

24   Q.   Ms. Gelman, Exhibit 26-2.  Let's take it down.  Thanks.

25        Is the child in that photo also your ██████,
```

1    Ms. ████████?

2    A.    Yes, it is.

3    Q.    During your trip in July 2019 to the Baxter residence, did

4    your children spend time in F.B.'s room?

5    A.    Yes.  That's where they were sleeping.

6    Q.    I'm sorry?

7    A.    Yes.  That's where they were sleeping.

8    Q.    Okay.  And did they do anything else in the room during

9    the trip?

10    A.    Yes.  They played, visited.

11    Q.    Were you always there in F.B.'s room when the children

12    were in there?

13    A.    No.

14    Q.    Ms. Gelman, 27-4.

15         Ms. ████████, do you recognize the location of the picture

16    that is before you?

17    A.    Yes.  That's F.B.'s bedroom.

18    Q.    Do you recognize the two children in that photo?

19    A.    Yes.  My daughter was sitting down and my son was exiting

20    through the doorway.

21    Q.    Where was your daughter sitting?

22    A.    On the bed.

23    Q.    Did you take this picture?

24    A.    No.

25    Q.    When was the first time you saw this picture?

1    A.    When it was shown to me yesterday.

2    Q.    Ms. Gelman, Exhibit 27-14, please.

3          Ms. ███████, do you recognize the child in that picture?

4    A.    Yes.

5    Q.    Who is it?

6    A.    That's my daughter.

7    Q.    Is she wearing the same shirt as she was in the previous

8    photo?

9    A.    Yes.

10   Q.    Can you describe that shirt?

11   A.    It's pink with a ruffle.

12   Q.    Do you recognize the location of that photo?

13   A.    Yes.  That's F.B.'s bedroom.

14   Q.    And how do you know that?

15   A.    You can see part of F.B.'s name on the wall.

16   Q.    Did you take this picture?

17   A.    No.

18   Q.    Were you previously shown other pictures of your daughter

19   at that location wearing only that pink T shirt?

20   A.    Yes.

21   Q.    Ms. ███████, did you give anyone permission to take these

22   types of photos of your daughter?

23   A.    No.

24              MS. SOTO:  Ms. Gelman, 25-1.

25              (Video played.)

```
 1    Q.    Do you recognize the location of the video?

 2    A.    Yes.  That's F.B.'s bedroom.

 3    Q.    Do you recognize the children in the video?

 4    A.    Yes.  You can see A.F., F.B., and M.F.

 5    Q.    Are the children clothed?

 6    A.    No.

 7    Q.    Do you recognize the male voice in this video?

 8    A.    Yes.  That's Patrick.

 9    Q.    Ms. ████, did you take this video?

10    A.    No.

11    Q.    When was the first time you saw the video?

12    A.    This video I seen for the first time yesterday.

13    Q.    Yesterday when you met with me and AUSA Tobin?

14    A.    Yes.

15              MS. SOTO:  Ms. Gelman, 25-3.

16              (Video played.)

