UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>PATRICK BAXTER,<br><br>　　　　Defendant. | Criminal Action<br>No. 23-10001-ADB |


* * * R E D A C T E D * * *


BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


Jury Trial Day 3

October 9, 2024


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
David G. Tobin
Jessica L. Soto
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3392
david.tobin@usdoj.gov

On Behalf of the Defendant:
Joseph B. Simons
Natalie I. Sreca
Simons Law Office
10 Post Office Square
Suite 800
Boston, MA 02109
617-544-9000
joe@jbsimonslaw.com

CONTENTS

WITNESS                                                        PAGE


PATRICK BAXTER

    Direct Examination By Mr. Simons                            4
    Cross-Examination By Mr. Tobin                             44


E X H I B I T S


Exhibit No.              Received


   30                        36

PROCEEDINGS

THE COURT:  Mr. Simons, is he still planning on testifying?

MR. SIMONS:  Yes, Your Honor.

THE COURT:  Okay.

COURTROOM CLERK:  All rise for the jury.

(Jury enters the courtroom.)

COURTROOM CLERK:  Court is in session.  Please be seated.

THE COURT:  Good morning, everyone.

JURY:  Good morning.

THE COURT:  Thank you.  I love it when we start right on time.  Mr. Simons.

MR. SIMONS:  Yes, Your Honor.

The defense would call Patrick Baxter to the stand.

PATRICK BAXTER, Sworn

DIRECT EXAMINATION BY MR. SIMONS:

Q.   Good morning, Mr. Baxter.

A.   Good morning, Joe.

Q.   Can you state your full name for the record and spell your last name.

A.   Excuse me.  My name is Patrick Baxter.  Last name is spelled B-a-x-t-e-r.

Q.   And Mr. Baxter, how old are you?

A.   I am 44 years old.

Q.    And where do you live?

A.    I live in Acton, Massachusetts.

Q.    With who?

A.    I live with my wife Vanessa and my children F.B. and C.B.

Q.    And currently how old are those two children?

A.    They are currently eight and six.

Q.    Okay.  And how long have you lived in Acton for?

A.    Approximately one year.

Q.    And prior to that where did you reside?

A.    We lived in Melrose, Massachusetts.

Q.    At what address?

A.    20 Gooch Street.

Q.    And how long did you live at that address for?

A.    We lived there for approximately, I believe it was about seven years.

Q.    Okay.  And how big was the home?

A.    It was a four-bedroom home.

Q.    And who lived there with you?

A.    We had my wife Vanessa, my children F.B. and C.B.

Q.    Did each of the children have their own rooms?

A.    Yes, they did.

Q.    And what about you and your wife, where did you sleep?

A.    We shared a bedroom.  Our fourth bedroom was used as an office.

Q.    Other than the people that lived there, how often would

you have visitors come over, whether to stay overnight or just in general?

A.    We would have friends over for dinner at times.  We had overnight guests a few times.  Friends of mine from out of state had visited.  My ███████████ from Canada has visited, and then ██████████ and ██████████████ and their children have also visited us.

Q.    Okay.  And as of, let's say October 2021, at that time what were you doing for work?

A.    In October of 2021, I was a traffic engineer working for the City of Cambridge.

Q.    How long about did you hold that position for?

A.    I held that position for, I believe it was about eight years.

Q.    Okay.  And let me say in the beginning, let me ask you, what was the nature of your job when you started it?

A.    So my title was engineering manager.  That put me in charge of all the traffic engineering aspects of the city. That includes the line-striping, the traffic signals, the signage, and a lot of design work that related to those things.

Q.    In the beginning was that an in-person job or remote?

A.    Yes, that was an in-person job working in the office in the City of Cambridge.

Q.    How if at all did the job evolve over time?

A.    So when COVID hit in 2020, we went to full-time work from

home.  Then we kind of slowly evolved back into a phase in 2021 and 2022 where we had kind of a hybrid environment where we could be in the office sometimes and at home other times.

Q.   During that hybrid time, how often would you have been at home versus at work?

A.   Typically I would do two days a week at home and three days a week in the office.

Q.   Was that directed by your employer, or were you given some flexibility?

A.   There was some flexibility in that.  I think we had a maximum of either two or three days we could be from home. Once we went to that schedule, we weren't allowed to be home for that time.

Q.   Again, at that time, October 2021, would you say that you were home more often or Vanessa, or was it fairly equal?

A.   Vanessa was home somewhat more often, but I would say roughly equal.

Q.   Okay.  Would you overlap a lot?  Like on the days that you would be home, would she typically be home, or would it just vary week to week?

A.   Once we went to the hybrid model, we actually kind of staggered our days so that one of us was typically home.  And it worked better for things like picking up children from school, taking the dog out, things like that.

Q.   Can you describe, like, what a typical day would have been

like for you on, let's say a weekday that you had to go into the office back in October 2021?

A.   So my days typically started at 8:30 in the morning.  On Mondays, we actually worked until 8:00 p.m., most other days until 5:00 p.m.  So I would take the children on certain days. It depended.  Our schedule varied a lot.  But my wife tended to leave earlier, so I would get the children ready for school, for daycare, bring them either to some combination of school/daycare or my parents' house, who helped with the childcare when we were at work, and then I would drive in to work.  I would also sometimes bicycle in to work.

Q.   And when you would be at work, how long would the workday usually last?

A.   So on Mondays it was an 11-hour workday.  Midweek it was an eight-hour workday.  Then on Fridays we had a half day.

Q.   And then after work, can you walk us through what the rest of the day would look like for you until bed?

A.   Sure.  So, you know, we would typically come home, make dinner.  We've always kind of followed a pretty solid schedule with the kids to kind of, you know, keep them on a routine.  So we would start bedtime around 7:00.

     We would typically kind of alternate who does what.  So one night I would kind of take care of cleaning up the dishes and things like that while my wife took care of bath time. Then we would both say goodnight to the children.  And then we

would kind of flip the next day so she could do some of the dishes and I could take care of the children.

Q.   What about your bedtime routine, yours and Vanessa's; can you talk about that a little bit?

A.   Sure.  So Vanessa, typically, she's always been more of a person who is early to bed and early up in the morning, so she would be, you know, she would typically head upstairs between maybe 9:00 and 9:30.  Maybe on a weekend she would stay up until like 10:00 or 10:30.  I typically go to bed somewhat later, so usually sometime between 11:00 and midnight.  Every now and then I'd kind of need to catch up on my sleep, I'll go to bed a little earlier, 10:00 or 10:30.

Q.   And what would you generally do during that time period when Vanessa would go to sleep before you and your bedtime?

A.   Typically I'd watch TV, play video games.  I have Playstation 4 that I enjoy playing games on.

Q.   Anything specific?

A.   I like Grand Theft Auto, I like racing games.

Q.   Kind of time to unwind, like your own time?

A.   Absolutely.  Also kind of, that in particular is something that I can't really do when the kids are awake, and Vanessa also really is not a big fan of video games.  So that was kind of my time, to have a little bit of me time in front of the TV and play a video game.

Q.   All right.  So that would be a typical day that you would

be going in to work.  Let's say a day you didn't have to go in but still a weekday that you worked from home.  Can you talk about how, if at all, that would differ, obviously you wouldn't leave the house, but in what ways that would be different for you?

A.    Sure.  So, I mean, I would still bring the kids to school or to daycare as appropriate, and then I would just come back to the house and work from home.  I would typically work in the dining room.  The job with the City of Cambridge involved a lot of meetings.  And so when we both worked from home and hybrid, those are all typically kind of using Microsoft Teams or Zoom, so it wasn't unusual to have five or six meetings in a day. You're just kind of sitting at your computer kind of hopping from meeting to meeting while trying to catch up on emails at the same time.

Q.    Let me ask you about that.  So when you're home working and doing meetings, what sort of device would you be doing those meetings on?

A.    So in the early days of COVID I was using a mixture of a work-provided iPad, and then also I was using my personal computer because I did not have a work-issued laptop.  There was only so much I would do on the iPad.

Later on, sometime in 2021, I was issued a work laptop that replaced the desktop computer that I had which enabled me to do more on a work-issued device.

Q.   What type of computer was the work-issued device that you later got?

A.   I don't -- I believe it was some sort of PC.  I don't remember the brand.

Q.   Do you remember around when --

A.   Actually, I believe it was a ThinkPad.

Q.   A ThinkPad, you think, okay.  Do you remember roughly when you got the ThinkPad issued?

A.   It was sometime towards the end of 2021.  I don't remember exactly.

Q.   So not too far before the search warrant was executed?

A.   It might have even been after, I'm not sure, because I don't believe I would have had it at the time.

Q.   Oh, okay.  So that might have been something post the search of your house?

A.   Yeah.

Q.   Okay.  What type of computer did you use?  You said you had to use a personal computer for work meetings aside from the iPad they gave you.

A.   Yes.  So I had a personal MacBook that was shared between myself and Vanessa.

Q.   Do you remember what type of model or make the MacBook was?

A.   I think it was the MacBook Air.  I don't specifically remember.

Q.    Okay.  Did you have more than one MacBook?

A.    So we did have an old MacBook Pro that was mostly broken that was from maybe 2014 that had been kind of shoved in a drawer because it was broken.

Q.    So it existed at your house, but it sounds like it wasn't something that you used or that you know anyone else would have used on a regular basis?

A.    Yeah.  It hadn't been used in years because it had some sort of hardware problem that cost more than a new computer to fix.

Q.    Did you do anything to back up the old computer, the MacBook Pro that was no longer in use?

A.    When I had been using it, I had done that.  That was actually backed up onto one of the other drives that were seized in the search.

Q.    Okay.  Let me ask you about that a little bit.  So the drives that were seized during the search, you're aware there was four different drives that the government alleges.  Were you familiar with all of those drives?

A.    So I don't remember all four.  I might have to see a list to specifically remember them.  I can definitely remember three.

Q.    All right.  And -- well, let me ask you about the solid state drive, the one that the government and the FBI have been referencing throughout the trial.  Is that a familiar drive to

you?

A.    Yes, it is.

Q.    Okay.  Can you describe -- well, first of all, do you remember roughly when you acquired that drive or how you acquired the drive?

A.    I think I bought it sometime either in 2018 or 2019, around the time I bought the computer as well.

Q.    Do you remember where you acquired it from?

A.    I cannot specifically remember.  I think it was either Amazon or Best Buy, but I couldn't say for sure.

Q.    All right.  And given that you had at least referenced one other drive that you knew of and potentially the other two, was this SSD the first drive that you had gotten, or had you previously obtained external hard drives?

A.    No.  I would say that was probably actually the newest one.

Q.    Okay.  So you were familiar with external hard drives?

A.    Yes.

Q.    And let me ask you about sort of your experience with them or what you would do with those external hard drives prior to the SSD.

A.    Sure.  So typically what I would use them for is to set up an Apple Time Machine backup, which is a system that essentially you plug the drive in and it automatically sees that it's plugged in and it just updates and makes a direct

copy of everything that's on the computer.  So that way if you have a hard drive failure or something happens to the computer, you don't lose all your family photos, tax documents, things like that that are very important to you.

Q.   Can you describe how you would go about backing up the computer, sort of what steps you would take?

A.   So once it was -- I believe at the beginning, and it's been several years since I actually set that up, so I don't remember the setup processes, but once it was set up, you just plug it in and it updates.  And then it will tell you when it's done, and you can unplug it.

Q.   All right. And with regard specifically now to the SSD, would you do more or less the same type of backup with that one as you would with the prior drives?

A.   Yes.

Q.   Okay.  And is that something that you ever saw Vanessa doing, or is that primarily something that you would handle?

A.   No.  That was something that I handled.

Q.   All right.  And every time you did it, was it sort of the same method where you'd plug it in and just back up the --

A.   Yeah.  It's a very automated process though.  My rough understanding is that it kind of looks at the computer, sees whatever you changed.  So let's say you took some photos at an event today, it will see that you've got new photos added, and it will just add those to the image.  And that way if you have,

you know, a virus or something like that, you can also be able to go back and fix the computer from that.

Q.   So your understanding and your observations of it were that, if you connected it, it wouldn't necessarily re-backup everything that it already had; it would just find whatever was new and then sort of automatically back that up to the external hard drive?

A.   I believe that's the case, yes.

Q.   Okay.  Did you ever use the hard drive in any other way than just simply to back up the drive --

A.   I did not.

Q.   -- or the computer rather?

A.   No.

Q.   Okay.  As far as your usage, did you ever go back and open files like in the hard drive, where you were connected to the computer and open files to look at all those old backups?

A.   I never had a reason to on that particular drive.  I did with the older drive.  When that older MacBook broke, I was able to use that older drive to bring the photos in when I updated the new computer.

Q.   And is it fair to say that this newer drive was sort of as an insurance policy in case the computer ever failed or in case you ever had to transfer data to a new computer?

A.   Yes.

Q.   Okay.  And do you know about how often you would back up

the MacBook Air, or would it vary?

A.   It would vary.  I mean, it would depend on, if I knew I had photos that I had taken and I wanted to make sure it got on there.  It was generally when I thought of it.  So if I was sitting there in the evening, it's very easy, so it's not something you have to physically really do.  You don't have to put any commands into the computer.  You just kind of plug it in.

I would typically, in the evening when I was watching TV or playing games, I would frequently have the computer open as well, just browsing the internet, thinking about vacation plans or reading the news or whatever else I was doing on the internet.  So I'd frequently just plug it in just as a habit to make sure it kept everything up to date.

Q.   Okay.  And do you know about how long it would typically take to complete the image or the update?

A.   I think, if not much has changed, it was only a few minutes.  I frequently didn't pay attention, because you just kind of plug it in and forget it, and later on you see the cord and just pull it out because it's annoying.

Q.   It sounds like something you could do in pretty short order on any given night, right?

A.   Yeah.

Q.   Let me ask you, going back to the computer usage.  So other that the MacBook Air, was there any other computers or

laptops that you were using regularly for home use other than your work computer that you later got?

A.    No.

Q.    Okay.  What about other devices, including phones, tablets, anything like that?

A.    So we did have an iPad that we shared between us as well. We honestly didn't use it that much.  Kind of never really found the ideal use for the iPad.  And then we, you know, I have my own personal phone, and I also had a work-issued cell phone and a work-issued iPad.

Q.    So while you were working for Cambridge, did you consistently have two phones, one for work and one for personal use?

A.    I did.  I found having a work cell phone to be more cumbersome than useful because carrying two phones is just difficult and remembering which phone to grab when you feel something buzz in your pocket.  So I would tend to forget the work phone to the point where I think people at work figured out that I frequently didn't have it on me, so they would usually just text me on my personal phone.

Q.    And with regard to the computer, the MacBook Air that you and Vanessa shared, how often would you say that you accessed the computer?

A.    I would say daily.

Q.    What about Vanessa, how often would you observe her

accessing the computer?

A.    I would say maybe two to three times a week.

Q.    And when you would access it, would you go on a specific profile to log in to get into the computer?

A.    Yes.  I would log into the profile that just had my name on it.  I believe it was Patrick or Patrick Baxter; I'm not sure which.

Q.    And what about Vanessa, would you see what she would do to log in, if anything?

A.    Same thing.  She would log into her own profile.  They both had the same password, so it was easy to get into.

Q.    Okay.  And you heard her testimony yesterday where she talked about sometimes using your profile.  Did you ever observe her doing that?

A.    Yeah.  I mean, sometimes I would just be, you know, shopping for something for, say, Christmas presents for the kids, and I would just kind of hand her the computer and say what do you think of this, and she would start clicking around, doing other things.  And again also, if she needed to look at photos, most of the family photos were on my side of the computer.

Q.    And for those photos, would you be the primary picture-taker between the two of you?

A.    Generally, I mean, I would say I took maybe two-thirds of the photos we took of family events.  She took maybe one-third.

That's a rough estimation.

Q.   Did you take some of those using your personal cell phone?

A.   Yeah.  I took almost all the photos using a personal phone.  I did have a digital camera, but I rarely used it because it's cumbersome.