17    Q.    Do you recognize the location of this video?

18    A.    Yes.  That's F.B.'s bedroom.

19    Q.    Do you recognize the child in this video?

20    A.    Yes.  That's my daughter.

21    Q.    Is she clothed?

22    A.    No.

23    Q.    Do you recognize the voice in this video?

24    A.    Yes.

25    Q.    Who is it?
```

```
 1   A.    It's Patrick Baxter.
 2   Q.    Did you take this video, Ms. ██████?
 3   A.    No.
 4   Q.    When was the first time you saw the video?
 5   A.    This video was shown to me, the RCMP showed it to me in
 6   August of this year.
 7   Q.    Again, the RCMP is the Royal Canadian --
 8   A.    Mounted Police, yes.
 9   Q.    Did you give permission to anyone to take these types of
10   videos of your daughter?
11   A.    No.
12         MS. SOTO:  No further questions.  Thank you.
13   CROSS-EXAMINATION BY MS. SRECA:
14   Q.    Good afternoon, Mrs. ██████.  AUSA Soto just asked you a
15   few questions about bath time during your visit with the
16   Baxters, and you had said that all of the parents would take
17   turns.
18         Could you elaborate a little bit more on how bath time
19   would happen during your trip?
20   A.    Mm-hmm.  The evening the photos were taken, Vanessa and I
21   were downstairs.  We were visiting, and the fathers took care
22   of bath time that evening.
23   Q.    Okay.  And you said "the fathers."  Are you referring to
24   your husband and Mr. Baxter?
25   A.    Correct.
```

1   Q.   Okay.  So they were together doing the bath time routine?

2   A.   Yes.

3   Q.   Okay.  Fair to say then that Mr. Baxter was not alone with

4   the children, particularly your daughter during that time?

5   A.   I was downstairs.

6   Q.   Okay.  So you wouldn't know?

7   A.   I wouldn't know for sure.

8   Q.   Okay.  And I believe in one of the images that you had

9   just seen, there's someone standing behind your daughter in the

10  bathroom.  Do you recall that image?

11  A.   Was that the first image?

12  Q.   I believe it was the first image.

13  A.   (Nods.)

14  Q.   Okay.  So you do remember that there's another person in

15  that photo?

16  A.   Yes.

17  Q.   Okay.  And did you recognize that individual to be another

18  child or another adult?

19  A.   Another adult.

20  Q.   Another adult.  Okay.  Do you know who took that photo,

21  can you say for certain?

22  A.   Who took the photo?  No, I cannot.

23  Q.   And the other images that you saw of your daughter on the

24  bed, do you know who took those photos?

25  A.   I didn't see who took the photos.

1    Q.    Okay.  During this time period, I'm going to back up a

2    little bit, just generally, would you ever give your children

3    your phone at a restaurant or to entertain them for any reason?

4    A.    Occasionally, yes.

5    Q.    Occasionally, okay.  And are you aware of whether the

6    Baxters ever did the same with their children?

7    A.    I can't remember them giving them their devices, like

8    their phones.  I remember the children having their own

9    devices, like an iPad.

10   Q.    Okay.  And did your kids ever have an iPad or access to

11   like an Apple device like that?

12   A.    No.

13   Q.    Okay.  But you had, during their lives, given them your

14   phone for entertainment purposes, let's say?

15   A.    Yes.

16   Q.    Okay.  Fair to say that they knew how to work those

17   devices?

18   A.    Very likely.

19   Q.    Okay.  It's scary how children can pick up on those

20   things, isn't it?

21   A.    Mm-hmm.

22   Q.    Okay.  So you can't say for certain who was holding the

23   camera when the photos of your daughter were taken?

24   A.    I didn't see who took the photos.

25   Q.    Okay.  Fair to say it's possible that one of the children

1    had the phone?

2             MS. SOTO:  Objection.

3             THE COURT:  Basis?

4             MS. SOTO:  Speculation.

5             THE COURT:  Overruled.

6    Q.   I'll repeat the question.  Is it fair to say that it's

7    possible one of the children had the phone and was taking the

8    pictures?

9    A.   Are we talking about just four images that I've seen today

10   or the entire set of images that I've seen?

11   Q.   The entire series of images that you've seen.

12   A.   I would say it's unlikely.

13   Q.   But is it possible?

14            MS. SOTO:  Objection, Your Honor.

15            THE COURT:  Basis?

16            MS. SOTO:  Asked and answered.

17            THE COURT:  Overruled.

18   A.   The perspective is higher than the height of those

19   children at the time.

20   Q.   And again, your testimony is that you didn't see who was

21   holding the camera?

22   A.   No.

23            MS. SRECA:  Okay.  If I could just have a moment, Your

24   Honor.

25            THE COURT:  Yeah.

1              MS. SRECA:  I just have one more question, Your Honor.

2    Q.   You saw an image, I believe it's Exhibit 16-1.  It was a

3    photo of your daughter in the cute little white shirt.  Do you

4    remember what that image looks like?

5    A.   The one of just my daughter, yes.

6    Q.   Just your daughter.  Do you know who took that photo?

7    A.   No.

8    Q.   Okay.  Is it possible that your daughter was taking like a

9    selfie in that photo?

10   A.   I don't think her arms would have been long enough for

11   that one.

12   Q.   Okay.  But again, you did see who took it?

13   A.   No.

14             MS. SRECA:  Okay.  I have no further questions, Your

15   Honor.

16             MS. SOTO:  One quick question, hopefully one.

17   REDIRECT EXAMINATION BY MS. SOTO:

18   Q.   Ms. ███████, defense counsel just asked you about the

19   photo in the bathroom.  You identified an adult being there?

20   A.   Yes.

21   Q.   Who do you believe that adult is?

22   A.   I believe it's my spouse, John.

23   Q.   And why do you believe it's your spouse?

24   A.   The figure is male.  The shape and the height of the

25   figure matches my spouse.  Patrick is much taller.

1   Q.   Your husband is shorter than Mr. Baxter?

2   A.   Yes, he is.

3          MS. SOTO:  Thank you.  No further questions, Your

4   Honor.

5          MS. SRECA:  Nothing further.

6          THE COURT:  You're excused.  Thank you.

7          MR. TOBIN:  May we go to sidebar, Your Honor?

8          THE COURT:   Yes.

9      **SIDEBAR:**

10         MR. TOBIN:  I just wanted to alert the court, we're

11  about to rest, but I want to point out that I'm doing so based

12  on the representations of the defense attorney, Mr. Simons, who

13  assures me he's going to be calling the defendant's wife as his

14  witness, which I assume will take place in just a moment or

15  two.

16         MR. SIMONS:  That is true, Your Honor, and I have

17  represented it, and Attorney Sreca had some contact with her.

18  I believe she's actually outside the courtroom.

19         THE COURT:  Okay, let's get her.  And then what about

20  the defendant?

21         MR. SIMONS:  I don't have a written motion, but I

22  would argue a motion for acquittal.

23         THE COURT:  So you can make that and preserve it.  I'm

24  going to keep going with the jury and we'll circle back to it.

25  Any witnesses besides his wife?