Q.   Okay.  You beat me to it.  I was going to ask.  So primarily the phone you would use on a daily basis would also serve as a camera for documenting your family life and presumably anything else you'd take pictures of?

A.   Yes, absolutely.

Q.   On that note, what else would you take pictures of besides obviously, your wife and kids?

A.   You know, I'd say pets.  Anything we're doing, if you come into the city and you see a sunrise in the skyline, you'd pop a picture off, or vacation photos.  Ever since I was a child I always enjoyed photography as kind of a minor hobby.  I was never particularly good at it though.

Q.   How would you go about sharing photos?  If you wanted Vanessa or anybody else to see some of the photos you took, what would you do to go about sharing those?

A.   So we had a shared photo album through iCloud.  You would select a certain number of photos from the photos app on your phone and say I want to add that.  And it was an album that I believe was called F.B. and C.B., our children's names, that then could be shared with various people that had direct access

to it.

Q.   And do you know who set up that shared album?

A.   I did.

Q.   And you granted access to certain people?

A.   Yes.

Q.   Okay.  What about besides -- actually, let me strike that. With regard to that specific album, did you have to do anything manually to get the photos from your phone into that shared album, or would all of your photos automatically go into that shared album?

A.   No.  That was a manual process.  We would kind of pick the best pictures of the kids or things we were doing and then add them in there.  And then other people that were subscribed to the album could do the same.  So if we were somewhere with my parents and they took good pictures of the kids, they could add that as well.

Q.   And physically how would you actually do it?  Can you sort of walk us through the steps?  How would you select and share those photos to the album?

A.   So it's been a long time since I've done it, but I believe you just kind of hit the select button on the corner of the phone, tap the photos you want to add and then hit a share button.  And it gives you various options, you know, you can text them, you can put them on Facebook.  One of them is the shared album.

Q.   And that would have been just from your phone as opposed to just connecting a phone to the computer?

A.   So that would be from the phone.  We did also sometimes do it from the computer because the phone photos automatically update to the computer over the cloud.

Q.   Without you having to manipulate anything, the photos from the phone would automatically also upload onto the computer?

A.   Yes.

Q.   Was that through some sort of an iCloud process?

A.   Yeah.  So I believe the way the process worked is essentially you take photos, the phone is always kind of updating to iCloud, so anything you've taken within a couple of minutes is on iCloud.  And then the next time you turn the computer on, it syncs that, and everything that was on iCloud is on the computer.

Q.   If you know, what other locations, if any, did those photographs upload to the cloud, if at all?

A.   So once they were on the cloud, that they were on the computer, that would obviously, you know, when you plug it back up, that would result in them being backed up on the backup hard drive as well because everything that was on the computer is automatically moved to the drive.

Q.   When you would go back and look at your photos, would you primarily use the phone or the computer, or did it vary?

A.   I would say it just depends on what's handy.

Q.   What about if you were showing Vanessa a photo or series of photos?

A.   Again, kind of both ways.  You know, like, if we're sitting at the dining room table talking about what we did today, maybe I'm sharing photos on my phone with her.  If it's in the evening and we're watching TV, I might pull them up on the computer, especially if we were talking about maybe getting photos printed.  We made a couple of photo albums, photo books.  And then you'd want to use the computer because you had more ability to move things around and do what you wanted to do.

Q.   You testified that the password for your profile in the computer was the same as Vanessa's, right?

A.   Yes.

Q.   And so you could log into her profile; she could log into yours, right?

A.   Absolutely.

Q.   Were there any restrictions for you going onto her profile --

A.   No.

Q.   -- things you couldn't access?

A.   No.

Q.   What about with regard to her, if she were to log into yours, was there any further passwords or anything else that would have been restricted for somebody else logging into your profile?

A.    No.    It was one password and the whole computer was unlocked.

Q.    What about with regard to that SSD, that drive that we've been talking about; was there a password you had to use to access or even to back up things into that drive?

A.    So when I was logged in, it would just automatically back up.    It didn't require any password.    And I believe -- I never had reason to go into that particular drive because I never had a failure in the time I was using that.    With the previous drive, when I plugged it into a new computer to pull the data from the old computer, then I had to enter the password for the old computer to kind of authenticate and get the data.

Q.    And where would you typically keep that drive, like where would you store it in the home?

A.    It would typically be kind of on the coffee table or end table.    I also typically kept my computer just in the general vicinity of the living room.

Q.    Okay.    And would that be the same for the iPad too?

A.    Honestly, the iPad typically just lived in a strange corner somewhere because we almost never used it, so that was the sort of thing where once a month somebody says where's the iPad, and we'd go looking for it and find it in some random corner.

Q.    I apologize if I asked you already, but were there any other people that would have accessed the computer, MacBook

Air, other than you and Vanessa?

A.    Not typically, no.

Q.    Like at all, if you know?

A.    I mean, nobody else would have had the password.  You know, if somebody else was visiting, we might hand it to them to show them pictures that we were talking about or a funny video on Facebook or something like that.

Q.    Okay.  That could be like family members or friends presumably?

A.    Yeah.

Q.    Okay.  Going back to the photos -- or actually to the phone rather, to your personal phone.  Were there ever times that you would give that to either of your children?

A.    I typically didn't give it to them.  There were a few times, you know, in restaurants when we're kind of having trouble managing, you know, quietness, that we might give it to them for a few minutes.  Typically at home, once they were old enough to, you know, be trusted with a device, they had their own Amazon Fire tablets, but there were times where they would kind of pick up the phone and run around with it.

Q.    And would you be able to observe what they were doing on the phone?

A.    Typically, I mean, sometimes it was literally just running around pretending to talk on it.  It was just an exciting device that mommy and daddy play with, therefore they want to

play with it.  They would sometimes also take pictures with it because it was easy to access the camera from the home screen without unlocking the phone.

Q.   Okay.  Let me go back to 2019, so let's say July of 2019. Do you recall whether or not you had family visiting your home?

A.   Yes.  We had my ▓▓▓▓▓▓▓▓▓▓ John, his wife Amy, and their kids, M.F. and A.F.

Q.   Okay.  And can you basically describe sort of some of the activities that you did with them.

A.   Sure.  You know, we spent some time up at the park that was near our house.  They had a July 4th parade up by the park. We all went up to the parade.  Everybody decorates wagons and bicycles and things like that and walks around the park.  Lots of little activities like that.  We went into Boston.  We went out to eat at a seafood restaurant in Melrose.  We also spent a lot of time just kind of playing at the house and set up water play things in the yard and things like that.

Q.   And can you describe what would happen when it was time for your children to take a bath during the course of that trip, the visit that the ▓▓▓▓▓ made to your home?

A.   Sure.  So typically the kids would kind of all go upstairs.  As soon as one kid started talking about bedtime, the three of them -- I say "three of them" because my daughter was only six months old, so she was still on kind of full-time infant care.  But the three of them would run upstairs and

start getting ready for bed.  My son, out of the three older children, my son was the youngest, so he still needed a little more help getting pajamas on and things like that.

Q.   And which of the adults would help with bath time?

A.   I would say it was different every night.  So, you know, I gave my son F.B. a bath or my daughter C.B., and then either John or Amy would help out with their children.

Q.   Were there ever times when you and John would be like helping the kids with bath time at the same time?

A.   Not at the same time, at this same moment.  Like, we were both upstairs, but our bathroom was very narrow, so there was not really room for wall to wall people in there.  The kids didn't bathe together anyways, so it would be kind of, I would take care of my son or my daughter, and he would take care of his kids.

Q.   When you say the kids wouldn't bathe together, do you mean your kids and ███ ████ and ██████ wouldn't bathe together, or you mean each kid individually would bathe by themselves?

A.   I believe maybe the █████ and ██████ bathed together.  I didn't really pay attention too much to that.

Q.   You meant more so your children and their children didn't bathe together?

A.   Yes, yeah.  And my daughter was too young to be in the tub with anybody else anyway, so she was kind of -- you know, you had to just wash her because she was an infant.

Q.    Probably sponge baths or something, right?

A.    Yeah.

Q.    Okay.  Were there any occasions when you would observe your children or ▇▇▇▇▇▇ and ▇▇▇▇ not fully clothed during that trip?

A.    Certainly, especially ▇▇▇▇▇ and ▇▇▇▇ tended to kind of, they'd run upstairs, shed their clothing and start running around like madmen.

Q.    And was that around bath time or just --

A.    I would say yeah, they didn't take a bath every night, so sometimes it was just getting ready for bed and changing into pajamas and things like that.  Sometimes it was for bath time. They have a lot of energy.

Q.    Okay.  And what would you or the other parents do as a result, if anything?

A.    I would say nothing to a degree.  I mean, they just kind of run around and then eventually we kind of say, all right, you got to kind of keep things moving here.  My son was typically a little more reserved, but he was very excitable by the presence of some older ▇▇▇▇.  And so you get to a point where they're all kind of jumping up and down on the bed and acting generally crazy.

Q.    And how old was your son F.B. at that time, July of 2019?

A.    He was about three and a half.

Q.    And what I was asking earlier, you were describing about

your kids sort of accessing the phone.  At that point in time when F.B. was three and a half, would he have already accessed your phone at times?

A.    Yes.

Q.    And can you describe sort of the circumstances and what you would observe of him doing?

A.    So typically, you know, we wouldn't always see it immediately.  You know, you would kind of be doing things, getting ready for work in the morning or making dinner or something like that.  And then all of a sudden you'd see him kind of running around you with the phone and we would -- I typically didn't like him to have my phone mainly because I was worried he was going to drop it and break it because I didn't have a case on it.  So you kind of say, okay, no, you have your own stuff; please don't take ours.  So, yeah.

Q.    Were there ever times though that you would observe him either taking pictures or pictures having been taken that you knew that you didn't take?

A.    Yes.

Q.    After he had the phone?

A.    Yeah, absolutely.

Q.    Okay.  And can you describe sort of what that would look like?

A.    So, I mean, you just kind of see, you know, blurry pictures of him kind of running around with the phone.

Sometimes there was pictures of us.  Sometimes there was pictures of the animal or something like that.  Frequently it was kind of an unflattering picture of you from behind while you're doing something in the kitchen or getting ready for work or something like that.

Q.   And did you always observe those photographs right away right after you got your phone back from F.B.?

A.   I would say not necessarily.  I mean, there were times when I would kind of later find my phone, because I think there were times he grabbed it and set it down again and I never even saw it, and it might be even a day or two later where I would go to look at some photo I took for work or something like that, and then all of a sudden I see like 26 blurry pictures of our bedroom or something in the dining room or something like that.

Q.   So it might not be until you go back to look through your photos that you would find a series of blurry photos or just photos that clearly you didn't take yourself.  Is that right?

A.   Yes.  In fact, I think one time it was even somewhere around 300 photos were in there.  And I think he got that function where you can kind of hold the button and it just starts taking pictures over and over again.

Q.   Okay.  Do you recall whether or not there were any times during the ▮▮▮▮▮▮▮ trip to your house that F.B. accessed your phone?

A.    I don't specifically recall, but then again, that was five years ago.  It's just, it's not something that I would kind of lock into my memory.

Q.    Okay.  So you're not -- basically it sounds like you're saying you don't recall.  It could have happened; it could not have happened?

A.    Right.

Q.    Nothing stuck out in your mind about it?

A.    Correct.

Q.    And fair to say it would not have been anything out of the ordinary if you had seen him with your phone?

A.    No, it certainly wouldn't have been.

Q.    Okay.  And did your phone have a password on it?

A.    It did, yes.

Q.    Okay.  Did it also have the ability to use facial recognition to open the phone?

A.    Yes.

Q.    Was your face tied to your phone so that you could access your phone without a password?

A.    It was.

Q.    Was anyone else's face associated with your phone?

A.    Vanessa's was as well.

Q.    Okay.  So Vanessa or yourself could have accessed your phone with either your face or the password?

A.    Yes.

Q.    Okay.  And what about her phone?

A.    It was the same, so it was set up so we could, either one of us could grab either phone.  And then, you know, that's helpful when you're in the car and you're trying to quickly pull up Google maps for directions or something like that.

Q.    And either of you -- sorry.  You each knew each other's passwords as well?

A.    Yes.  In fact, they were both the same password.

Q.    Was there -- sorry.  Was there anything restricted on your phone, like if somebody were to log into your phone with the password or face ID, was there anything that was further restricted in terms of apps or photos or anything on the phone?

A.    No.

Q.    Okay.  So somebody getting into your phone, as far as you know, could have accessed anything that had been on the phone?

A.    Yes.

Q.    Okay.  So let me go back now to F.B. and his use of your phone.  If you know, could somebody access the photo app without using the facial ID or a log in?

A.    You couldn't access the photo app in terms of looking at photos, but in terms of taking photos, you can.  So there's a button in the corner of the screen for the camera.  That's just intended for that moment when you kind of, the kids are doing something awesome and you want to take a quick photo of it, and the amount of time it's going to take to unlock the phone and

then find the camera app, you're going to lose the picture.  So you just press the button, I think you had to kind of long-press it or something like that so you don't accidently press it, and then it would open the camera.  You wouldn't be able to see any photos that were taken before that moment, but you could take new photos.

Q.   Other than the camera app that you could get from the home screen without logging in, was there anything else that somebody could access without logging into your phone or using a facial ID?

A.   You could see the time and any messages received.  I guess actually I think there was a flashlight button as well.

Q.   Okay.  But pretty limited in what somebody could do?

A.   Yeah.

Q.   So other than using the photo app, or I guess the camera app to be more specific, was there anything that you observed F.B. to be using when he would take your phone?

A.   No.  Because beyond that, it was locked, and he was three years old, so he certainly wasn't able to unlock my phone.

Q.   Okay.  So it sounds like that was probably the main attraction if he had your phone.  Is that right?

A.   Yeah, I would say so.

Q.   I'll ask, but I think I know the answer.  I presume C.B. as of 2019 could not have accessed your phone?

A.   No.

Q.    Do you know whether or not ███████ or ██████ accessed your phone at all during that trip?

A.    I'm not sure.  I don't recall ever seeing them.  Again, it was five years ago, and it's just not something that I would have cared enough about to remember.

Q.    Okay.  Let me ask you this:  Are you familiar with some of the information that your iPhone gathered along with the photo, some of the, let's say, metadata?

A.    I am, and I've learned more through this case as well. Just following what's come through here.

Q.    Okay.  But can you just describe sort of briefly some of the information that you're aware of that your phone was capable of capturing along with just the actual image?

A.    So I know it does do the GPS data that says where the photo was taken.  That's actually a feature I've used sometimes when I can remember taking a photo at a place, and then you can, there's a map button in the photo app so you can click the match and say I remember taking this photo in Washington, D.C. So you could go there and find the photo if you couldn't remember the date.  I believe it also records information just like what kind of phone was used to take the photo and possibly which camera.

Q.    Okay.  When you say "which camera," can you describe what you mean by that?

A.    So there's, I believe, three cameras on the phone.

There's like a wide-angle lens.  There's a standard lens on the back, and then there's also the front-facing camera for like video calls and selfie pictures.

MR. SIMONS:  Okay.  And if I could, Ms. Gelman, I'd like to ask if you could pull up USAO_001522, and just for the attorneys and for the witness and the court at this time.

COURTROOM CLERK:  Is that screen on?

MR. SIMONS:  This screen is off, it looks like, yes. Do you want me to turn it on?

COURTROOM CLERK:  No.

MR. SIMONS:  I'll leave it off.

Q.   All right.  Mr. Baxter, can you see the item I just referenced in front of you?

A.   I can, yeah.

Q.   Okay.  And is that document that you're looking at, is that familiar to you?

A.   It is, the photo is familiar to me, and I have seen the document through the process of this case.

Q.   Okay.  So you see a photo.  Can you describe, if you know, who was in the photo?

A.   That's ▓▓▓▓▓▓ A.F.

Q.   Okay.  And is that a photo that looks similar to any of the other photos that have been introduced into evidence?

A.   I have seen those photos as part of the exhibits, yes.

Q.   Okay.  Is it fair to say that it looks like 16-1?

A.    I don't see where the number would be on that.

Q.    Okay.  You may not remember what exhibit number corresponds to which --

A.    No, sorry.

Q.    On the right-hand side of the photograph that you're looking at, what other information do we see?

A.    It looks like that's where all the information is.  The font size is very small, so I'm having trouble reading it right now.