```
 1              MR. SIMONS:  I think Mr. Baxter may testify.  I don't
 2     know for sure, but it's definitely on the table.  I think it's
 3     a healthy possibility.
 4              THE COURT:  Okay.  Let's forge forward then.
 5     (End of sidebar.)
 6              MR. TOBIN:  Your Honor, the United States rests.
 7              THE COURT:  Okay.  That means they've finished
 8     presenting their case-in-chief.
 9              From the defense, do you intend to call any witnesses?
10              MR. SIMONS:  We do, Your Honor, yes.  We have Vanessa
11     Baxter.  I believe she's in the hallway.
12              THE COURT:  Okay.
13              VANESSA BAXTER, Sworn
14              COURTROOM CLERK:  You can be seated.  Can you please
15     state your name and spell your last name for the record.
16              THE WITNESS:  Vanessa Baxter, B-a-x-t-e-r.
17     DIRECT EXAMINATION BY MR. SIMONS:
18     Q.   Good afternoon, Mrs. Baxter.  Mrs. Baxter --
19     A.   Oh, sorry.
20     Q.   How, if at all, do you know Patrick Baxter?
21     A.   I'm married to him.
22     Q.   How long have the two of you been married?
23     A.   About, this will be the 11th year.
24     Q.   And do the two of you have children?
25     A.   Yes.
```

1    Q.    Who are your children and how old are they?

2    A.    I have one son, F.B.  He is -- he'll be -- he's eight.

3    And I have a daughter, ███    She is six.

4    Q.    Where do the four of you currently live?

5    A.    Acton.

6    Q.    All right.  And how long have you lived in Acton?

7    A.    A year.  It will be, this year just turned a year.

8    Q.    Where did you live previously?

9    A.    Melrose.

10    Q.    Where in Melrose?

11    A.    Like, Melrose.

12    Q.    I mean, what was the address?

13    A.    Oh, sorry.  20 Gooch Street, Melrose.

14    Q.    How long did you live there?

15    A.    Seven years.

16    Q.    Okay.  And you moved in 2023?

17    A.    Yes.

18    Q.    So maybe around 2016 to 2023?

19    A.    Yeah.  We moved in the house around 2016, but we lived in

20    an apartment in Melrose for like a year and a half.

21    Q.    All right.  And who lived with you in that home?

22    A.    Patrick and F.B. and C.B.

23    Q.    As of, let's say 2021, what did you do for work?

24    A.    I'm a restoration project engineer.

25    Q.    Can you explain what that means?

1    A.   I do like structural kind of stuff, like garages and kind

2    of like minor buildings.  I would do assessments of garages to

3    make sure, see what kind of repairs that are required, and then

4    we'll do like construction documents, specifications and bids

5    and bring it out to contractors and then make sure they do the

6    job right.  So, not exciting.

7    Q.   And is that a full-time job?

8    A.   Yes, it is.

9    Q.   And as of 2021, did your husband also work?

10   A.   Yes.

11   Q.   What did he do?

12   A.   He was a traffic engineer.

13   Q.   For whom?

14   A.   For the City of Cambridge.

15   Q.   And was that a full-time job?

16   A.   Yes.

17   Q.   Who would take care of the children during the day when

18   you both had to work?

19   A.   Well, they had before- and after-school care for the

20   school, and then the grandparents would help out.

21   Q.   Do they live local, I would assume?

22   A.   Yes.

23   Q.   Whose parents, yours or his?

24   A.   Patrick's.

25   Q.   So back to 2021, the kids were how old?  Let's say October

1    2021.

2    A.    C.B. would have been like maybe three.  18, 19 -- yeah,

3    three.  And F.B. would have been six, six and a half.

4    Q.    And your job, was it an in-person job that you had to

5    leave the home and work at --

6    A.    Yeah.  I was working like a couple of days at home, I

7    think it was like two days at home and three days in the

8    office, around COVID.

9    Q.    What about Patrick?

10    A.    Same.

11    Q.    Would he also have a flexible schedule?

12    A.    Yeah, his was not as flexible as mine.

13    Q.    Was he away from the home more than you were at that time?

14    A.    Yeah, at the time.  It depended.  I don't know.  The

15    schedules, they varied.

16    Q.    And were these schedules that came because of COVID?

17    A.    Yes.

18    Q.    Or were you already hybrid before COVID?

19    A.    I was not hybrid before COVID.  The schedules came during

20    COVID.  So before COVID I was in-person and so was he.

21    Q.    So after COVID, then you got a little more flexible?

22    A.    Yeah, mm-hmm.

23    Q.    What was your sleeping schedules like?  What time would

24    you typically go to sleep as of October 2021?

25    A.    Like 9:00, 9:30 I'd, like, go upstairs.

1   Q.   What about Patrick?

2   A.   He's usually about, like between 11:30 and midnight.

3   Q.   Okay.  Would that vary?

4   A.   No.  It was pretty consistent, unless he was like super

5   tired and he would go to bed at like 10:30.

6   Q.   What about wake-up time, would you wake up at the same

7   time?

8   A.   No.  So I wake up early.  So I usually get up at 6:00 or

9   before that.

10  Q.   You would wake up at 6:00.  What about him?

11  A.   He would get up at 6:00, but it would take him a little

12  longer to get up, but I was always out the door first.

13  Q.   Let me ask you about computer usage at the time.

14  A.   Sure.

15  Q.   Did you have a computer?

16  A.   I don't have my own computer, no.  There's one house

17  computer.  I have a work computer.

18  Q.   Okay.  So you had a work computer that you were allowed to

19  bring home?

20  A.   Yeah.

21  Q.   What type of computer was that?

22  A.   It was just like a DELL.

23  Q.   And would you have to bring it back and forth?

24  A.   Yes.

25  Q.   Would you use it for anything other than work?

1    A.    No.

2    Q.    You mentioned having a shared computer.

3    A.    Mm-hmm.

4    Q.    Who did you share the computer with?

5    A.    Patrick.

6    Q.    What type of computer was that?

7    A.    An Apple, a Mac.

8    Q.    Okay.  Was there more than one computer in the home that

9    you knew of?

10   A.    No.  Well, yeah, I had an old college computer.  It was

11   like a Toshiba.  I don't think it worked because I hadn't used

12   it in like 15 years.

13   Q.    So there was one computer that was active that you would

14   use and also Patrick would use?

15   A.    Yeah, mm-hmm.

16   Q.    And when you logged in, did you log into a specific

17   profile?

18   A.    There was two profiles.  I had my own profile and he had a

19   profile.  But sometimes I would like double-dip and use his

20   profile if it was open or if I needed a certain app -- well,

21   not app, but like if a website used a certain browser.  I don't

22   know.

23   Q.    All right.  So sometimes you'd use yours.  Sometimes you

24   would use his?

25   A.    Yeah, yeah.