Q.    Okay.  Can you see, for example, whether it shows a created date/time?

            THE COURT:  You can blow it up, you know.

A.    If it's possible to zoom in there a little bit.  Yes.  It was there at the top.  Scrolled past.  There it is, yeah, it has created date, looks likes July 5 of 2019.

Q.    Okay.  And it has a time too?

A.    Yeah.  Looks like 9:51 p.m.

Q.    Okay.  It has some other things.  It has a width and a height, right?

A.    Yes, it does.

Q.    Okay.  Does it also indicate to you which camera was used?

A.    So it says "iPhone XS Front True Depth Camera 2.87 millimeter."

Q.    And do you know what that means in lay terms?

A.    I believe that to mean it's the front-facing camera on the

phone, which is typically used for a selfie photo.

Q.   Okay.  And the data that you're looking at along the right-hand side, is that data that you're familiar with having been also on your phone when photos were taken?

A.   So I believe so, yes.

MR. SIMONS:  Okay.  Your Honor, I would move to have this be marked as the next exhibit.

MR. TOBIN:  No objection, Your Honor.

THE COURT:  I think that's 30, Karen.

COURTROOM CLERK:  Yes, 30.

(Exhibit 30 admitted into evidence.)

MR. SIMONS:  If we could publish it, or maybe you've already beat me to it, publishing it to the jury.

Q.   Just to be clear, Mr. Baxter, this is a page, you didn't create this page yourself.  Is that right?

A.   That's correct.

Q.   Is it your understanding that Mr. Kajita had created a report, and this is a page from that report, the extraction report?

A.   I believe based on the testimony we heard yesterday that that's -- he was the one that created this report, yes.

Q.   Okay.  So given that you believe that this photograph was taken with the front camera, are there any other conclusions that you can draw from that?

A.   I mean, I'd also say it looks like, if you zoom back out

to see the whole picture, that it looks like you can see her arm kind of extending down, holding the camera to take the picture.

Q.   And does that give you any indication of who might have taken the photo?

A.   It certainly appears based on the photo that she was taking the photo.

Q.   Okay.  And I asked you already whether you recalled seeing her take any photographs.  Sounds like your recollection is that you didn't see any photographs from her taken on your phone.  Is that right?

A.   Yeah, I don't recall.  That said, it wouldn't necessarily be something I would remember.

Q.   Okay.  So you're not saying it didn't happen; you're just saying you didn't observe it.

A.   Yes.

Q.   And again, you might have seen your son take the phone and give it back and that wouldn't have necessarily raised a flag in your mind at that time.  Is that accurate?

A.   Yeah.  And again, I typically didn't worry about it.  The phone was locked so nobody was going to be able to go in and start making expensive long-distance calls or anything.  So really the only thing I actually worried about when I saw a child with my phone was that it was going to get broken.

Q.   Okay.  Thank you, Ms. Gelman.  I appreciate it.

With regard to the photos, obviously through the trial yesterday we've heard testimony, we've seen a number of different photographs that are attributed to your phone, a number of them of ███████ A.F.

Can you describe to the jury if you took any of those photographs yourself and, if so, what the circumstances were and, if not, whether you have any idea who took the photographs?

A.   So I believe there was one photo there that I did take. There's a photo of C.B., my daughter C.B., who is the baby in the photo crawling on the floor next to ██████ A.F.  I believe I did take that.  In fact, I think I remember seeing that in my photo albums on my phone.  I think that's one of the ones that's in our shared photo album.

Q.   Okay.  What about the nude photographs that appear to depict A.F.?

A.   No.

Q.   Did you see any -- did you take them?

A.   I did not take them, no.

Q.   Okay.  Did you see anybody taking photographs of A.F. while she was in the nude?

A.   No, I didn't.

Q.   Okay.  Let me ask you about the videos.  There was a video, at least one video where I think your ██████████ had identified your voice as being you in the video.

Can you describe, if you recall, the circumstances under which that video or those videos came to be?

A.   So I don't specifically remember taking the video.  It certainly does appear, looking at the video, that it was me taking it.  You can hear my voice in the background, and you can see the kind of higher perspective that would come from me walking into the room.

When I saw the video, my best guess is that I kind of walked into the room because they were all jumping around on the bed and it was kind of fun and I was going to take a video.  And I did not realize that they, at that point, had taken their clothes off.  So I kind of walked into the room to say I'm going to take a video, then I saw that the children weren't clothed, and I kind of pulled the camera away and turned it off and then probably just immediately deleted the video.

Q.   Those videos were fairly short in duration, right?

A.   Yeah, I believe they were something like eight seconds or ten seconds.

Q.   Okay.  And do you remember who else was in the room at the time of those videos?

A.   At the time I believe it was the three older children.

Q.   Okay.  And would they typically have been together during the time that the ▉▉▉▉▉ were visiting your home?

A.   Yes.  They really enjoyed playing together.

Q.   Okay.  Prior to this case or the search warrant or

anything to do with these allegations, had you seen or do you recall seeing any of those photos or videos of ███████████ in the nude?

A.    No.

Q.    Okay.  Let me ask you this now.  Going back to the allegations about Freenet that we heard from Special Agent Montoya and Officer Kajita, prior to this case or prior to the search warrant execution and everything that ensued, had you ever heard of Freenet?

A.    No.

Q.    Presumably then, as far as you know, you've never used Freenet?

A.    No.

Q.    Okay.  What would you typically do on the internet when you were accessing the internet for non-work purposes?

A.    I would say, you know, social media things.  I'm not the biggest fan of social media, so I don't spend a ton of time on things like Facebook.  I enjoy kind of reading discussions on reddit.  I spend time on websites reading about cars.  I also really have a penchant for vacation planning, so I spend a borderline irrational amount of time thinking about where we're going to go on vacation, and half the time we don't end up taking the trip I've thought up.  But, you know, finding hotels, finding restaurants, things like that.

Q.    And what sort of browsers would you use, or how would you

access the internet when you would use the laptop?

A.    So I would use the Safari browser.

Q.    And that's the browser that's native to Apple products?

A.    Yes.

Q.    Would you ever use any other browsers that you were aware of?

A.    I did also have Google Chrome that I used.  Typically I used Google Chrome at work, so I also had it on the home computer because I had my work bookmarked so if I needed to access something work-related, I would use Google Chrome.

Q.    Okay.  And for email, would you typically check your email on any given device; and, if so, would it be your phone, computer, something else?

A.    I would use both the phone and the computer to check my email.

Q.    Okay.  And did you have a work email and a home email?

A.    Yes.

Q.    All right.  Did you typically -- would you check both at home?

A.    Yes.  Typically, you know, most nights I would try to avoid checking work emails because it just makes things stressful when you're trying to relax in the evening, but there's times there's just a lot of work that needs to get done, or I'm just bored and kind of want to see what's going on at work, that I would check the work emails at home.

Q.   Would you use the same browsers, mostly Safari, sometimes Chrome, to access those emails?

A.   I believe so.  I can't remember specifically which browser I used for work emails.

Q.   Do you recall whether or not your email provider or the URL would have been bookmarked in either of those browsers?

A.   I'm not sure if I bookmarked it or not because the gmail was pretty easy to remember.  You just type in mail, and it just kind of goes there.  I believe I had my work email bookmarked though.

Q.   Okay.  When you would back up the computer, the MacBook Air to the SSD, do you know whether or not there was any sort of settings that you had to either enable or disable to get both profiles onto the SSD?

A.   I honestly don't remember, it's been so long since I set that up.  I don't really remember how the setup process for that worked.

Q.   Okay.  Not to beat a dead horse, but I just want to be clear to ask you, once the backups were done on any given night that you would just plug it in and back it up, did you ever have occasion to change where a certain image was or change where something was stored from one folder to another folder, for example?

A.   No, I never actually went into the backup to do anything. That was really only if I kind of needed to restore the backup.

And, you know, I do believe on the previous version of the backup with my old computer, I had one time, after the old computer had broken, I went in there trying to find stuff. And the way the system organizes the files kind of makes no sense when you're just looking at them. It's really meant to be used with the software that pulls it out.

Q.   One of the exhibits that came in yesterday was I think what Officer Kajita described as sort of a replication of what a desktop would look like, do you recall, with the pretty flower in the middle?

A.   Yes.

Q.   Okay. Is that something that you had ever seen prior to the production of the exhibits from the government?

A.   I honestly didn't recognize it at all.

Q.   Okay. And again, his description said it wasn't exactly what you would see but he replicated it. So that wasn't something that was on your computer. Is that right?

A.   Correct, yeah. I typically would have a wallpaper that was photos of our kids or something like that.

Q.   Okay. I asked you about Freenet. What about the dark web; would you ever do anything on the dark web?

A.   No. I mean, the dark web was pretty much something you'd hear about when you get a email notification saying your phone number or something has been found on the dark web. But I've never personally gone on there. I don't really fully

understand what it is.

Q.   Did you participate in any sort of forums, chat groups or the like regarding child pornography or underage sex exploits?

A.   No, never.

Q.   Okay.  Prior to this case, in preparing and looking at the evidence, had you ever seen child pornography before in your life?

A.   No.

MR. SIMONS:  Okay.  Judge, can I just have a moment?

THE COURT:  Sure.

MR. SIMONS:  Thanks.  Excuse me.

Thank you, Your Honor.  Thank you, Mr. Baxter.  Those are all the questions I have.

THE COURT:  Cross from the government?

MR. TOBIN:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. TOBIN:

Q.   Good morning, Mr. Baxter.

A.   Good morning.

Q.   Where did you graduate from college?

A.   Worcester Polytechnic Institute.

Q.   What was your area of study?

A.   Civil engineering.

Q.   You are an engineer?

A.   I am.

Q.   And you would consider yourself knowledgeable about

computers?

A.    Reasonably, yes.

Q.    And you would have the technical knowledge to log into Freenet.  You have that ability.  Is that accurate?

A.    That is not accurate.  I don't even know what it is.

Q.    You don't know how to -- no, I'm not saying -- you've already told us that you never logged into Freenet.

My question is, would you have the technical ability to be able to get on your computer to find a specific site?

A.    I guess, I suppose it's possible.  I don't know fully how it works and what's involved.

Q.    But don't you go onto sites all the time?  You go onto your computer and you look up things, presumably, don't you?

A.    I do go onto websites.  My understanding, from what I've read through this case, is that Freenet is a piece of software.  It's not actually a website.  So I don't really fully know how that would work.

Q.    And you're telling us, and you've testified under oath, that you have never been on Freenet and you had never heard of Freenet prior to the charges being taken against you.  Is that true?

A.    That's correct.

Q.    And yet, you are aware that the Federal Bureau of Investigation, as part of a national investigation, observed that someone in your home on three separate occasions had

logged in or appeared to have logged into Freenet.  You understand that, don't you?

A.    I do understand that, yes.

Q.    And you understand that those dates were quite varied. They were June 4, 2021, July 2, 2021, and August 10, 2021. Isn't that true?

A.    I had not heard the August 10 date before.

Q.    You had not.  But you understand the FBI had observed someone at your house logging into Freenet on various dates. Is that accurate?

A.    I do understand that.

Q.    And you're telling us that wasn't you?

A.    I am telling you that.

Q.    Then who was it?

A.    If I knew that, I wouldn't be here.

Q.    Well, do you have somebody living in the cellar that we don't know about?

A.    I certainly do not.

Q.    No.  And are you aware that the individual on those dates was attempting to download specific known child pornography?

A.    I became aware of that through the indictment.

Q.    And are you aware that some of that specific known child pornography that was attempting to be downloaded in your house on those dates was found in the collection of child pornography on the SSD?

A.    I'm aware of that, yes.

Q.    You are.  Now, in July 2019, you, your wife, and your two children lived on Gooch Street in Melrose, correct?

A.    That's correct, yes.

Q.    Your son F.B. was three years old.  Is that accurate?

A.    Yes.

Q.    And C.B. had just turned a year old.  Is that true?

A.    I believe she was -- in July, she wouldn't have quite been a year yet.

Q.    Right.  July of 2019.

A.    She would have been --

Q.    No other adult, other than you and your wife, lived in the house.  Is that true?

A.    That's correct.

        MR. TOBIN:  May we have Exhibit 2.2 on the screen, please.

        THE COURT:  We're going to flip this one back.

Q.    You can see Exhibit 2.2.  Is that true, sir?

A.    Yes.

Q.    That is your living room.  Is that true?

A.    That is.

Q.    That lounging-type leather chair is someplace you would often sit.  Is that true?

A.    That's correct.

Q.    And number, evidence number 2, can we zoom in on that,

please.  That is the SSD.  Is that accurate?

A.    That does appear to be accurate, yes.

Q.    Well, you bought it, didn't you?

A.    Yes.

MR. TOBIN:  Maybe this will help.  Could I have the actual exhibit.

May I approach, Your Honor?

THE COURT:  Of course.

Q.    I'm going to show you what has been marked as Exhibit 6.  What is that?

A.    That appears to be the Samsung portable drive.

Q.    And this appears to be the portable drive that was in your house next to the green colored chair where you frequently sat.  Is that accurate?

A.    It does appear to be, yes.

Q.    And this is the portable drive on which hundreds of images and videos of child pornography were found?

MR. SIMONS:  Objection, Your Honor, as to the classification.  It's a decision for the jury.

MR. TOBIN:  I'm sorry.  I'll rephrase.

Q.    This is the portable drive on which there are hundreds of videos depicting children as young as six and seven being anally, orally, and vaginally penetrated.  Is that accurate?

A.    I don't know that that's accurate.  I've never seen those myself.

Q.   You've never seen those yourself?

A.   Correct.

Q.   You did hear testimony during the course of the trial as to what was found on this, didn't you?

A.   I did, and it sounds horrifying.

Q.   Could we have Exhibit 2-6, please.

That again, you would agree, is your living room.  Is that true?

A.   I would.

Q.   And you would agree that 6 is the laptop that was found at the search in your house.  Is that true?

A.   Yes.

Q.   And you understand and have the technical ability to be able to connect this, the SSD, to the computer?

A.   Yes.

Q.   And you understand that when you connect the two devices together -- and you've done that on numerous occasions, haven't you?

A.   Yes.

Q.   And you understand that, when you do that, anything on the SSD is then available to be viewed, for instance, on that computer screen?

A.   Yes, should you choose to do so.

Q.   And in fact, the night before the FBI executed the search warrant in your house, they did that -- the search warrant was

executed on November 2 in the morning.  Isn't that true?

A.    Yes.

Q.    The very night before, on November 1, at 9:03, you were sitting in that chair, weren't you?

A.    I don't specifically remember it, but it seems likely, yes.

Q.    And you had connected your SSD drive with the computer. Isn't that true?

A.    Again, I don't specifically remember it, but that's something I would frequently do, yes.

Q.    Yes.  And can you tell us on November 1 at 9:03 -- and by that time the children would have been asleep, wouldn't they have been?

A.    The children would have been asleep, yes.

Q.    And your wife goes to bed early.  She could have been asleep at 9:03 the night before the search?

A.    Typically at 9:03, no, she would not have been asleep. She might have been upstairs, she might have still been downstairs.  It's usually I would say anywhere between 9:00 and 9:30 that she goes upstairs.  I certainly can't remember when she went upstairs that night.

Q.    Any time between 9:00 and 9:30, and this is 9:03.

A.    Correct.

Q.    You're in the chair.  You've connected the two devices. What did you watch?

A.   I didn't watch anything.  I used that device to back up the hard drive.

Q.   Okay.  What about the night before that, Halloween, maybe that sticks in your mind, at 11:27 p.m.?  Presumably your children would have been asleep at that hour?

A.   Certainly, yes.

Q.   And your wife certainly by 9:27, based on her testimony and yours, would have been asleep at that hour?

A.   Almost certainly, yes.

Q.   And you connected this device with hundreds of videos of child porn -- though I know you say you don't know they're there, you don't know how they got there, you connected the device to your laptop.  Isn't that true?