```
 1   Q.   And what about, were they password-protected?
 2   A.   It was password-protected, yes.
 3   Q.   Both profiles?
 4   A.   Yeah, but it was the same password for each profile.
 5   Q.   So if you wanted to log into his profile, you could do
 6   that anytime?
 7   A.   Yes.
 8   Q.   And vice versa presumably?
 9   A.   Yeah.
10   Q.   Would he ever go on your profile, if you know?
11   A.   I don't know.
12   Q.   All right.  But you know that you would go on his?
13   A.   Yeah.
14   Q.   Would there be times that you would be using the computer
15   sort of together; you'd both be looking at the screen doing
16   activities?
17   A.   Only if it was like, if he was trying to show me something
18   that he was -- we were going to do like for a vacation or
19   Christmas gift or something.
20   Q.   All right.  Did you ever have difficulty accessing the
21   computer or times when Patrick would make it hard for you?
22   A.   No.  I mean, I didn't really use it that often.  I don't
23   use it -- I guess I had difficulty when I'm trying to find like
24   Word documents and how to write a paper or something because
25   I'm not familiar with the way it's set up because I only use
```

 1    the work computer for stuff.

 2    Q.    Was Patrick ever protective or secretive about the

 3    computer?

 4    A.    No.  It was always left in the living room.  It was never

 5    in a place where I couldn't find it.

 6    Q.    All right.  Did he ever change the passwords without

 7    telling you?

 8    A.    No.

 9    Q.    What about a phone; did you have a Smartphone as of

10    October 2021?

11    A.    Yes.

12    Q.    What kind of phone?

13    A.    Oh, I believe it was a -- I don't -- I want to say a six.

14    I had the iPhone 6 I think.

15    Q.    Okay.

16    A.    It wasn't very good.  Then I think I maybe upgraded.

17    Q.    Do you remember what the next phone that you got was after

18    the iPhone 6?

19    A.    Right now I have a 14, so maybe I got an eight or ten.

20    I'm not sure.

21    Q.    Somewhere in between six and 14?

22    A.    Somewhere in between, yeah.

23    Q.    Okay.  And what about Patrick, what did he have for a cell

24    phone at that time?

25    A.    So I know he probably, he had a six before and maybe he

1    had a ten and maybe an 11.  You know, I don't really know

2    because I don't really keep track of the numbers, so I can't

3    really say.

4    Q.   When it would come time for you to get a new phone, would

5    you go into the store and buy a new phone?

6    A.   Well, the last phone I got was from Costco, so, you know,

7    it was on the way in.

8    Q.   Okay.  What about before that, how would you get your

9    phones?

10   A.   Good question.  I think we went to the Apple store or

11   wherever was having a good deal.

12   Q.   When you upgraded your phones, would Patrick also upgrade

13   his at the same time?

14   A.   No.  It was only in a need.  Like, my last phone was

15   basically dead, so I had to get a new phone.

16   Q.   Okay.  Have you had iPhones for the last few times?

17   A.   Yes.

18   Q.   Same with Patrick?

19   A.   Mm-hmm.

20   Q.   Where would you store the photos that you took on your

21   phone?

22   A.   The cloud.

23   Q.   Okay.  And did you frequently take photos?

24   A.   I'm not the best phone picture-taker, but yes.

25   Q.   And what sorts of things would you take photographs of?

1  A.   Children, animals.

2  Q.   What about your husband Patrick, would you see him taking

3  photographs?

4  A.   Yeah, of like the animals, children, us doing things.  I

5  was never really taking good photos, so he was always the

6  photo-taker when we would do stuff.

7  Q.   Including family photos?

8  A.   Yeah.

9  Q.   Do you know if and how he stored his photographs?

10 A.   On the cloud.

11 Q.   Okay.  And did you have a shared --

12 A.   Yeah.

13 Q.   -- access to the cloud, or did you each have a separate

14 profile?  How did that work?

15 A.   I know we have a shared file for the family photos, but

16 I'm not really sure how that works because I think it goes to

17 combined.  I don't really know if it's combined or not.  I

18 don't really know how that works.  I know that my pictures go

19 somewhere and I have them, and then when I download my work

20 photos to work, then they're there and then I delete them.

21 Q.   Let me ask you this.  Were there occasions back in 2021,

22 for example, that you would access photos that had been

23 uploaded to the cloud?

24 A.   Yeah, if I was trying to make like an album, I'd get them

25 from the computer, yeah.