A.   Not that I specifically remember, but again, it seems likely a possibility.  I did see the exhibit.

Q.   Okay.  And we won't go through this exhaustive list of course.  And the night before that, on October 30 at 10:20, the connections were made between this device and your laptop?

A.   I can say specifically on Halloween I would have been likely to plug it in to back up photos that were taken on Halloween.  We took lots of photos of the children in their costumes.

Q.   But, sir, you're knowledgeable about computers.  You're an engineer.  You're college educated at a technical school?  Isn't that true?

A.    I am a civil engineer.  However that does not include much computer training.

Q.    Yes, but you are nonetheless an engineer?

A.    Yes.

Q.    And you understand, by your own admission, how computers -- you understand computers?

A.    I understand the basics.  I don't know coding or anything like that.

Q.    Yes.  But you saw the exhibit, I think it's 9, that lists all the times that the SSD was connected to the laptop that was in that room, didn't you?

A.    Yes.

Q.    And you have no reason to doubt the accuracy of any of that information based on your own experiences.

A.    Nope.

Q.    Now, let's talk again about the SSD.  What was the password for the SSD?

A.    It did not have its own password.  It would have just been controlled by the password to the computer.

Q.    What was the password that was needed to be able to access that?

A.    So the computer password was, I believe it was either ████████36 or ████████20.  We had changed it at one point just for security purposes, so I can't remember which of those two it was.

Q.   Sir, did you not hear testimony from the forensic specialist who testified that in order to get into this machine, in order to get into the SSD which you purchased, which your wife didn't use, the password was SR2 -- I can't read my own writing -- 0DET?

A.   I did hear that.

Q.   Are you telling us that's not accurate?

A.   That's not the password that I would have set for the computer.  And again, I did not independently, to my recollection anyways, set a password for the drive.  It would have just automatically taken it from the computer.

Q.   Okay.  So wait a minute.  Let me ask you, separate and apart, do you recognize SRT0DET, what that is?

A.   I don't.

Q.   You don't recognize that as a car engine?

A.   It's something that, last night, after we heard it in the testimony, my wife looked it up on the internet.

Q.   No, no, no, no.  My question is about you, not what your wife or someone else did.  Are you testifying today that, one, you didn't put a password on this device, yes or no?

A.   I did not separately put a password on that device.

Q.   And are you telling me you never used the password SR20DET?

A.   Correct, I never used that.

Q.   And are you telling me -- well, let me ask you.  Are you

telling me you don't recognize what SRT0DET is?

A.   I did not, before last night.

Q.   You are a car enthusiast, aren't you?

A.   Absolutely.  I love cars.

Q.   You love cars, you're into cars.  You also love gadgets. Isn't that true?

A.   That's true.

Q.   And you didn't create this password on your device that references some sort of engine?

A.   I did not.

Q.   Okay.  Thank you.

Now, are you suggesting in your testimony that your three-year-old son F.B. is the one guilty of taking nude and pornographic photos of A.F.?  Is that your testimony?

A.   I think it's distinctly possible, and certainly he wouldn't have known or understood that that was inappropriate.

Q.   So we'll take that as a yes.

A.   I don't know what happened.  It seems like the most likely possibility, yes.

Q.   You heard your wife's testimony about sometimes finding the phone, that F.B. had taken photographs of, and they're of the ceiling and things of that nature.  True?

A.   That's true, and sometimes they are of people as well.

Q.   Yes, but there are no photographs of the ceiling with regard to A.F., are there?

A.    Some of the photos I saw did not even entirely have her in the frame.  I saw, one of the ones that you showed me in your office appeared to have her half out of the frame, and then most of the rest of the photo was the wall.

Q.    Sir, you will agree, will you not, that on July 3, two pictures of A.F. naked were taken in the second floor of your house coming in or out of the bathroom.  You saw those pictures, correct?

A.    I did see those.

Q.    You recognized that as A.F.?

A.    I did.

Q.    You would agree that she was nude or at least had her shirt in one picture above her head?

A.    It appeared that her father was removing her shirt at the moment the picture was taken, yes.

Q.    And you didn't take those pictures?

A.    No, and I would certainly say, if I was taking photos of ███████ while her father was standing there facing me, that I think he would have said something.

Q.    Well, her father wasn't facing you.  The jury can look at the pictures themselves.

A.    They can look at the pictures.  I believe --

Q.    Yes, they can.  Now, let's talk about July 4th, the very next day.  Are you telling us you didn't take the 16 pictures of A.F.?

A.    That's correct.

Q.    You're telling us that you didn't specifically put the camera in such a way to focus on her naked vagina and buttocks?

A.    I would never do that.

Q.    Yes, you are, okay.  That was also possibly your three-year-old son?

A.    Possibly, yes.

Q.    Is that the suggestion?  I'm sorry.  Is there an answer to that?

A.    I said possibly, yes.

Q.    Yes, of course.  And on July 11, the video in the bedroom, you do admit you took those, do you not?

A.    I don't recall taking them, but from looking at the videos, it certainly does appear that I took them.

Q.    Let's talk about that July 11 video in the kids' bedroom. Did you testify that you were walking into the room with your phone on video to take a picture of the kids.  You just walked in and there it was.  Is that true?

A.    Yes.

Q.    It was on?

A.    No, I don't recall specifically what happened.  It appears from the video that what I think happened is, I opened the door because I heard them jumping around on the bed, and they had had some really high jinks in there, and I wanted to take a video of it.  And then when I opened the door, they weren't

dressed, and I turned the camera off.

Q.   Sir, you've testified that these children run around the house naked a lot.  I think you said they go crazy, or something -- "madmen," I think is the word you used.  Is that true?

A.   But at that particular moment I did not realize they had disrobed yet.

Q.   Oh, so even before you entered the room, you turned on to take a video.  Is that your testimony?

A.   I don't specifically remember.  I believe it was as I entered.  I couldn't say exactly when I turned the video on.

Q.   These are two separate and distinct videos, aren't they?

A.   It does appear to be, yes.

Q.   So what did you do, take one video and turn it off and then turn it back on?  Do you remember doing that?

A.   I don't remember doing that either.  I think the second video might have been I accidentally turned it back on with my thumb as I was standing there, but I don't know.

Q.   An accident in taking the picture of A.F.'s vagina.  Is that what you're suggesting?

A.   I don't believe you could see that in that video that you're referring to.

Q.   There are two videos of the naked children.  Is that your understanding?  Is that what you viewed --

A.   That's what I've seen, yes.

Q.   -- I'm correct on that?  And would you agree that in both videos, the camera is trained almost exclusively on naked seven-year-old A.F.?

A.   No.  I would say in the first video the majority of the time you see my son and M.F. in the view.

Q.   Would you agree that in one of those videos A.F. is on the bed, throws her legs up and exposes her vagina?

A.   That does appear to be true.

Q.   And you believe based on the videos and you believe based on hearing your voice that you took those videos.  Is that true?

A.   It does appear to be true, yes.

Q.   Yes, it does.  And you're telling me, though -- are you telling us this was by accident?  You had no idea you were capturing a child's vagina on video?

A.   The video is eight seconds long, sir.  I started to take the video and then realized it was a mistake.

Q.   But after you took it -- you took the video, then didn't you see it and say, Oh, goodness, what has happened here, I must erase this?

A.   I'm assuming that's what happened, I looked at that and said that's not a video I would ever want to keep and so I erased it.

Q.   Whoa, whoa, whoa.  You're assuming?  Are you telling us you erased it or didn't erase it?

A.    I don't specifically recall, sir.

Q.    Well, if you erased it, then how did it get put onto your computer?

A.    I believe it would still back up the deleted photos from the phone.  If you look at the way the iCloud app works, it saves the deleted photos.

Q.    You would agree with me, will you not, that if you take a video, pornographic or otherwise, on your phone, you have to manipulate or do something to put it onto the computer?

A.    No, that's not how my computer worked.  It automatically updated everything from the phone to the computer.

Q.    Would you agree with me that once the film, the pornographic or the Grand Canyon is on your computer, you would then, a human being would have to take this, a wire, a cable I think they call it, and connect it to the computer to transfer the data from the computer to this?

A.    Yes, that is the process.  You plug it in and then it automatically just updates everything.

Q.    But you're telling us that you never saw the two videos that you believe you took.  You never saw them ever until the police showed them to you or your lawyer showed them to you?

A.    No.  I'm assuming at the moment I took them, I then looked at it and said that's not a video I wanted to take and deleted them.  I believe they would have stayed in the deleted folder.

Q.    But you're telling us -- I'm sorry.  You're telling us

that this is an assumption because you don't remember?

A.    It was five years ago.  I don't specifically remember, no.

Q.    Well, how often do you accidentally take pictures of naked children, including ████████, exposing her vagina?  I mean, you don't remember that even after five years?

A.    I don't, no.

Q.    But you assume, if you had seen that, you would have been horrified and erased it?

A.    Yes.

Q.    Is that your testimony?

A.    I wouldn't have been horrified.  I would have said that's inappropriate, and I would have deleted it.

Q.    Well, did you ever go downstairs and say, Oh, my goodness, let me tell you other adults what happened, I accidently took a picture of this child?

A.    I did not.  And I probably should have but I did not.

        MR. TOBIN:  If I may have just a moment, please.

Q.    Now, you're aware, are you not, that the multitudes of child pornography were found in a specific folder.  Isn't that accurate?

A.    It sounded like they were in more than one folder, yes.

Q.    When I say -- let me rephrase that question, but thank you.

    You are aware that all of the child pornography was found on one user profile, aren't you?

A.    I became aware of that through the testimony yesterday, yes.

Q.    And that was the backup profile.  Isn't that accurate?

A.    That's what they said yesterday.

Q.    And you set up that backup profile, didn't you?

A.    I did not set up a profile named "Backup."  I set up a drive.  The drive -- the profile names on the drive should have matched the profile names of the computer.  It's actually not possible, to my knowledge, for the profile names on the drive to be different from the profile names on the computer.

Q.    The person who set up the backup -- the person who set up the backup thing, folder, excuse me, used your email.  Isn't that true?

A.    Well, I would have set up the computer which was tied to my email.  However, the profiles on the backup drive should have been one for Patrick and one for Vanessa.

Q.    And the individual, the user on the Backup profile checked your email, didn't they?

A.    Well, again, it would have been a backup of my computer, so the email was checked on the computer.  You've got, you know, as Joe mentioned or questioned me on, I did use both my work email and my personal email on that computer, and then the browser history from all of the things that I do on a day-to-day basis should have been backed up on that drive.

Q.    Sir, you have logged into the backup drive, have you not?

A.   It is not possible to my knowledge to actually use the backup drive.  I would have plugged it in and let the computer put stuff on there.  As my current computer has never failed or had a virus, I've never had a reason to actually pull data off of there or even look at what was on there.  I just plugged it in and let it update.

Q.   I'd like to ask you some questions about your son and his use of your computer.  You're telling us you believe that on three separate days while ███ ████████ were here he somehow got a hold of your phone and took images of his naked ████.  That is essentially what you're suggesting to the jury?

A.   I believe it was two separate days the images were taken on.  I could be wrong.

Q.   Because the third day you admit you actually took the pictures of the child's vagina.  Is that true?  The videos I should say.

A.   It appeared I accidently took a video, most of which did not include any lewd access.

Q.   I'm sorry.  Which video didn't include anything lewd?

A.   I said the first half of the video just contained my son and M.F. running around the background, at which moment I realized they were naked.  And it appears that I took the camera and brought it down to turn it off, and in the process, you briefly see A.F. in the frame as well.

Q.   Again, these are all assumptions because you have no

memory of any of this.  Is that true?

A.   Yes, that's correct.

Q.   So you go to the second floor of your house on at least two occasions, and you have us believe that you have your cell phone, and you just leave it someplace for your son to pick up?

A.   I would typically leave it on the dresser or sometimes the bathroom counter when I was doing things.

Q.   And the three-year-old is able to get it, manipulate it and take pictures?

A.   He frequently did that with both my phone and Vanessa's phone.

Q.   Interesting though, isn't it, that the only pictures that were recovered were pictures of naked children.  We don't have pictures of anything but that.  Is that your understanding of the evidence, your understanding?

A.   My understanding is that the computer had thousands of photos and I believe that the non-pornographic photos are just not entered into evidence.  We had tens of thousands of family photos that were on both the computer and the backup drive.

Q.   Well, you seem to be very knowledgeable on computers.  Did you find or to the best of your knowledge are there any pictures taken around the time that those pornographic images supposedly taken by your son that don't show a vagina?

A.   Again, I would have deleted photos he took.  So if I had seen a batch of photos that he took, I would open it up and

kind of just batch delete them.  So I wouldn't necessarily notice every single photo in there.  If there's 100 photos and you're looking at a thumbnail view, I would just drag it and delete those photos.

Q.   So you're saying if your son got your camera, you would have taken it, looked at the photos, and deleted them.  Is that accurate?

A.   I wouldn't necessarily look at the photos.  You can frequently see just a thumbnail view.  You see a bunch of photos of walls, floors, people, and you just kind of grab it and say these aren't mine and wipe it.

Q.   But, sir, in this instance you're telling us you never saw the two pictures of A.F. in the bathroom door, correct?

A.   Correct.

Q.   And you never saw the 16 pictures, many of which are close-up of her vagina in the bedroom, correct?

A.   If I had seen those, I certainly would have told my ▮▮▮▮▮▮▮▮▮▮ what had happened and talked to my son as well about the appropriateness of using a camera like that.

Q.   And you never saw the two videos you took?

A.   I presumably saw those in the moment and then deleted them.

          MR. TOBIN:  I have no other questions -- excuse me.  I have no other questions.  Thank you.

          THE COURT:  Redirect?

MR. SIMONS:  No, thank you, Your Honor.

THE COURT:  You're excused.  Thank you.

MR. SIMONS:  With that, the defense rests.

THE COURT:  Okay.  The government has rested.  The defense has rested.  Ready for closing?

MR. TOBIN:  We are, Your Honor, after the instructions of course.

THE COURT:  Yes, I can instruct first.

So I think what we'll do here is, I'm going to give you the instructions on the law before they close, and it's my preference because it lets you know the law before they close and it saves them the time having to go through the law and you will know what to listen for with regards to the law when they're closing.  So when I finish, we'll take a break, and then we'll come back and do closing arguments, and then you'll begin your deliberations.

As I think you probably understand now, you will have a copy of these written instructions in the jury room.  I don't give them to you before I charge because inevitably I find a bunch of typos and then I correct them as we go, and I print a clean copy.  As I'm sure you also understand by now that anything I share with you has been -- I'm not going to say that the parties always agree to it, but they always know what I'm going to say, so I sort of have to read it so that what I give you is the same thing they agreed on and what I said.  So

again, I will attempt to be animated and interesting, but I'm going to have to ask you to bear with me.

So it is your duty as jurors to find the facts from the evidence admitted in this case. The determination of the law is my job as the judge presiding over this matter. You must apply the law as I give it to you to the facts as you find them. You must follow the law as I explain it to you, whether you agree with the law or not. Regardless of any opinion you may have as to what the law should be, it would violate your sworn duty as a juror in this case to base a verdict on any view of the law other than that given in my instructions. You must not be influenced by any personal likes or dislikes, prejudices or sympathy. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You must not interpret these instructions or anything I may have said or done during this trial as a suggestion by me as to what verdict you should return. That is a matter entirely for you to decide. Counsel and witnesses may have quite properly referred to some of the applicable rules of law in the course of this trial and may do so again during their closing arguments. If, however, any difference appears to you between the law as stated by any of them and the law as stated by me, you are to be governed by my instructions.

At the beginning of the trial, I talked to you about

implicit bias and the importance of treating everyone fairly and equally when you're deciding this case.  Just a few reminders of ways to combat any implicit bias that any of us may have.

First, slow down.  Do not rush to any decisions.  Take time to carefully consider the evidence and whether the evidence supports the conclusions you are drawing.  Hasty decisions are the most likely to reflect stereotypes or hidden biases.