```
 1   Q.   So you would go onto the computer that you shared with
 2   Patrick?
 3   A.   Yeah.
 4   Q.   Can you explain to the jury how you would go about
 5   accessing all the photographs?
 6   A.   So all the photographs are on his side because my side was
 7   not very -- it was light.  So all the photos are on his side,
 8   so I would have to access it and then go into the photo thing
 9   on the side and then all the photos were there.
10   Q.   And when you would do that, would you be able to access
11   the photos that you had taken?
12   A.   Yeah.  Well, not what I have taken.  I don't think what
13   I've taken.  It was -- I was only looking in the ▮▮▮▮▮
14   folder, I mean, in the combined shared family photos so, like,
15   where all the kids were.  That's what I was looking for.  My
16   photos don't go on there.
17   Q.   Not your photos?
18   A.   Yeah.
19   Q.   They would have been whose photos, Patrick's?
20   A.   Yeah, because his was linked to that shared family photo
21   album.
22   Q.   Were there other people that had access to those
23   folders --
24   A.   Yeah.
25   Q.   -- sorry, those photos.
```

```
 1    A.    That album?

 2    Q.    Yes.

 3    A.    Yes.

 4    Q.    You said "███████."  Is that a maiden name for you?

 5    A.    Yeah.

 6    Q.    Who else would have had access to those photos?

 7    A.    The shared file would be my mom, my uncle, my aunt, my

 8    sister, and my brother, and the grandparents obviously.

 9    Q.    And do you know whether all of those people had their

10    phones connected to the same cloud account?

11    A.    No, no.  I have no idea about that.

12    Q.    Do you know how the photos ended up where they did?

13    A.    What do you mean?

14    Q.    Like, do you know how the photos ended up in this shared

15    album?

16    A.    Well, like our photos that we take?

17    Q.    Yeah, sure.

18    A.    Yeah.  I mean, if I take photos it goes -- I upload the

19    photo to the shared photo album.  There you go.

20    Q.    I see.  So if you wanted to share some photos --

21    A.    Yeah.

22    Q.    -- would you have to select which photos you wanted to

23    share?

24    A.    Correct, yes.

25    Q.    Okay.  And for Patrick, presumably the same thing?
```

```
1   A.    Yes.

2   Q.    Okay.  But you would be able to go onto his computer and

3   look at the photographs?

4   A.    Yeah.

5   Q.    Besides that shared album that was among the ████

6   family, were you able to see other photographs that, for

7   example, Patrick might have uploaded or might be connected?

8   A.    Yeah.  If, like, I wanted to see photos he had taken on

9   his phone, I would just ask him for his phone and flip through

10  the photos.

11  Q.    So let me ask you about that, going back to the phones.

12  Was Patrick's phone password-protected back then?

13  A.    Yeah, I think it was just face ID.

14  Q.    All right.  And how would you get in if you wanted to look

15  in his phone?

16  A.    I'd put my face to the screen.

17  Q.    So his phone was set up so that your face could unlock it?

18  A.    Yeah.

19  Q.    Was it also set up so that his face could unlock it?

20  A.    Yeah.

21  Q.    And what about your phone, did you grant access to

22  Patrick?

23  A.    Yeah, mm-hmm.

24  Q.    And what was the sort of policy that you had -- I'm sure

25  it was unspoken.  But sort of, what was the vibe in terms of
```

1   you being able to access his phone and vice versa?

2   A.    I would say, Can I see your phone, and I need to look at

3   something, like a picture, and he'd say, Okay.

4   Q.    And he would hand it to you?

5   A.    Yeah.

6   Q.    And was that pretty typical in terms of his response to

7   your request?

8   A.    Yeah, yeah.

9   Q.    And vice versa, was there ever times when he wanted to

10  look at your phone?

11  A.    Yeah, sure.

12  Q.    He wouldn't hesitate or try to stop you from looking at

13  certain things?

14  A.    No.

15  Q.    Is that accurate?

16  A.    Yeah, that's accurate.

17  Q.    Okay.  Let me ask you this.  Do you recall a time when

18  ██████████████████████████████ and their kids came to visit you

19  in 2019?

20  A.    Yes.

21  Q.    Okay.  Do you remember roughly when that occurred?

22  A.    It was in the summer, July I believe.

23  Q.    And how long were they visiting for?

24  A.    They were visiting for, I think it was like four or five

25  days, and then they left to go visit ██████, and then they