Second, when you think about the people involved in this case, consider them as individuals rather than as members of a particular group and maybe ask yourself if you would be viewing the evidence differently if the people weren't from different groups, such as different racial, ethnic or gender identity groups.

And lastly, listen to your fellow jurors and consider their different points of view and be willing to share your views.  This can help to focus on evidence rather than on unsupported assumptions.  Again, your job individually and as a group is to resolve this case based solely upon the evidence before you and according to the law without sympathy, bias, or prejudice.

Again, every person accused of a crime is presumed to be innocent unless and until their guilt is proven beyond a reasonable doubt.  The presumption of innocence means that the

burden of proof is always on the government to prove that a defendant is guilty of any crime with which he or she is charged beyond a reasonable doubt.

This burden never shifts to a defendant.  It is always the government's burden to prove each of the elements of any crime charged beyond a reasonable doubt.  A defendant does not have to prove that they're innocent or even present any evidence.  The presumption of innocence alone may be sufficient to raise a reasonable doubt and to require the acquittal of a defendant.  So you may not convict the defendant here of a crime charged against him if the government fails or is unable to prove every element of that crime beyond a reasonable doubt.

A reasonable doubt is a doubt that a reasonable person has after carefully weighing all of the evidence.  It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.  A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence.  Reasonable doubt exists when, after weighing and considering all of the evidence, using reason and common sense, jurors cannot say they have a settled conviction of the truth of the charge.

You may not convict the defendant based on speculation or conjecture.  Again, to convict the defendant, you must find that the government has proven each element of an offense charged against him beyond a reasonable doubt.  You may not

convict the defendant if you decide that it is equally likely that he is guilty or not guilty.  If you decide that the evidence would reasonably permit either of two conclusions, either that the defendant is guilty as charged or that he's not guilty, you must find him not guilty.

You may not convict the defendant if you find that it is only probable or even strongly probable that he is guilty. A mere probability of guilt is not guilt beyond a reasonable doubt.  The law does not require, however, that the government prove guilt beyond all possible doubt.  Proof beyond a reasonable doubt is sufficient to convict.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

Again, the defendant is presumed to be innocent and the government bears the burden of proving him guilty beyond a reasonable doubt.  This presumption is not a mere formality. It is a fundamental principle of our system of justice.  If after fair and impartial consideration of all the evidence you have a reasonable doubt as to the defendant's guilt, it is your duty to acquit him.  On the other hand, if after fair and impartial consideration of all the evidence you are satisfied beyond a reasonable doubt as to his guilt, you should vote to convict him.

As I indicated at the beginning of the trial, you've

been permitted to take notes, but some cautions apply.  You should bear in mind that not everything that is written down is necessarily what was said.  When you return to the jury room to discuss the case, do not assume simply because something appears in somebody's notes that it is necessarily what took place in court.  Notes are an aid to recollection, nothing more.  The fact that something is written down does not mean that it is necessarily accurate.

The evidence in this case consists of the sworn testimony of witnesses, both on direct and cross-examination, the exhibits that have been received into evidence, and any facts to which the parties have agreed or stipulated.

Again, a stipulation means simply that the government and the defendant accept the truth of a particular proposition or fact.  Since there is no disagreement, there is no need for evidence apart from the stipulation.  You must accept the stipulation as fact to be given whatever weight you choose.  You should consider all of the evidence, no matter what form it takes and no matter which party introduced it.  Whether the government has satisfied its burden of proof does not depend upon the number of witnesses it has called or upon the number of exhibits it has offered but instead upon the nature and quality of the evidence presented.

The number assigned to the exhibits are for convenience and in order to ensure an orderly procedure.  You

should draw no inference from the fact that a particular exhibit was assigned a particular number.

Certain things are not evidence. Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they said in their opening statements and during trial and what they may say in their closing arguments is intended to help you interpret the evidence but it is not evidence. If the facts as you remember them from the evidence differ from the way the lawyers have stated them during openings, closings, or at any other point, your memory of the facts should control.

Questions by lawyers standing alone are not evidence. Again, the lawyers are not witnesses. The question and the answer taken together are the evidence. Objections by lawyers are not evidence. Lawyers have a duty to their clients to object when they believe a question or an exhibit is improper under the rules of evidence. You should not be influenced by any objection or by my ruling on it.

The indictment is not evidence. Anything you may have seen or heard when court was not in session, and I hope there was nothing like that, is not evidence. You must decide the case solely on the evidence received at trial.

Now, although you may consider only the evidence presented in the case, you are not limited to the plain statements made by witnesses or contained in the documents.

You're permitted to draw a reasonable inference from the facts that you believe those inferences are justified in light of common sense and personal experience.  An inference is simply a deduction or conclusion that may be drawn from the facts you find have been proven.  Any inference you draw must be reasonable and based on the facts as you find them.  Inferences may not be based on speculation or conjecture.

As we discussed the other day, evidence may take the form of either direct evidence or circumstantial evidence.  Again, direct evidence is direct proof of a fact, such as testimony from an eyewitness that the eyewitness saw something.  Circumstantial evidence is indirect evidence.  That is proof of a fact or facts from which you could draw a reasonable inference that another fact exists, even though it has not been proven directly.

You are entitled to consider both direct and circumstantial evidence.  The law permits you to give equal weight to both.  It is for you to decide how much weight to give any particular piece of evidence, whether direct or circumstantial.  Back to my chocolate chip cookie example.  Remember, you see the kid eat the cookie; that's direct evidence.  The kid's covered in chocolate and the cookie is gone; that's circumstantial evidence.

Now let's go to inferences, okay?  If you have a dog and you have a kid, and the dog and the kid are sitting

together on the floor, and you know that the kid hates chocolate chip cookies and the dog loves them, then it's going to be a better inference that the dog ate the cookie than the kid ate the cookie.  So you can draw an inference from circumstantial or direct evidence, but it has to be a reasonable one supported by your common sense.

You do not have to accept the testimony of any witness if you find that the witness is not credible.  You must decide -- hold on.  Let me make sure -- I didn't want to skip a page here.  You must decide which witnesses to believe considering all the evidence and drawing upon your common sense and personal experience.  You may believe all of the testimony of a witness or some of it or none of it.  You alone are the judges of the witnesses' credibility.

In deciding whether to believe the testimony of the witness, you may want to take into consideration such factors as their conduct and demeanor while testifying, any apparent fairness or unfairness they may have displayed, any interest they may have in the outcome of the case, any benefit they have received or potential benefit they stand to receive, any prejudice or bias they may have shown, their opportunities for seeing and knowing the things about which they have testified, the reasonableness or unreasonableness of the events that they've related to in their testimony and any other evidence that tends to support or contradict their versions of the

events.

In this case, the defendant decided to testify.  You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of the case.  You should not disregard or disbelieve his testimony simply because he is charged as a defendant in the case.

You've heard the testimony of law enforcement officials.  The fact that a witness may be a law enforcement official or a police officer does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or less weight than that of any other witness.  You should not accept, nor should you reject testimony based on such employment.  It is your decision after reviewing all of the evidence whether to accept the testimony of a law enforcement witness and to give that testimony whatever weight, if any, you find it deserves.

A number of documents, including photos and videos, have been received into evidence, some of which you were shown and some of which were admitted into evidence but not shown here in court.  You will have all of them with you in the jury room available for your review.  You decide the weight, if any, to give to each document.  That is, you may credit all of a document, a portion of a document, or none of a document.

In evaluating the believability of statements or assertions in a document, you should consider all of the

surrounding circumstances. Among other factors, you may consider the author of the document, the believability of the author, when the document was created, the purposes for which the document was created, whether the document was created in anticipation of litigation, whether the statements in the document are contradicted by anything else, and whether the statements in the document are reasonable or unreasonable, probable or improbable, in light of all the other evidence in the case.

With regard to photos and videos, again, you will have photos and videos in the jury room with you that were not shown to you during this trial. They were admitted into evidence but not displayed. You may look at those, but you do not have to if your memory of what was shown to you in court is sufficient for you to come to a verdict. The government presented samples of the exhibits they believe are sufficient to prove each element of the charged offenses. You may rely solely on images or videos that they showed you, or you may base your verdict on any of the admitted exhibits.

This case, like most criminal cases, began with an indictment. The indictment is not evidence or proof of guilt. The indictment is simply an accusation. It is the means by which a defendant is charged with a crime or crimes and brought before this court.

In this case, the indictment charges three crimes.

Count One charges the possession of child pornography.  Count Two charges the receipt of child pornography.  And Count Three charges the production of child pornography.

The indictment alleges that some of the charged offenses were committed on an approximate date.  It is not necessary for the government to prove that the offense was committed precisely on the date charged.  The law only requires a substantial similarity between the dates alleged in the indictment and the dates established by testimony or exhibits.  The defendant in this case is not on trial for any act or any conduct not specifically charged in the indictment.

I'm now going to give you some more specific instructions on the offenses charged in the indictment and the elements of those offenses.  For you to find the defendant guilty on any count, the government must prove each element of that count beyond a reasonable doubt.

Count One charges the defendant with knowingly possessing child pornography that involved a prepubescent minor, or a minor who had not attained 12 years of age.  For you to find the defendant guilty of this crime, you must be convinced that the government has proven each of the follow elements beyond a reasonable doubt.

First, that the defendant knowingly possessed an electronic device; second, that the electronic device contained at least one image or video of child pornography; third, that

the defendant knew that the electronic device contained an image or video of child pornography; fourth, that the image or video of child pornography had been mailed, shipped, or moved in interstate or foreign commerce; and fifth, that at least one of the images or videos involved a prepubescent minor or minor under the age of 12 years old.

Count Two charges the defendant with knowingly receiving child pornography.  For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt.

First, that the defendant knowingly received child pornography material; second, that the material contained at least one image or video of child pornography; third, that the defendant knew that the material contained an image or video of child pornography; and fourth, that the image or video of child pornography or the device on which it was stored had been mailed, shipped, or moved in interstate or foreign commerce.

Count Three charges the defendant with knowingly producing child pornography.  For you to find the defendant guilty of this crime you must be convinced that the government has proven each of the following elements beyond a reasonable doubt.

First, that the defendant employed, used, persuaded, induced, enticed, or coerced Minor 1 to engage in any sexually

explicit conduct for the purpose of producing a visual depiction of such conduct; second, that Minor 1 was a minor at the time; and third, that the visual depiction was produced or transmitted using materials or stored on a device that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

The word "knowingly" as used in these instructions means that the act was done voluntarily and intentionally and not because of accident or mistake.  To possess something means to exercise authority, dominion, or control over that thing. Possession includes both actual and constructive possession.  A person who has direct physical control of something on or around his person is in actual possession of it.  A person who is not in actual possession of something but who has both the power and intention to exercise control over that thing is in constructive possession of it.  Whenever I use the term "possession" in these instructions, I mean actual as well as constructive possession.

To receive something simply means knowingly to accept or take possession of that thing.  Receipt does not require proof of ownership.  Receipt can be actual or constructive.

Child pornography is any photograph, video, picture, or computer image of sexually explicit conduct that was produced using an actual person under age 18 engaging in sexually explicit conduct.  Sexually explicit conduct includes

any one of the following categories of conduct, whether actual or simulated:  sexual intercourse, including genital/genital, oral/genital, anal/genital, or oral/anal, whether between persons of same or opposite sex; masturbation, sadistic or masochistic abuse; lascivious exhibition of a genital or pubic area of any person.  Whether an image or video of genitals or a pubic area constitutes a lascivious exhibition requires consideration of the overall content of the material.  In considering the overall content of the image or video you may but are not required to consider any or all of the following factors.

One, whether the genitals or pubic area are the focal point of the image or video; two, whether the setting of the image or video is sexually suggestive, for example, a location generally associated with sexual activity; three, whether the child is depicted in an unnatural pose or inappropriate attire considering the age of the child; four, whether the child is fully or partially clothed or nude; five, whether the image or video suggests sexual coitus or willingness to engage in sexual activity; six, whether the image or video appears intended or designed to elicit a sexual response in the viewer.

It is for you to decide the weight, if any, to be given to any of the factors I just listed.  You may conclude they are not applicable given the facts of this case.  The list is not comprehensive and you may consider any other factors

specific to this case that you find to be relevant.

As used in these instructions, the term "minor" means any person under the age of 18 years old.  An image or video has been shipped or transported in interstate commerce if it has been transmitted over the internet or over the telephone line.  This element may also be satisfied by showing that the device used to store the possessed child pornography was manufactured outside of Massachusetts.  The government need not prove that the defendant had actual knowledge of the transmission over the internet or telephone or where the storage device was manufactured.

Your verdict must be unanimous as to each count.  In other words, all of you must agree that the defendant is guilty or not guilty in order to convict him or acquit him of the crime under consideration.  One additional instruction on unanimity for Count Three.  For Count Three, the government has alleged that the defendant committed that offense, that is sexual exploitation of children, which I've also referred to as production of child pornography, in July 2019.  The government has introduced images and videos taken on different dates in July 2019, which the government contends are child pornography.

To find the defendant guilty of Count Three, you must be unanimous as to which image or images or video or videos you find that the government has proven beyond a reasonable doubt.  That is, you must unanimously find beyond a reasonable doubt

that the government has established each of the three elements of this offense, the production offense, for at least one particular image or video, and you must be unanimous as to which images or video.

The question of possible punishment of a defendant should not in any sense enter into or influence your deliberations.  The duty of imposing sentence rests exclusively with me, assuming we get there.  Your function is to weigh the evidence in this case and to determine whether or not the defendant is guilty beyond a reasonable doubt based solely on the evidence that you have heard or seen during this trial in this courtroom.

So I am going to stop there.  As you know, they have an opportunity to make additions, corrections, or comments.  Would the government like to be seen at sidebar?

MR. TOBIN:  No, Your Honor.

THE COURT:  Defense?

MR. SIMONS:  No, Your Honor.

THE COURT:  Okay.  So I want to give everybody a break before closing arguments.  How much of a break would anybody like?

MR. SIMONS:  Would the court consider ten or 15 minutes?

THE COURT:  Yes.

MR. TOBIN:  That would be fine with the government.

THE COURT:  All right.  How about you all, ten minutes, 15 minutes?  Ten?  Ten minutes.  We'll be back at ten-of.  We'll compromise, 12 minutes.

COURTROOM CLERK:  All rise for the jury.

(Jury exits the courtroom.)

THE COURT:  Can you all take two minutes of your 12 minutes, ten minutes to look at the verdict form.

(Recess, 10:39 a.m. - 10:50 a.m.)

THE COURT:  Government, are you all right with the verdict form?

MR. TOBIN:  We are.

THE COURT:  Mr. Simons, while you're walking in, are you all right with the verdict form?

MR. SIMONS:  Yes, Your Honor.

THE COURT:  So, Kelly, both sides just signed off on the verdict form.

COURTROOM CLERK:  All rise for the jury.

(Jury enters the courtroom.)

COURTROOM CLERK:  Court is in session.  Please be seated.

THE COURT:  When you're ready, Mr. Tobin.

MR. TOBIN:  Thank you, Your Honor.

Good morning.  In July 2019, Amy and John ▓▓▓▓▓ and their two children, A.F. age seven, and M.F. age 5, visited the Baxter family in Melrose, Massachusetts.  The Baxter family

consisted of Patrick Baxter, the defendant, his wife Vanessa, and their two children, F.B., and C.B., who had just turned one.

The defendant was the uncle of A.F. and M.F. ████. The ███████ children were excited to visit with their ███████ and did not get to do so very often, as they lived in Canada. The photo on the screen shows the ████████████ during that visit. The little boy on the left is M.F. Baxter.

What the ███████ family did not know, what they could not know, was that the defendant was going to take pornographic videos and pictures of seven-year-old A.F. and add those images to his vast collection of child pornography.

The evidence you received during this trial proves beyond a reasonable doubt that the defendant, Patrick Baxter, is guilty of receiving child pornography, possessing child pornography, and producing child pornography.

The child pornography in this case was found in multiple separate folders on an encrypted SSD found in the defendant's living room. The child pornography had once been on the Apple MacBook laptop also found in the defendant's living room and then moved onto the SSD. The child pornography was found in the user profile named "Backup." The evidence proves that the defendant alone used and controlled the Backup profile.