```
1   came back and then they left.
2   Q.   And how was the visit overall?
3   A.   It was pretty crazy.  It was fun but crazy, because
4   they're kids, and they were, like, having a good time and
5   seeing ████████████ and they were happy.
6   Q.   What kinds of activities did you do all together when they
7   visited?
8   A.   Went to the park.  We went out to visit ████████████
9   ████████████, just kind of like hung around.  It was really
10  hot that year, I do remember that.
11  Q.   And presumably there was times that you must have been at
12  your home together?
13  A.   Yeah, mm-hmm.
14  Q.   And what was the sleeping arrangements like when they
15  visited?
16  A.   All, like F.B., A.F., and M.F. all slept in F.B.'s room.
17  And C.B., because she was only six months, she slept in her own
18  room, in the crib.
19  Q.   How many bedrooms did your home have?
20  A.   Four.
21  Q.   Okay.  So you said the two boys were in one room?
22  A.   Well, yeah -- no.  All of them.  So it was M.F., A.F., and
23  F.B. all slept in the same room.  It started out with like A.F.
24  in C.B.'s room, but A.F., she was missing out, so she wanted to
25  go hang out with everybody.
```

```
 1   Q.   Okay.  So she was with her brother and also F.B.?

 2   A.   Yeah, yeah.

 3   Q.   And then C.B., being a baby, was in a separate room?

 4   A.   Yes, mm-hmm.

 5   Q.   Then you and Patrick in one room presumably?

 6   A.   Yes.

 7   Q.   And then ████████████████████████████?

 8   A.   Mm-hmm.

 9   Q.   What about during bath time?  How would that go, if you

10   recall?

11   A.   I would bathe my own children, so I would bathe F.B. and

12   C.B. basically.

13   Q.   Were there times that your children and ███████████

14   children would also bathe together?

15   A.   No, no.

16   Q.   Okay.  Is it -- you mentioned you bathing your kids.

17   Would you be the typical parent to bathe the kids, or would

18   Patrick sometimes bathe the kids?

19   A.   We would trade off before.  Now I do all of the --

20   everything, but before, yes, we would trade off.

21   Q.   Okay.  As of like up to 2021, when this all occurred?

22   A.   Correct.

23   Q.   Okay.  And you're still married, right; you and Patrick

24   still live together, still married?