There was also evidence that the user of the Backup

profile signed into the defendant's email account, and of course the password for the SSD itself references a well-known automobile engine, well-known to car enthusiasts, that is.  The defendant's ███████████, his wife, and the defendant himself tells you that he is very much into cars.

Now, the defendant testified that he had no idea what the password was.  In fact, he said there was no password, he had no idea what that engine was.  You heard the testimony of the forensic specialist Task Force Officer Yu Kajita.  The way you get into this SSD which contained the child pornography was to use a password, and the password was of an engine that had been produced by a Japanese car company sometime later.  Defendant says that's not accurate.  Who is more credible on that, the defendant or Yu Kajita, with his training and his certification?

There was no evidence linking Vanessa Baxter or anyone else to the Backup user profile in which all the child pornography was found.  The defendant alone is responsible for everything found on that SSD.

Now, a few moments ago the judge instructed you on the law you must apply in reaching your verdict.  I ask you to keep in mind the elements of the three offenses she laid out for you.  More about the elements a little later.  Let's now look at the evidence in this case and how it proves the defendant's guilt on all three counts.

In 2021, the FBI was conducting an operation to identify computer users who used the peer-to-peer network Freenet to receive child pornography. As you have learned, Freenet users can exchange pictures and videos with other Freenet users. The FBI was able to monitor Freenet use and determine that the users of a computer at a particular in Melrose, Massachusetts -- that address being the defendant's house -- attempted to download child pornography from Freenet on more than one occasion. In fact, I think you know now it was on three very disparate and different dates that an individual in the defendant's house was on Freenet attempting to download child pornography. You also know that some of that child pornography that was attempted to be downloaded was found on the defendant's password-protected SSD.

The defendant claims he had never heard of Freenet. He claims that he was not on Freenet on all those multiple occasions, he was not on Freenet on those dates that the FBI noticed somebody at that residence. So who was it? Well, you know who it was. It was the defendant. Who else could it be?

On November 2, 2021, the FBI went to the defendant's Melrose residence to execute the search warrant. At the home the FBI encountered the defendant, Patrick Baxter, his wife Vanessa, and their two young children. While the FBI searched his house, the defendant left and went to work. The FBI seized eight electronic devices from the residence pursuant to that

federal search warrant.  Interestingly, at the Melrose home that morning, or shortly after the completion of the search, FBI computer forensic analysis -- analysts, excuse me -- were able to review what was stored on seven of the devices.  Child pornography was not found on any of those seven devices.  The one device the Boston FBI could not open, the one device that was securely encrypted was an external hard drive, the Samsung SSD that you have heard so much about.

Why was that one device, this device so securely encrypted?  What was it about this device that its user wanted to protect from prying eyes?  You know the answer to those two questions, because you know now what is on the SSD:  the defendant's hidden stash of child pornography.  His wife didn't have the password for this.

When Task Force Officer Yu Kajita could not bypass the encryption on the SSD, he sought the assistance of a specialized FBI unit in Quantico, Virginia.  The forensic folks at Quantico were able to determine the password for the device.  The password for the securely encrypted SSD was, as you've heard, S20DETT, referencing an engine that a car enthusiast may very well know existed.  You know now that this is a particular model of a car engine.

With the external hard drive's password, the SSD's password now provided to him, FBI Task Force Officer Kajita was able to examine the contents of the SSD.  And what a treasure

trove of damning evidence it held.

As you know from the testimony of FBI Task Force Officer Kajita, the encrypted SSD contained a mirror image at what had once been on the Apple MacBook found near the SSD in the living room.  The contents of the laptop had been transferred from the laptop to the SSD.  And we know that once data and contents leave a laptop and go into let's say this SSD, then the user can erase, obliterate, can do anything else and take away any trace on the laptop from what is now on the SSD.

Can we have Exhibit 2.2 please.  This is a photo of where the FBI found the SSD on which the child pornography was found right next to the defendant's chair.

2.6, please.  This is a photo of where the FBI found the MacBook from which the contents of that had been loaded onto the SSD.  In your mind's eye, you can just see the defendant sitting on the chair connecting the SSD with its huge collection of child pornography to his laptop that so that he could view the child pornography.

May we have Exhibit 9, please.  Remember Exhibit 9, which captured the number of times in the 30 days before the FBI searched the defendant's house that the laptop had been connected to the SSD.  The SSD does not have a screen to view his stash of pornography.  The defendant had to connect the SSD to the laptop.  The very night before the FBI executed the

search warrant, the two devices were connected at 9:03 p.m.  We know that Vanessa Baxter did not connect the two devices.  She never used the SSD and did not know its password.

What was found on that SSD?  The defendant's stash of downloaded child pornography and the child pornography he made himself of his ███████████████ A.F.  Two user profiles had been transferred from the laptop to the SSD.  One profile was named "Baxter."  The other was named "Backup."  And as you know now, all of the child pornography was on the Backup profile.

Ladies and gentlemen, there was overwhelming evidence to prove that the Backup profile belonged to and was controlled by and used exclusively by the defendant.  The Apple ID username associated with the Backup profile was pwbaxter@gmail.com.  That username, pwbaxter@gmail.com had to be entered onto the Backup profile by the user, the defendant.  That email address was also the Apple ID username for the defendant's own cell phone that was seized from him during the FBI search of his residence.  You also learned that the defendant used that same email address when opening his Verizon home internet account, and he used it when he purchased an Apple iPhone XS on December 23, 2019.  We also know that he is the subscriber of that, which would make sense.  It's his name, PW Baxter.  And that is the name that he gave to the Backup profile.

There was also evidence that the user of the Backup

profile had signed into Patrick Baxter's email account, which makes sense.  You're on the computer, you want to check your email, you go onto your email.  And I've said now repeatedly, and of course the password itself for the SSD was something that was set by the defendant, despite his testimony to the contrary, you heard Yu Kajita, and it is of an automobile.  And of course for the third time perhaps we know he is a car enthusiast.

Now, what else have we learned about the SSD which contained the child pornography?  The defendant's wife testified that she never had anything to do with that SSD.  She testified she never heard of Freenet until this case, and she never downloaded child pornography from Freenet or from anywhere else on the internet.  She never put anything on the SSD.  She also testified that she never took naked pictures or videos of █████████ A.F.

What was found on that backup file?  And again, hundreds and hundreds of videos of child pornography.  You saw a sample of those videos.  They depicted children, some very young children, being raped, sexually assaulted and lasciviously displayed to sexually arouse the viewer.

The defendant's child pornography collection was stored on a number of different folders on the Backup profile.  One folder was named Freenet.  Within that folder was a sub-folder named Downloads, and on that sub-folder the

defendant had stored 116, 116 videos of child pornography he downloaded from the Freenet peer-to-peer network.

Task Force Officer Kajita explained to you that the file paths for those 116 Freenet downloads tells us that the videos had been downloaded from Freenet. This was no surprise. Remember the FBI tip. Somebody's in the house. Somebody's accessing Freenet. Somebody you know now as the defendant is downloading child pornography from Freenet.

Special Agent Montoya showed you snippets of three of those Freenet downloads. All three contained child pornography. I suggest that any of those three is evidence of receipt. Receipt means, if you download -- listen to the judge, of course I don't give out instructions -- but if you download pornography from the internet, if you download it from Freenet and you know you're doing it, you are receiving, your computer, you are receiving the child pornography.

Exhibit 18 contains all of the child pornography found on the defendant's SSD in the Backup profile which he set up with his own email address. There are 427 child pornography videos in that exhibit.

Downloading child pornography from the internet was not enough for the defendant. He sought an opportunity to make his own child pornography. He found that opportunity when his ██████████ visited from Canada. Remember the defendant's collection of child pornography included so many images of

young girls.  Many of the young girls were under 12 years of age.  And with the arrival of the ████████ family came a prepubescent little girl, seven-year-old A.F.

And what does the defendant do?  He takes pornographic pictures and videos of ████████ on three separate occasions.  And astoundingly, astoundingly, he wants to blame his three-year-old son.

On the very first night that A.F. was at the defendant's residence, July 3, 2019, the defendant snaps two photos of A.F. where she is naked in the bathroom door.  In one image A.F. has taken her top off.  And her naked body, including her vagina, is visible.  In the other image, the photo captures A.F.'s naked lower body including her vagina.  They were taken on an Apple iPhone.  They were taken on the defendant's phone.

What did the defendant do with these two images of ████████████████████?  Both of which were pornographic, both of which showed her vagina, one doesn't even show her face, what did he do with them?  Well, he stored them with the rest of his child pornography collection.  He put them with the rest of his collection of child pornography on the encrypted SSD.  Now the defendant could view those images anytime he chose.  All he had to do was to connect the SSD to the laptop to get access to it and have a screen.

The very next day, July 4, 2019, the defendant took 16

pictures of seven-year-old A.F. in his son ████'s bedroom.  You have seen all 16 of those pictures.  In one of the images A.F.'s face is clearly visible, and she is wearing a pink shirt with no pants or underwear.  Her mother, Amy, who you heard testify, identified the child in those 16 photographs as her seven-year-old daughter A.F.

These are not pictures of a cute baby, sitting naked in a bathtub, taken by a loving parent.  These are images, a number of them focusing on A.F.'s vagina.  In many of the images you can't even see A.F.'s face.  Of course it's not the child's face that the defendant is sexually interested in.  I hate to say it, but it was her vagina, and the photos captured that vagina repeatedly.  Again, where does the defendant hide those images?  In the secure SSD with the rest of his child pornography collection that no one else had access to because he alone had set and he alone had the password.

On July 11, 2019, the defendant took two videos of ████ ████ in his son's bedroom.  You know the defendant made the two videos because you can hear his voice on both videos.  He conceded that he took them.  Couldn't avoid that.  He couldn't deny that.  His voice is on there.  In both videos A.F. is naked, and her vagina is the focal point at times of each video.  You remember that disturbing video where the child is on the bed, she throws her legs up, spreads her legs and there's her vagina.  Look at those two videos and listen to

those two videos.  You will see and hear that the defendant is talking to his son and ██████████.  You can hear the defendant actually use the name "F.B." and "M.F.," the names.  But the camera isn't on those boys when he's speaking to them.  It's trained on what the defendant is interested in, on the naked A.F.

Who videotapes other people's children naked?  There was no doubt that the defendant considered these two videos of naked A.F. as sexually arousing.  He stored both videos on the encrypted SSD with his other child pornography.

And ladies and gentlemen, you decide, you decide credibility of witnesses.  Is what the defendant told you about those videos even, even remotely credible?  According to him, before he got into the room, he had planned to take a video of the frolicking children, so he turned on the camera.  Shucks, he then forgot to turn it off.

But how can that be because there's two separate videos with a space between them?  Oh, he must have forgotten that he it turned it off and then turned it back on again.  He never saw them.  He took these videos and never bothered to check what the videos were and what the pictures were?  I mean, that's not credible, is it?  That's ridiculous.  He's in the room.  He has the camera.  He's filming naked children.  He's talking to his sons, but he's focusing on the object of his interest, which is a seven-year-old naked girl.  He can't blame

that one on his son because we hear his voice.

Let's look at the elements for each of the three offenses that the judge has told you.  Let's first look at receipt.  Did the defendant knowingly receive child pornography material?  Of course he did.  He downloaded more than 100 child pornography videos from Freenet.  Check.

By the way, if he didn't download them onto his secure SSD, well, then who did?  I had asked if there was a phantom or someone living in the cellar.  There was nobody else.  Nobody had access to the SSD.  Nobody, according to him, even had the password for the computer other than his wife.  There's no third party here.  Are we to believe that three-year-old F.B. knew how to move something from a camera to a computer -- from a camera phone to a laptop to the SSD?  Of course not.

Let's look at the second element.  Did the material contain at least one image of child pornography?  Of course here we're talking about, because this is receipt, all of the child pornography that he had.  We know that there was more that 100 videos of child pornography downloaded from Freenet.  Check.

Three, did the defendant know that the material contained an image or video of child pornography?  Again, ladies and gentlemen, of course he knew.  He downloaded more than 100 child pornography videos on different dates from Freenet.  Check.  It is clear that the defendant was into two

things:  cars and child pornography.

The fourth element here deals with the interstate requirement.  You have listened carefully to the judge's instructions on this element.  This element is proven to you if you determine that the child pornography was stored on a device made outside of Massachusetts.  And you have received sworn testimony that the SSD was made outside of Massachusetts, as was the MacBook laptop that it had been on at one point, as has the -- all of which was transferred to this, made outside of Massachusetts.  The fourth element is proven.  Check, please.

Let's look at the elements for possession of child pornography briefly.  They are similar to elements of receipt of child pornography that we just went over.  Did the defendant knowingly possess an electronic device?  Shucks, the defendant possessed eight electronic devices, including the SSD found on the side table in his living room.  By his own admission, he bought it.  By his own admission, he used it.  Check.

Two, did the electronic device contain at least one image of child pornography?  Remember, all the law requires is one image, but what do we have?  Hundreds and hundreds of images and videos.  Did the electronic device contain at least one image of child pornography?  Yes.  Check.

Did the defendant know that the electronic device contained an image of child pornography?  Again, folks, of course he knew it.  He transferred the child pornography from

his laptop to the SSD.  His child pornography collection consisted of images he downloaded from the internet and videos and pictures he took of his ██████████████████.  Check.

The fourth element deals again with this interstate requirement.  And again, that has been proven to you because the SSD on which the defendant stored his child pornography was manufactured outside of Massachusetts.  Check.

Lastly, did at least one -- interestingly, all it has to be is one and he has hundreds.  Lastly, did at least one image involve a prepubescent minor or a minor under the age of 12 years?  That is resounding yes.  We know that A.F. is seven.  Look at the other pictures.  Look at the -- I'm not -- you can look at whatever you want to look at.  But there's the picture of the little girl with the missing teeth.  There's all sorts of pictures.  There's 200 -- hundreds of videos to select from.  Did they involve a prepubescent minor or a minor under the age of 12 years?  Decidedly, yes.  Check.

Let's look at the last count, the production count, and let's look at how the evidence proves the defendant's guilt of this offense beyond a reasonable doubt.  There are three elements.  One, did the defendant employ, use, persuade, induce, entice, or coerce A.F. to engage in any sexually explicit conduct for the purpose of a visual depiction of such conduct?  Of course he did.  He used A.F. to take pornographic pictures and videos of her in his son's bedroom and in the

bathroom.  Think of those 16 pictures of A.F. taken by the defendant.  In many of them you don't even see A.F.'s face, just her vagina in a close-up.  That, as well as all of these other images, is child pornography, and that is child pornography shot, taken, produced, and made by the defendant.  Check.

The second element is whether A.F. was a minor at the time.  Her own mother testified to her age.  Who would know better?  You know she was seven years old, seven years old when she was sexually exploited by the defendant, her uncle, in his house, welcoming her family into the home.  Check.

The final element has to do again with the interstate connection.  And again in that instance, the evidence is clear and has been proven that the images were taken on a cell phone made outside of Massachusetts, the defendant's cell phone, and stored on an SSD made outside of Massachusetts.  Check.

The evidence has proven the defendant is guilty of all three charges.  The defendant received child pornography from Freenet.  He possessed child pornography, hundreds on his encrypted SSD which had been on his laptop and, remember, on a profile that he set up using his own email.  And the defendant produced child pornography by photographing and recording ███████'s vagina in a way to satisfy his prurient lust.

Look at the definitions that the court has given you,

and you'll have them in writing, of what constitutes a lascivious display.  There will be no question in your mind that pictures of a child's vagina where it's the focal point, where it's the close-up, where it seems to be what the viewer is desiring is child pornography.  The defendant knew what he wanted and the defendant took the photos.  And when you're thinking about the defendant taking the photos, his phone, his person, he can put it here, he can put it here, he can do anything.

Ladies and gentlemen, the dishes have been washed and dried.  The counters have been wiped down.  The floor has been swept.  The kitchen is clean.  The elements have been proven beyond a reasonable doubt the defendant is guilty.  I ask you to return guilty verdicts on all three counts.  Thank you.