25   A.   Mm-hmm, mm-hmm.
```

1  Q.   Did you ever see any photographs that were concerning on

2  Patrick's cell phone?

3  A.   No.

4  Q.   Or on his computer?

5  A.   No.

6  Q.   And I'll be a little more specific.  Any photographs that

7  appeared to be minors without clothing or minors engaging in

8  sexual activity?

9  A.   Never, never.

10 Q.   Okay.  Did you ever see photographs of ██████████ on

11 Patrick's phone?

12 A.   No.

13      MR. SIMONS:  Okay.  Your Honor, can I just have a

14 moment?

15      THE COURT:  Sure.

16 Q.   Just a few more questions, Mrs. Baxter.

17      Did you ever see your husband looking at what you believed

18 to be child pornography?

19 A.   No.

20 Q.   Okay.  Do you sleep in the same bedroom normally?

21 A.   Yes.

22 Q.   Okay.  Would you say you have a typical sex life?

23 A.   Yup.

24      MR. SIMONS:  Okay.  No further questions.

25 CROSS-EXAMINATION BY MS. SOTO:

1    Q.    Good afternoon, Mrs. Baxter.

2    A.    Mm-hmm.

3    Q.    You don't use Freenet, do you?

4    A.    No.  I didn't know what it was until recently.

5    Q.    You don't seek child pornography on Freenet?

6    A.    Nope.

7    Q.    Don't seek child pornography from any other sources?

8    A.    No.

9    Q.    You don't collect child pornography?

10   A.    No.

11   Q.    You don't take naked pictures of ██████ regularly?

12   A.    No.

13   Q.    Ever?

14   A.    Never.

15   Q.    Mrs. Baxter, you never used a solid state drive, correct?

16   A.    I don't know what that is.

17   Q.    Okay.  So you're unaware that an SSD was found in the

18   living room of your home?

19   A.    A what?

20   Q.    I'm sorry.

21   A.    What did you say?

22   Q.    Strike that.  I'll start again.

23         Were you at your home on November 2, 2021 when law

24   enforcement executed a search warrant?

25   A.    Yes.

1    Q.   And you know that they took several devices from your

2    home, correct?

3    A.   Yes.

4    Q.   Including the MacBook laptops you've been discussing?

5    A.   Yes.

6    Q.   And you're aware that they took a solid state drive from

7    your home, correct?

8    A.   Is that just the backup drive?  I don't know what a solid

9    state drive is, so just explain it to me, please.

10   Q.   Fair enough.  Did you see them remove a small blue box?

11   A.   Yeah.  I didn't see them remove it, but the blue jump --

12   the blue drive, yes, I am familiar with that.

13   Q.   So you've seen that blue box before?

14   A.   Yes, yeah.

15   Q.   But you've never used it, have you?

16   A.   No.

17   Q.   You've never connected a MacBook to that drive?

18   A.   No.

19   Q.   So the only person who's ever used that drive is the

20   defendant, Patrick Baxter.

21   A.   That I'm aware of.

22   Q.   You were talking about your schedule and Mr. Baxter's

23   schedule.

24   A.   Mm-hmm.

25   Q.   He typically goes to bed later than you do, correct?

1   A.   Correct.

2   Q.   So you don't see what he's doing when you're asleep,

3   presumably?

4   A.   No.

5   Q.   You discussed a computer, a MacBook that you and

6   Mr. Baxter shared, correct?

7   A.   Mm-hmm, yes.

8   Q.   And it's typically your husband who uses that computer,

9   correct?

10  A.   Correct.

11  Q.   Do you know what the password of that shared computer is?

12  A.   Yes.

13  Q.   What is it?

14  A.   ███████20 or ███████36.

15  Q.   And your husband knew that password, correct?

16  A.   Yes.

17  Q.   Ms. ███████, does your husband have an interest in cars?

18  A.   Yes.

19  Q.   Finally, I want to go to the July 2019 trip that ████

20  ██████████████████████████████████ took in July

21  2019.

22       Did you take any pictures of ███████ A.F. fully nude

23  during that trip?

24  A.   No, no.

25  Q.   Did you take any pictures of her partially nude during

1   that trip?

2   A.    No, nope.

3   Q.    Did you see anyone take pictures of A.F. partially --

4   A.    No.

5   Q.    -- or fully nude during that trip?

6   A.    No, no.

7   Q.    Mrs. Baxter, you referred to -- you were asked questions

8   about the children's bath time.

9   A.    Mm-hmm.

10  Q.    Did the children bathe around the same time typically?

11  A.    Yeah, yes.  They would go in groups.  You know, mine would

12  go, and then ████████████████ would do their own children.

13  Q.    Okay.  So presumably they could have been on the same

14  floor around the same time?

15  A.    Well, yeah, they have to be on the same floor.  That's

16  where the bathroom is and the bedrooms.  So the bathroom is

17  located right beside the bathroom, so they have to be on the

18  same floor, if it was close to bed time, yeah.

19  Q.    On the first night of the ██████'s trip to Massachusetts,

20  isn't it true that you and ████████ had a drink together

21  while your husbands bathed the children?

22  A.    Yeah.  Not a lot though because I just had a baby, so I

23  was still kind of, you know -- I didn't drink a lot.  I still

24  don't drink a lot.  So maybe I had a little bit but I cannot

25  recall.  So it doesn't sound like I was boozing it up.

1  Q.   Okay.  But the husbands handled the children's bath time

2  on that night, correct?

3  A.   Yes.  Mm-hmm.

4       MS. SOTO:  One moment, Your Honor?

5       THE COURT:  Yeah.

6  Q.   The blue SSD that was taken from your home the night or

7  the morning of the search warrant execution, you didn't have

8  the password to that SSD, did you?

9  A.   I didn't know -- I wasn't aware there was a password.

10 Q.   Just like you weren't aware of -- strike that.  Thank you.

11 A.   Okay.

12      MR. SIMONS:  Thank you.  Just a couple.

13 REDIRECT EXAMINATION BY MR. SIMONS:

14 Q.   Mrs. Baxter, just a couple of follow-up questions from

15 what you were just asked.

16 A.   Sure.

17 Q.   With regard to the -- you were asked about the blue box.

18 A.   Mm-hmm.

19 Q.   -- and the SSD.  In response earlier, you said, "You mean

20 the backup drive."  So is that what you knew that to -- is that

21 what you referred to that as?

22 A.   Yeah.

23 Q.   And did you understand what the backup drive was used for?

24 A.   Yeah.  Like, when we got a new computer, we would back up

25 the old computer, and then you put it all on the new computer.

1    Q.    Was there ever any times that you sought to look at the

2    stuff that had been --

3    A.    No.

4    Q.    -- saved to an external hard drive?

5    A.    No.

6    Q.    Okay.  Presumably -- strike that.

7          You never had asked to look --

8    A.    No, I never asked to look at it because it was a backup

9    drive.

10   Q.    Okay.  You just didn't have any occasion to, right?

11   A.    No.

12   Q.    And then you were asked about whether you took any

13   photographs of ███████ A.F.  You said no --

14   A.    No.

15   Q.    -- naked photos anyway.

16         Did you see any of the children, yours or ██████████

17   children, with Smartphones during the trip?

18   A.    I didn't see anything, but I know that they did have them.

19   Q.    I'm not necessarily asking if you saw anyone take

20   pictures.

21   A.    Oh.

22   Q.    If you recall --

23   A.    Well, F.B., yeah, he'd walk around with my phone or he'd

24   hand it to me, or he'd walk around with Patrick's phone and

25   hand it to me.  They still do that now.  They find it somewhere

1    and, "Look, mom," and I was like, "Yeah, I know."

2    Q.    And do you recall whether or not you saw any children

3    accessing the photograph application?

4    A.    It was so long ago, I don't recall seeing them do that.

5    Q.    Okay.  But would it surprise you --

6    A.    No, it wouldn't surprise me if they did because I've

7    deleted many photos that F.B. has taken from my phone that I

8    didn't even know he had.

9    Q.    You've had to do that before?

10   A.    I've had to do that.  There are a lot of blurry pictures

11   of the floor.

12            MR. SIMONS:  Thank you.  No further questions.

13            MS. SOTO:  No other questions, Your Honor.

14            THE COURT:  You're excused.  Thank you.

15            THE WITNESS:  Okay.

16            MR. SIMONS:  Given the time, do you want us to press

17   forward?

18            THE COURT:  Depends what you're going to press forward

19   with.

20            MR. SIMONS:  I was going to ask for a brief moment.

21   Can I report back in just a moment?

22            THE COURT:  Yes.

23            (Counsel confers.)

24            MR. SIMONS:  We have one more witness.  That would be

25   Mr. Baxter.

1          THE COURT:  All right.  Given the time, why don't we

2    hold off on him until tomorrow morning.

3          MR. SIMONS:  Okay.

4          THE COURT:  All right.  So we will resume tomorrow.  I

5    have to stop a little bit early tomorrow.  So would anybody

6    object to starting at 9:00 tomorrow and going until 3:00

7    instead of 9:30 to 3:30?  Would that be all right with

8    everyone?

9          Okay.  So we'll start at 9:00.  They have one more

10   witness, and then we'll proceed on to closing arguments and

11   instructions.  So I'm anticipating that you'll have the case by

12   tomorrow afternoon, although that's just a guess because I

13   don't know how long the testimony will be.

14         If you were going to be here longer, you would know

15   that I say this every night, but I will say it for you tonight.

16   Keep an open mind.  Don't discuss the case with anybody, and no

17   extracurricular research.  We're in the homestretch.  You've

18   seen that this trial has gone very smoothly.  And one way or

19   another, it's a difficult thing for everybody to have to try a

20   case twice, so let's all really be careful to stick to the

21   rules.

22         And I'm being extra emphatic about this because the

23   government has rested, and it's an easy time to start making up

24   your minds, but you need to keep an open mind until the

25   defendant has also finished presenting his case.  So put it out

1    of your minds for tonight.  See you at 9:00 tomorrow morning.

2    Thanks, everyone.

3              COURTROOM CLERK:  All rise for the jury.

4              (Jury exits the courtroom.)

5              THE COURT:  I need to figure out my schedule for

6    tomorrow.  I have another hearing scheduled at 10:00 that I've

7    now moved to 11:00.  But I want to figure out if I need to move

8    that further.  So when we get to closings, how long do you

9    anticipate your closing is going to be?

10             MR. TOBIN:  25 or 30 minutes maximum.

11             THE COURT:  All right.  And what are you anticipating?

12             MR. SIMONS:  I'm usually pretty quick.  I would say

13   15.

14             THE COURT:  Okay.  Do you have any ballpark on his

15   direct?  I'm just not going to hold -- I'm just trying to do

16   some planning.

17             MR. SIMONS:  Sure.  Longer than hers but probably less

18   than a two -- I would say maybe 45 minutes or so.

19             THE COURT:  Can you ballpark cross for me?  I know

20   that's --

21             MR. TOBIN:  It would only be a guess.  30 minutes.  I

22   can't imagine, if I may, I can't imagine that you'll be able to

23   get to what you need to at 11:00 if we're going to do

24   instructions --

25             THE COURT:  Thanks, Mr. Tobin, for the help with my