MR. SIMONS:  Thank you.

One thing we can all agree on I think is that there are photographs and videos that you saw that are horrific. Even by Mr. Baxter's testimony, these are horrific images.  But that's not the end of the story.  That may be part of your calculation, but the bigger part is whether or not the government has proven every element beyond a reasonable doubt, most importantly whether or not Mr. Baxter himself was the one who downloaded, received, and possessed child pornography and then, yes, produced child pornography.  That's the real question.

And the more horrific the charges, I would suggest the more important it is that you get it right, that you get the right person if you're going to render a conviction. Because as much as I'm sure it would be satisfying to convict somebody who committed these heinous crimes, what would be an even worse injustice would be convicting the wrong person or convicting somebody for whom there remains a doubt.

And all of this evidence against Mr. Baxter is essentially circumstantial. There is not a single witness that ever observed Mr. Baxter engaging in the receipt or viewing or possessing of child pornography. There is not a single person who testified that Mr. Baxter took any of the photographs of A.F. herself.

And before I get into the facts even more, first, I'm impressed that the government had taken my co-counsel's analogy of cleaning the kitchen. I think it's nice sometimes to have analogies. Let me take that one step further, though. If you're cleaning your kitchen and you miss a spot or you don't sweep the floor or you forget to clean the inside of the oven, you might still check the box in your everyday life. You might still say to your wife or your husband, you know what, I cleaned the kitchen, just like you wanted me to. You might be satisfied yourself that you cleaned the kitchen, even though you missed a couple of things.

But imagine alternatively that you pay a professional

to clean the kitchen.  You pay them whatever the going rate, I don't know, 100 bucks, 200 bucks, whatever it is.  And part of the job is to clean the inside of the oven, the inside of the microwave, wipe down the refrigerator.  And imagine you come home and it looks mostly good, but the counter is not wiped down or the inside of the microwave isn't wiped down.  If you paid for that service and you were promised that service, you might not be so satisfied.

And if you think of this case, you're not making your everyday decisions.  You're not deciding things that you do on a day-to-day basis.  This is a much higher standard.  Obviously I won't reiterate what the judge said about beyond a reasonable doubt, but it is there for a reason because it is very easy to be accused of something, it is very easy for inferences to exist, but it is entirely on the government with the tremendous resources that they have to prove beyond a reasonable doubt that Mr. Baxter is the one who committed these crimes.

Now, it would be much easier for me to come before you and suggest an alternative.  The government was incredulous over this lack of a third party.  Nobody living in the basement, no phantom person coming in the house.  You can imagine Mr. Baxter putting himself up on the stand to testify under oath and subjected to cross-examination that it would have been easier for him to make something up, perhaps even to tell you that he goes to bed at the same time as his wife or

earlier.  Instead, he chose to tell you the truth, good, bad, and neutral.

He told you that he's the one that uses the SSD.  He told you how he uses it.  He told you the nature of what he does to plug it in and to back it up and how he doesn't go in there.  He did have an alternative theory.  I don't have something to give you.  But that's not your job.  Your job isn't to determine what really happened or if somebody else may have accessed.  Your job really is simple, and it is to determine whether there is enough to convict Mr. Baxter and nothing else.

And that may be entirely unsatisfying because there are questions that we're not going to get the answers to.  We're not going to get the answers, for example, to, if you plug in a laptop to the SSD, do both profiles from the computer end up on the SSD?  I don't know.  Mr. Kajita doesn't know.  He was qualified as a, quote-unquote, "expert," but he was knowledgeable about computers, and we certainly know that the FBI has people that are smarter than him or -- maybe that's an unfair thing to say -- that are more knowledgeable about computers and forensics in Quantico, Virginia at the government's disposal.  I'm sure that answer could have been given by somebody smarter than myself in that realm.  We don't know.  We don't know.  And that seems like a basic thing to know, what happens when you plug in the computer.  What method?

Is it a Time Machine backup?  Is it something else?  We don't know.  We also don't have a good explanation for why the SSD would contain files that are not contained on the computer.

Mr. Kajita himself, who I would consider to be more of an expert than Mr. Montoya about computer forensics, he explained and testified that you would expect to see something on the computer matching up to the SSD, especially where there was connections between the computer and the SSD the day before the warrant, before those items were seized, couple of days before the warrant, a few days before the warrant.

Mr. Baxter explained why that would have been the case.  He would have, on a nightly or pretty routine basis, just plugged in and had everything backed up that hadn't been backed up before.  But Mr. Kajita, when I asked him if he would expect to see something analogous on the computer, that there had been a folder or file moved from the computer to the SSD, he said yes, you would expect that.

He did say that something could be deleted.  And when I asked him on cross-examination, if something were deleted, would you still expect that you might find some sort of an artifact, something on that machine.  And he said yes.  There was nothing on the computer.  I can't explain it.  But it's odd.  There was nothing on the computer that Mr. Baxter allegedly used to conduct child pornography viewing or downloading.  Nothing, nothing whatsoever, nothing on his

telephone at all.

Interestingly, with those logs that you see, the logs meaning, showing the computer to the SSD every time it connected, there is no evidence at all that you are going to see or that you heard about that suggest that during those time periods that Mr. Baxter or anybody else in that home accessed Freenet. None whatsoever. No connection to saying the same time period was backing up or connecting somehow vicariously through this SSD to Freenet. It simply doesn't exist.

Now, the government had a lot of leeway in what they chose to do and what they chose not to do. The government may argue that it's ridiculous to fingerprint a drive that Mr. Baxter owned and that was in his home. But I asked Mr. Montoya if that would have been possible, if that's something that they had the capability of doing. And certainly it was, and certainly they did not choose to do that. Why I think that's one factor that could have been considered and, by his own admission, would have changed his investigation. Because you don't know who else touched it. Clearly Mr. Baxter's fingerprints would have been on it. Maybe Vanessa's, maybe somebody else. Maybe it would have jogged a memory for Mr. Baxter or Mrs. Baxter, or maybe it would have given a clue to Mr. Montoya who else could have access. We don't know.

We also don't know what sort of activity was going on

with the computer or with the SSD at the times in question. Meaning, the government is arguing that Mr. Baxter was logging into email. I don't think that's really what the evidence shows. The evidence shows some sort of website visit to an outlook URL, but that doesn't mean that somebody actually went in and checked their email. You would expect to see multiple entries. If somebody was receiving emails and opening this or that email, you'd see multiple things on the search history or the history that was accessed. That's not the case. Could have been that there was a homepage that, when you open it up, it goes to Outlook. A lot of explanations that don't lead to the conclusion of Mr. Baxter accessing any sort of email whatsoever.

And with regard to that email address, the pwbaxter@ gmail, that is indeed associated with the backup, the SSD and with the computer, so of course you would expect that anything being done by the SSD or by the computer on his profile would be connected to that username. Of course it would, whether it was him, Vanessa, or somebody else, obviously.

The government didn't go through, or apparently didn't tell you about it if they did, go through any sort of messages that they could have, whether it be email messages, whether it be text messages, whether it be messages on any sort of forums that would have suggested Mr. Baxter having researched or talked about child pornography or what sorts of things to

request if he were on Freenet.  None of that exists at all.

With regard to the exploitation charge or what the government may call the child production charge, first of all, before I get into the facts of that, I would just ask that you look at the elements as you're deliberating, and what you'll see, again, is something along the lines of Mr. Baxter's accused of coercing, enticing, using, forcing -- I'm paraphrasing, but there's a whole number of verbs that are being used that suggest that you would have to find that Mr. Baxter did something to get ███████ to do something sexual, not simply to take a photo.  I'm not saying that he took the photos, but I'm saying even if you found that, I don't think that the elements would be met based on what the government's theory is here.  There's no evidence that the girl ever disclosed Mr. Baxter having told her to do anything or doing anything to her.

There's actually no evidence that the girl ever disclosed to her parents or to anybody else both at the time and during the course of this investigation leading up to this trial that she ever said Mr. Baxter came in and took photographs of her when she was in the nude.  And I would suggest to you that that indicates that he did not, that he did not take those, especially those close-up photographs.  I'm not talking about the videos that he explained.  The photographs that were apparently of her vagina and of her naked body.

I would suggest to you that Mrs. ██████, the mother of A.F., had suspected that her husband was in the background of at least one of those photographs of her daughter being partially undressed.  Can you imagine if Mr. Baxter were taking those photos that he would actually do so when her own father was present in the background in the direct line of sight of the photo?  I would suggest not.

Could a three-year-old kid who certainly had access and the ability to take photographs, could he have taken those photographs?  Sure.  I'm not suggesting that a three-and-a-half-year-old would be sexually deviant.  But I'm suggesting to you a little boy, with his own private parts, might be interested in seeing a naked little girl.  Sure, he had a baby, but the baby was new, the baby was little.  You can imagine why a little boy might be interested in something different, something that he doesn't have.  So maybe he did take those photographs.  Maybe A.F. took some photographs.

You can decide what you think, but that photograph that is 16-1 in evidence that you will have back there with you, I would suggest to you that the evidence, both just looking at the photo itself and the evidence from the metadata, suggests that A.F. did take a photograph with Mr. Baxter's phone.  Pretty innocuous photograph but, indeed, it looks like a selfie, and indeed the evidence shows this was taken from the front camera, which is consistent with the selfie.

What was interesting is ▮▮▮▮▮▮ said, Oh, I don't think so, her arm is too long, or whatever.  And you can imagine why she might say that.  Her judgment and her views of this case are probably clouded by everything else that she's been told by the government, everything else, because it's very easy to jump to conclusions.  That's why the judge reminded you and that's why I remind you that you have to look at the facts and not let your emotions control.  Because in our everyday lives, I understand how easy it is to hear about somebody being accused of something, and even if there's inferences, it makes it stronger, but that's not enough, that's not enough.

Going back to what A.F. did or didn't disclose, you could imagine that she might not disclose her little ▮▮▮▮▮▮ going around with a camera and clicking around because that would not seem to be out of the ordinary.  That would not seem to be anything that would stick out.

Regarding the videos that Mr. Baxter had been asked about, I would suggest to you that he was candid about what he remembered and what he didn't remember.  There was some amount of speculation over whether he deleted the photos or what he thought of the photos or whether he told -- he acknowledged not having told his wife or ▮▮▮▮▮▮ about the videos that he took.  But I would suggest that that's natural in the sense of, in the moment you can imagine taking a photograph of kids in your home that are nude but not doing anything inappropriate,

you might think, okay, this photo is inappropriate. You might not think, Oh, my God, this is the worst thing in the world that's ever happened, right, without the context of this allegation and this series of charges.

I would suggest to you, though, that what remains clear is that there isn't any direct links to somebody seeing Mr. Baxter doing anything deviant at all, sharing these photographs with anybody. And if he was the type of person to access these types of materials, especially the prevalence of the number of materials for his taking other people's homemade or produced child pornography, he's not trading, he's not talking. There's no evidence that he was at all engaged in any sort of communities where you could learn how and where to access child pornography.

Indeed, these are heinous allegations, ladies and gentlemen. But before, or as you deliberate, I just ask that you hold the government to their burden of beyond a reasonable doubt. And I suggest to you that there may not be a satisfying answer to every question, but there is simply not enough evidence here. And I would suggest to you that the only reasonable answer is that Mr. Baxter is not guilty of the crimes charged. Thank you.

THE COURT: Short rebuttal.

MR. TOBIN: Short, Your Honor.

There is not enough evidence here? Ladies and

gentlemen, you know that isn't accurate.  There are a few things that I want to hit on in the very short time that I have with you.  I'm going to suggest that the defense attorney's take on the law -- and again, the judge gives you the law.  You interpret.  You apply it.

There is a lot of words in the statute about production.  The one we're focusing on is "use."  This defendant used A.F.  He used her by taking her naked body and taking photographs.  There is no requirement that he had to speak with her, direct her, move her legs or arms.

Think of this.  The tiny infant who doesn't understand language, naked on a bed.  Not an uncommon site.  An individual goes up, trains the camera, takes a picture of just the penis or the vagina.  It's child porn.  In this instance, this defendant saw an opportunity to take pictures of this naked seven-year-old and he did it.

Now, there's only two real people that testified in this trial about computers.  One is the defendant, who admittedly has some knowledge but not an expert certainly; and one is Yu Kajita, a man who has examined more than 2,000 devices, a man who has been -- what's the word he used -- certified as a forensic person, an individual who has spent years doing this.  If you're going to listen to one of the two and determine which one is credible, the defendant who seemed to have an answer for everything, or Yu Kajita?

And why do I bring that up?  Because many of the things that the defense attorney just said just don't hold water.  Yu Kajita told you that in order for things to be transferred onto this, an act had to be done of connecting computer to hard drive.  In order to access this, you needed a password.  We know what the password was, even though the defendant claims he never heard of that engine, although he's a car enthusiast.

It was Yu Kajita who said that these images, all of this porn was put into the -- was put into the Backup profile, and we know that that had to have been set up by an individual, and we know that they gave it -- that it was associated with the email of the defendant.  And I don't know what the defendant's lawyer is talking about.  Yu Kajita testified somebody in that profile checked on the email for the defendant's email.

I'm almost done, Your Honor.

You know why there was nothing on the laptop, and that is because the defendant wanted no trace for his wife or anybody else to see.  He moved it all to this.  It was secured.  It was there.

And, you know, you do have to ask yourself, if it wasn't the defendant, then who was it?  Who else had access to this?  Who else knew how to work the computer?  Who else had access to the computer?  It's the defendant.

Lastly, and I'll leave you with this.  He really wants to blame his three-year-old son for his criminal acts.  Ladies and gentlemen, you've heard all of the evidence.  And of anything you've heard from the defense, anything that you've heard, that is the most outlandish.  Is it just by happenstance that on two separate dates his little three-year-old took his camera and decided to take pictures?  He's three years old, and we're supposed to believe that it's the three-year-old taking those pictures?  It's Daddy taking those pictures.  It's the defendant taking those pictures because that's consistent with what he likes and what his interest is.

There is no credible evidence whatsoever that little, cute F.B. Baxter was running around taking these pictures.  Because, ladies and gentlemen, if that were the case, then the defendant is the luckiest man in America, because, think of it.  He's really into child porn.  He's really into the sexual exploitation of young children.  And by happenstance, so is his son?  His son just by happenstance takes pictures of vaginas on two separate occasions and Daddy finds them?  It would be like hundreds of dollars floating down from the sky into your pocket.  That didn't happen.  That's not worthy of belief.  It's not even worthy of simple or significant contribution.

Ladies and gentlemen, in a moment you will go in and begin your deliberations.  At that time, after that you will render a verdict.  And "verdict," the word, comes to us from

two Latin words.  I don't claim to be a Latin scholar.  But "verdict" comes from to us from vericus dictum, to speak the truth.  And your verdict will speak the truth, and your verdict will speak loudly and clearly, and it will be that this defendant, Patrick Baxter, received child pornography, possessed child pornography, and made child pornography.  Thank you.

THE COURT:  Now it's time for deliberations.  Two more minutes from me.

Each of you must decide the case for yourself but you should do so only after considering all the evidence and listening to the views of your fellow jurors.  You should not hesitate to reconsider your views from time to time and to change them if you're persuaded that is appropriate.  But do not come to a decision simply because other jurors insisted that it is right, and do not surrender an honest belief about the weight and effect of the evidence just to reach a verdict.

Just a reminder that your verdict must be unanimous as to each of the questions I'm going to ask you to answer on the verdict form.  I'm going to ask juror number four, that's you -- raise your hand so we know who we're talking about -- to serve as the foreperson.  You'll have the same voice and the same vote as the other deliberating jurors.  The fact that one of you is the foreperson does not give that person special status in your deliberations.  You are all equal.

The foreperson will act, to the extent helpful, as the moderator of the discussion and will serve as jury spokesperson.  The foreperson's most important obligation is to ensure that any juror who wishes to be heard on any material issue has a full and fair opportunity to be heard by his or her fellow jurors.