```
 1    planning, but I've got it.

 2              MR. TOBIN:  Oh, no.  I'm just --

 3              THE COURT:  I'm just trying to get a ballpark.  I will

 4    figure out my own schedule, but thank you for your assistance.

 5              MR. TOBIN:  I'm just concerned about the court.

 6              THE COURT:  You must know my husband, who also thinks

 7    he can be helpful in the same way, but I've got it, I've got

 8    it.

 9              So I'm going to give a careful proof of the

10    instructions tonight.  You all should do the same.  If you have

11    anything to say tomorrow, speak or hold your peace, and I will

12    be on the bench by 8:30 or as close to that as I can get here.

13    I was a little late, 8:35 today, but if you have anything to

14    say about the charge or anything else.  Otherwise, we'll see

15    you all at 9:00.  Anything else for today?

16              MR. TOBIN:  Just one thing.

17              THE COURT:  Aside from helping with planning my

18    schedule, Mr. Tobin?

19              MR. TOBIN:  No, no.  I can't plan my own schedule.

20              THE COURT:  It didn't stop you from trying to plan

21    mine, but that's okay.

22              MR. TOBIN:  I was actually, that was based on my

23    concern about how long I will take.  I said 30 minutes.  I said

24    it was a ballpark.  But I'm lengthy.

25              So quick question.  I do like the idea of what you
```

1  recommended or what you suggested you might do and doing the

2  instructions first.

3          THE COURT:  Okay.

4          MR. SIMONS:  I agree with Mr. Tobin on this issue.  I

5  think that doing the instructions first makes sense and I

6  agree.

7          THE COURT:  All right.  So we'll see everyone at 9:00

8  tomorrow, and I'll sort out my other scheduling issues on my

9  own.  Have a good night, everyone.

10          MR. SIMONS:  Thank you.

11          MR. TOBIN:  Thank you.

12          (Adjourned, 3:25 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Professional

4    Reporter, Registered Merit Reporter and Certified Realtime

5    Reporter, in and for the United States District Court for the

6    District of Massachusetts, do hereby certify that the foregoing

7    transcript is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter to the best of my skill and ability.

10                       Dated this 25th day of November, 2024.

11

12                       /s/ Kelly Mortellite

13                       _____

14                       Kelly Mortellite, RPR, RMR, CRR

15                       Official Court Reporter

16

17

18

19

20

21

22

23

24

25