If you as a group decide to take a recess during your deliberations, you should stop discussing the case until the recess is over.  Don't discuss the case during a recess when not all jurors are present.  If it becomes necessary during your deliberations to communicate with me, you may do so by sending a note through the court officer.  No member of the jury should ever attempt to communicate with me except by a signed note.

If you do communicate with me, do not tell me in the note how you stand, numerically or otherwise, on any issue before you until after you've reached a verdict.  You are not to communicate with anyone but me about the case outside of the jury room and then only in writing.  In turn, I will communicate with you only in writing or orally here in open court on anything concerning the case.

On matters touching on things like arrangements for meals, schedule, or convenience, you're free to communicate with either the court officer who will be outside your door or Karen orally rather in writing.

When you've reached your verdict, your answers will be recorded by the foreperson on what is called the verdict slip or the verdict form, which is simply the written notice of the decision you reach in this case.  After you've reached unanimous agreement on the verdict, your foreperson will fill in the verdict form, sign it, date it, and tell the court officer you're ready to come back to the courtroom.  When you come back to the courtroom, your foreperson will deliver the completed verdict form as directed in open court.

Okay.  We're going to send up copies of the jury instructions and copies of the verdict form.  This is the verdict form.  A little explanation about this.  The first page is blank, so when you carry it back in to court, no one can see it.  That's just your little cover.

Second page, Count One, Count Two, and Count Three.  For each count it says, "Do you the jury find the defendant not guilty or guilty of each of the offenses?  Count One, Count Two, Count Three."  Then sign and date it.

Just a reminder on Count Three, there are numerous videos associated with the allegation of production.  You need to be unanimous about which of those videos or photos satisfy the production statute.  So if half of you think it's video one and half of you think it's video two, that's not good enough.  You have to all agree that it's either video one or video two or more than that.

A little bit on the logistics. Your lunch is coming up at 1:00. I normally let you stay as long as you want to deliberate. You set the schedule. But today I have to leave at quarter-of-three. I have something else I need to take care of. So I'm going to let you go at quarter-of-three. If your deliberations go into tomorrow, there's absolutely no pressure on you. You can take as long as you want. You set the time when you come in, agree amongst yourselves. You set the time when you leave, agree amongst yourselves. The only thing I would ask is, if you decide at 2:00 you want to go home and sleep on it and come back tomorrow, just let us know when you're coming and going so we're not all standing around waiting for you, okay? So if you leave, you've got to tell us.

I won't bring you in in the morning to say hello, if your deliberations continue to tomorrow, and I won't bring you in at quarter-of-three to say goodbye. But you understand if you go into tomorrow, you shouldn't start deliberating until everybody gets there. And everything you do, you do as a group. So that's it. So quarter-of-three today will be the stop.

And once again, anything, do you want to be seen at sidebar?

MR. TOBIN: I'm sorry. Briefly at sidebar.

THE COURT: Yes.

**SIDEBAR:**

THE COURT:  I just want to make a record of one other thing.  I'm sorry to put your personal information on the record, but Mr. Simons came in this morning and said he had an unexpected death in the family.  He preserved his Rule 29 motion yesterday.  He did not make the motion at the close of evidence today, but I'm going to assume that you intended to make the motion carry over from yesterday, and I'm going to consider the motion preserved.

Just so you all understand, the motion is denied as to Counts One and Two.  Count Three we may circle back on because I'm not -- I have a potential issue for the purpose of part of the language, so we may circle back on that.  But the motion is denied on Counts One and Two, both at the close of evidence, the government's evidence and close of your evidence.  Go ahead.

MR. TOBIN:  Yes.  You had mentioned with regard to Count Three that what only -- the pictures you have to be unanimous, which is perfectly correct.  I just want to make sure they understand that, based on the comments, all they have to do is be unanimous on a single video or single photo.  You talked about looking at one, two -- I just want to put on the record, you did offer Mr. Simons, because of this horrible thing, to not go forward today, and he opted I believe to go forward believing that he was fully capable of doing so.

THE COURT:  Well, there was nothing about his

performance today that indicated to me that he was not fully prepared to do so.

MR. TOBIN:  I agree.

THE COURT:  Yes.  I take it you don't have any objection, preserving the Rule 29?

MR. TOBIN:  No.  I do -- well, he didn't make it and now you're going -- I mean, if you said that I'm going to deny it, I'd have no objection but you're saying --

THE COURT:  I'm going to consider the motion preserved.

MR. TOBIN:  I understand, I understand.

THE COURT:  Well, it seems it would be more prudent for the government to go along, given the consequences of it not being preserved.

MR. TOBIN:  I may change my mind and withdraw the objection.

THE COURT:  I'm going to consider the objection preserved.

MR. SIMONS:  Thank you.

THE COURT:  And it's denied on Counts One and Two. You can declare partial victory.

(End of sidebar.)

THE COURT:  Counsel pointed out a potential lack of clarity.  What I just said about Count Three, you need to be unanimous about at least one photograph or video for the

production charge, but you don't need to be unanimous on more than one.  If you find one, that's sufficient.

Does that satisfy you, Mr. Tobin?

MR. TOBIN:  It does, Your Honor.  Thank you.

THE COURT:  All right.  Karen is going to take you out to deliberate.  I'm going to ask the two of you in the back row in the last two seats to sit tight, depending on your perspective, sad or happy, to report that you two are the alternates, so we'll send the other 12 out.

COURTROOM CLERK:  All rise for the jury.

(Jury exits the courtroom.)

THE COURT:  Sit tight.  For you guys, the alternates, we're going to put you in a separate room.  If they come back tomorrow, we'll let you bring in your computers so that you can have something to do in your separate room.  We'll let you go in and get lunch before they serve themselves.  I'm going to ask you to stay because we never know what's going to happen with a deliberating jury, so if we extend into tomorrow, we can negotiate this.  Maybe if one of you doesn't want to stay, we can probably arrange for that and have you on call.  If you want to come back for the second day, I totally understand that, too.  That's fine as well.  Karen is going to take you out to your private special room.

They don't have a computer or a phone or anything because of how we left things.

COURTROOM CLERK:  After I get everything situated, I'll go down --

THE COURT:  And get their phones, all right.  Thanks.

I have to run.  I have another case that started at 11:00 that I've had someone else babysitting for me in another courtroom, so I'm going to run.  Stay here.  Karen is going to take your contact information, and I'm going to ask that you stay within about ten minutes.

Just before we get a verdict, I just want to thank you all.  You both did an excellent job with this case.  Obviously someone is going to be happier than someone else once a verdict is returned, but it shouldn't detract from the fact that these child pornography cases, it's a very tough subject matter, it's a difficult thing to talk to a jury about, and you both have done very well by your clients.  You did it in a professional and competent way that took seriously the subject matter but wasn't at all inappropriate about it.  It can be a fine line.  And the case was obviously extremely efficiently tried because here it is Wednesday and the jury has the case.

So I don't know how it's going to come out, and I know not everyone is going to be equally happy at the end, but thank you for the job that you've done here.  It's appreciated and noticed.  Karen will be back in a minute.

MR. TOBIN:  Thank you, Judge.

MR. SIMONS:  Thank you, Your Honor.

COURTROOM CLERK:  Does plaintiff and defendant agree these are the correct exhibits to go up to the jury room?

MR. TOBIN:  The United States agrees.

MR. SIMONS:  And Mr. Baxter also agrees.

COURTROOM CLERK:  Thank you.

(Recess, 11:55 a.m. - 2:19 p.m.)

THE COURT:  This is the question.  Exhibit 25, which is the July 9 video, they only have audio, not the video.  And we did send our technical person in to check it out, Lynne Shannon, who is the expert, and they do only have the audio.

MS. SOTO:  There's a way of opening it?

TECHNICIAN:  Sorry.  I should have written it down or something, but for that one they have to right-click and open with VLC media player.

MR. TOBIN:  Can you explain that, not to the jury of course, but to the media person?

THE COURT:  Give me that again slowly.

TECHNICIAN:  So right-click on the video, open with, and then VLC media player.

THE COURT:  Okay.  So I wrote, "Try this:  Right-click on video" -- I'm going to write, "1, right click on video.  2, open VLC media player."

It was just a very technical question.  We started without you.  They can't get the video on Exhibit 25, which is the July 9 video.  They can only get the sound.  So the

government just told me how to get the sound.  And what I wrote on the bottom of the question is, "Try this:  1, right-click on video player.  2, open with VLC media player."

MR. SIMONS:  All right.

THE COURT:  Thank you.

MR. TOBIN:  Your Honor, while we're on the record, could I --

THE COURT:  I'm going to let Karen get that up there. I want them to get this.

MR. TOBIN:  Sorry.  While we're on the record, I had mentioned to you that I might come back and withdraw the objection that I lodged at sidebar.  I am now doing that.  We withdraw that objection, and the defendant's rights are preserved with regard to that issue.

THE COURT:  Okay.

MR. TOBIN:  Thank you very much.

THE COURT:  I know I didn't wait for your client to get here, but given the nature of the question, do you want me to stay here and repeat the question?

MR. SIMONS:  I'm satisfied I can relay it appropriately.  For the record, he texted me back that he's on his way, but I'm content to just relay it to him.

THE COURT:  It's not anything of substance.  They just wanted -- the only thing that could possibly be of interest to him is the fact that they want to look at the video, and now

you know.  Okay.  Thanks, everyone.

(Recess, 2:22 p.m. - 2:40 p.m.)

COURTROOM CLERK:  All rise for the jury.

(Jury enters the courtroom.)

COURTROOM CLERK:  Court is in session.  Please be seated.  Members of the jury, please remain standing.  All others, please be seated.

Mr. Foreperson, has the jury reached a unanimous verdict?

JURY FOREPERSON:  We have.

COURTROOM CLERK:  Could you please hand it to the court.

THE COURT:  It's in order, Karen.

COURTROOM CLERK:  Mr. Foreperson, members of the jury, please listen to your verdict as it is read into the record.

In Criminal Matter 23-1001, United States v. Patrick Baxter, the verdict is as follows:

Count One.  Do you, the jury, find the defendant not guilty or guilty of possessing child pornography as charged in Count One of the indictment?  Guilty.

Count Two.  Do you, the jury, find the defendant not guilty or guilty of receiving child pornography as charged in Count Two of the indictment?  Guilty.

Count Three.  Do you, the jury, find the defendant not guilty or guilty of sexual exploitation of children, production

of child pornography, as charged in Count Three of the indictment?  Guilty.

Signed and dated, the foreperson of the jury.  So say you, Mr. Foreperson, so say you all members of the jury that you agree with the verdict as it was just read?

THE JUROR:  Yes (collectively).

COURTROOM CLERK:  Thank you.  You can be seated.

THE COURT:  So I want to thank you all, not for your verdicts because that's entirely yours, but thank you for your attention, your time, your conscientiousness.  You know what my instructions are every night.  Now I'm going to give you the opposite.  You no longer have to keep an open mind.  You can do any extracurricular research that you want.  And you can talk to anybody you want about the case.  I would just suggest that it might be appropriate to keep things that other people might have said in the jury room private.  But you are free, your First Amendment rights are fully restored.

I have about two minutes of work to do down here with these people, and then I'd love to come up and talk to you for just a couple of minutes.  So anyone that feels like waiting up there, I would love to chat.  We're all going to rise one more time out of respect for the job that you all have done here.

COURTROOM CLERK:  All rise for the jury.

(Jury enters the courtroom.)

THE COURT:  Karen is going to give you a sentencing

date.  What's your position on release, Mr. Tobin?

MR. TOBIN:  Yes, Your Honor.  We believe and we ask that the defendant be remanded to the custody of the United States Marshal.  I believe that that?  Is mandatory under 3143(a)(2), given the nature of the conviction.

There are some manners the statute allows for an individual not to be remanded.  I don't think any of those apply here.  I won't bother to go through them, unless you want me to, so we would ask that he be remanded immediately, which I think under the law needs to happen.

MR. SIMONS:  I would object, Your Honor, and request Mr. Baxter remain free, so to speak, under the same conditions.  He's been meticulously following all the conditions of pretrial release.  And he's not a flight risk, not a danger to the public I would suggest based on the conditions.  So I would ask that you continue his current release.

THE COURT:  He has two children who are certainly going to be traumatized by this.

MR. TOBIN:  Of course.

THE COURT:  And I would like for him to have the opportunity to have an orderly transition out of their lives.  I don't think he's a risk of flight.  He has adhered to every condition.  I don't think on the current conditions -- he's on home confinement, right?

MR. SIMONS:  I believe right now -- he was on home

confinement completely, then he was permitted to work.

THE DEFENDANT:  Yes.

MR. SIMONS:  He was permitted to work up until this point.

MR. TOBIN:  I mean, I don't want to be the ogre, I really don't.  But I'm looking at the law.  It says that, "The court shall order that a person who has been found guilty," yada, yada, yada, "and is waiting execution of a sentence be detained unless the judicial officer finds that there's a substantial likelihood that a motion of acquittal or new trial will be granted," I don't think that applies, "judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person in the community."  And then it goes on to talk about crimes of violence and other sort of felonies that trigger this mandatory situation.

I understand that there are two children.  I understand that there's a wife with whom he is still -- is connected.  He has had two years to get his affairs in order.  He may have already said goodbye to these children, I don't know, but I don't think that it's appropriate in a case where there's a significant sentence and, given the nature of the crime, that he be released.  I'm not happy to say that.  I just don't think there's any real leeway under the law.  I'm sorry.

THE COURT:  Well, you have a right to appeal what I do

here today, but I'm going to find by clear and convincing evidence that there's no risk of flight and he's not a danger to the community.  The potential danger to the community is with online pornography.  I think that Probation has been managing it.  He only has access to one computer and they have access to the computer.  So I'm going to let him remain on release pending sentencing.  If you want to appeal it, go ahead.  Probably you're right --

MR. TOBIN:  May I ask --

THE COURT:  -- I may well be wrong on it.  I'm trying to take --

MR. TOBIN:  May I ask one thing in the alternative?

THE COURT:  Yes.

MR. TOBIN:  If the court wants to give him an opportunity to say goodbye or to deal with his children, why can't we give him five days to do that?  Why does he need 12 weeks?  I'm just throwing that out as an opportunity.  You want to be reasonable with him.  You are always reasonable with us.  You want to give him an opportunity to get his life in order.  12 weeks?  I don't think that's appropriate.  But again, you are the judge and I am not.

THE COURT:  I'm going to give him the time.  Do we have a sentencing date, please?

COURTROOM CLERK:  January 8 at 9:15.

MR. SIMONS:  May I just double-check?

Okay.  That works for the defendant.

THE COURT:  Mr. Baxter, I'm sure this goes without saying, but you don't want to get into any trouble.  You've been adhering to your conditions.  You should stick to them.  And I know this is a difficult situation, so if you feel like you need any kind of mental health or professional attention during this time, I hope you reach out and let your counsel know and take advantage of whatever services there are for you and your family.  Probation can help with that too if you need it.  Okay?

MR. TOBIN:  Your Honor, I know the government's objections obviously are very hollow, but I would object, and I do think he's a danger, but I understand the court's rulings.

THE COURT:  Look, Mr. Tobin, I know what the statute says, and I'm doing what I feel is right here.  If you feel like you need to appeal it, I'm not going to take it personally.  It's your right to do it.

MR. TOBIN:  No, no, I understand.  Thank you, thank you.

THE COURT:  Believe me, I won't take it personally. I'm doing what I think is the right thing and then the government will have its opportunity to do what it thinks is the right thing too.  I fully understand that.

MR. TOBIN:  Of course.  I understand.  Thank you.

THE COURT:  As I think I've told you this before, but

as someone very wise once told me, where you stand depends on where you sit.  So I understand that we're sitting in different places.

MR. TOBIN:  I understand, and so do I, so do I.  Thank you very much.

THE COURT:  Thanks, everyone.  We're recessed.

(Adjourned, 2:47 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this <u>25th day of November, 2024.</u>

/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

CONTENTS

WITNESS                                                          PAGE


PATRICK BAXTER

    Direct Examination By Mr. Simons                              4
    Cross-Examination By Mr. Tobin                              44


E X H I B I T S

Exhibit No.            Received


   30                     36