```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                              )
UNITED STATES OF AMERICA,     )
                              )          Criminal Action
          Plaintiff,          )          No. 23-10001-ADB
                              )
v.                            )
                              )
PATRICK BAXTER,               )
                              )
             Defendant.       )
                              )




           BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT JUDGE


                         SENTENCING

                     January 8, 2025




        John J. Moakley United States Courthouse
                    Courtroom No. 17
                    One Courthouse Way
              Boston, Massachusetts  02210




                      Kelly Mortellite, RPR, RMR, CRR
                      Official Court Reporter
                      One Courthouse Way, Room 3200
                      Boston, Massachusetts  02210
                      mortellite@gmail.com
```

1    APPEARANCES:

2    On Behalf of the Government:
     David G. Tobin
3    Jessica L. Soto
     United States Attorney's Office
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3392
6    david.tobin@usdoj.gov

7    On Behalf of the Defendant:
     Joseph B. Simons
8    Natalie I. Sreca
     Simons Law Office
9    10 Post Office Square
     Suite 800
10   Boston, MA 02109
     617-544-9000
11   joe@jbsimonslaw.com

12   Martin G. Weinberg
     Michael Pabian
13   20 Park Plaza, Suite 1000
     Boston, MA 02116
14   617-227-3700
     owlmgw@att.net
15   pabianlaw38@gmail.com

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(Case called to order.)

COURTROOM CLERK:  Will counsel identify themselves for the record.

MR. TOBIN:  Good morning, Your Honor.  David Tobin and Jessica Soto for the United States.

MS. SOTO:  Good morning.

MR. SIMONS:  Good morning, Your Honor.  Joseph Simons for Mr. Baxter, and with me is Attorney Natalie Sreca and new co-counsel Martin Weinberg and Michael Pabian.

MR. WEINBERG:  Good morning, Your Honor.

MS. SRECA:  Good morning, Your Honor.

THE COURT:  All right.  We're here for Mr. Baxter's sentencing.  In preparation for the sentencing I have received and read the Presentence Report, which was revised on December 27 and again on January 26, the defendant's sentencing memorandum, which was filed on January 3 and accompanied by six letters, plus some information on the sentencing guidelines and the JSON data, the government's sentencing memorandum, which was filed on January 6.  And I also have pending before me the government's motion for preliminary forfeiture and the defendant's motion for release pending appeal.

From Probation, is that everything?

U.S. PROBATION:  Yes.  Your Honor just misspoke and said the second addendum was received on January 26.  It would

1  have been January 6.

2          THE COURT:  If I said January 26, I meant to say

3  January 6.  It's on the front page.

4          Anything else from the government?

5          MR. TOBIN:  Your Honor, we were just notified by a

6  text message that the mother of the production victim, the

7  mother of Arianna, has provided a written statement and it is

8  being -- apparently late last evening or even this morning.

9  It's being printed and brought down.  I'll give it to the court

09:17 10  at the appropriate time.  Ordinarily, if I had had such a

11  statement, I would have given it to you beforehand but we have

12  yet to receive it.

13          THE COURT:  Do you know how long it is?

14          MR. TOBIN:  I have no idea, to be honest.  I didn't

15  know one was coming.  She had spoken to us and expressed what

16  she'd like us to say on her behalf, but apparently now she's

17  thought about writing something.  I don't anticipate that it

18  would be that long.

19          THE COURT:  All right.  How about you, Mr. Simons,

09:17 20  anything else?

21          MR. SIMONS:  I think the court covered all of the

22  submissions, Your Honor.

23          THE COURT:  I'm going to start with the easier things

24  first.  Mr. Simons, do you have any objection to the

25  preliminary order of forfeiture?

1          MR. SIMONS:  No, Your Honor.

2          THE COURT:  Okay.  Karen, 155 is granted.

3          COURTROOM CLERK:  Okay.

4          THE COURT:  I'm next going to go to the motion for

5    bail pending appeal, which is denied.  The circumstances of

6    this case just don't satisfy the criteria that need to be

7    satisfied for me to agree to bail pending appeal.

8          And just to cut to the chase on that, whatever

9    arguments there are as to Count Three, Count Two is very solid

09:18 10   and carries a five-year mandatory minimum, and that alone makes

11   it appropriate for him to be remanded pending appeal.

12         Do you want to be heard any further on that?  I think

13   that's your motion.

14         MR. WEINBERG:  No, Judge.  If you've made an

15   unconditional ruling, I'm not going to burden the court while

16   there are so many other issues before you.

17         THE COURT:  Well, I mean, I appreciate the

18   professionalism and the thought that went into the motion, but

19   I think you know as well as I do that it doesn't actually

09:19 20   satisfy the criteria, mainly because whatever one has to say

21   about Count Three, Count Two warrants the detention.

22         MR. WEINBERG:  I do reiterate the arguments we made on

23   Count Two, that the government admitted without objection an

24   enormous amount of prejudicial information that didn't satisfy

25   Rule 701 of the hearsay rules.  I do think that's a substantial

issue.  We've written about it.  If the court would entertain a short rebuttal brief, we can file it in the nature of a motion to reconsider, but I don't want to burden the court today with further argument.

THE COURT:  As I say, the motion was well-drafted.  I think you made what arguments you could make, but I'm going to disagree with you on the evidentiary arguments underlying Count Two.  I sat through the trial, and they weren't objected to, but I don't think that objections on those grounds would have been sustained.

MR. WEINBERG:  Just to preserve the record, I would respectfully disagree.

THE COURT:  Yes, the record is preserved.

All right.  I'm just going to confirm with Ms. Sousa, nothing has been withhold from the report, correct?

U.S. PROBATION:  No, Your Honor.

THE COURT:  Mr. Simons, have you had an opportunity to review the Presentence Report?

MR. SIMONS:  I have, and so has Mr. Baxter, Your Honor.

THE COURT:  So you've gone over it with him?

MR. SIMONS:  Yes.

THE COURT:  And Mr. Baxter, you feel you've had ample time to consider the report and discuss it with your attorney?

THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  I want to go over the

2     guideline calculations for a minute and we'll go through the

3     objections.  But I talked to Ms. Sousa this morning, and I want

4     to tell you where we ended up on this.

5          In terms of the Chapter 4 enhancement and the

6     repetitive conduct, I don't know that those are actually double

7     counting or duplicative math, but it's close enough that I'm

8     not going to apply the Chapter 4 enhancement.  It doesn't make

9     a difference to the guideline calculation.  It takes down five

09:21 10     points, which gets us to a 44, but the guideline calculation

11     still drops to a 43.

12          Is that the victim impact statement?  Why don't you

13     pass that up to Mr. Tobin, please.

14          MR. TOBIN:  Your Honor, may I provide a copy to the

15     defense?

16          THE COURT:  Of course, yes.

17          MR. TOBIN:  And to madam clerk?

18          THE COURT:  Yes.  I'm going to take just a minute to

19     read this, okay?  There's writing on two sides, but it looks to

09:21 20     be the same writing, right?

21          MR. TOBIN:  I'm sorry, I don't have writing on my

22     side.

23          MS. SOTO:  Your Honor, it's the same message on both

24     sides.

25          THE COURT:  I'm going to read one.  It's not long.

1    Just give me a second.

2            Let's add this to the record.  I've read it.

3            All right.  We're discussing the guidelines, so just

4    to be specific about it, at least on my copy I've put a big X

5    through paragraph 44.  And then in terms of the victim-related

6    adjustment, which is set forth at paragraph 40, after a

7    conversation with Probation, there is still a two-point

8    enhancement, but it's a vulnerable victim enhancement under

9    3A1.1, rather than a victim-related adjustment under 3B1.3.

09:23 10            Does anybody want to be heard on either of those

11    things before I get to the other objections?

12            MR. TOBIN:  No, Your Honor.

13            MR. SIMONS:  Just to note our objection, Your Honor,

14    to the enhancement that you just mentioned, the 3A1.1.

15            THE COURT:  To the vulnerable victim?

16            MR. SIMONS:  Yes.

17            THE COURT:  What's your argument on that?

18            MR. SIMONS:  I want to just make sure we're objecting

19    to all the enhancements that Probation has requested.  Some of

09:23 20    them we briefed.  Some of them were added two days ago.  I

21    think we only had one day to look at them.  I just want to make

22    sure for the record that they're noted.  And if the court would

23    like, I'm happy to provide a brief.  But since we're at

24    sentencing right now, I just want to make sure for the record

25    that I'm objecting.

1          THE COURT:  All right.  You can object to it, that's

2    fine, and it will be preserved.  But that reference that you

3    just made to only getting things yesterday or in the last

4    couple of days, you're prepared to go forward today?

5          MR. SIMONS:  Yes, I am.

6          THE COURT:  Okay.  All right.

7          MR. TOBIN:  Your Honor?

8          THE COURT:  Yes.

9          MR. TOBIN:  I'm sorry.  This brings -- you're striking

09:24 10    those certain levels, as you have, which I'm not objecting to.

11    But that brings up a very interesting point, doesn't it?

12          Now the total offense level is 44 as opposed to -- is

13    it 44?  I'm saying, are we using the original calculations, or

14    are we using the revised calculations?

15          THE COURT:  It doesn't change anything, Mr. Tobin.

16    And just so we're all clear here, if you go to page 12 of the

17    revised Presentence Report and you look at paragraph 44 --

18    well, let's start with 42.  So he's at a 44 before we added the

19    five levels in paragraph 44.  And then you'll see that in

09:25 20    paragraph 46, anything above a 43 automatically gets dropped to

21    a 43.

22          MR. TOBIN:  No, no, no.  I understand that.

23    Originally, and I defer to Probation of course, but originally

24    before the more recent or the third iteration of this, we were

25    sentencing under United States Sentencing Guidelines Section

2G2.2.  With the revised PSR, we're sentencing under 2G2.1, but
we're now under the original where we take out the five.  We're
at 44, which is less than the 45 under the revised.  So the
question is do we revert back?

U.S. PROBATION:  The offense level at 2G2.2 is still
higher than that at 2G2.1 because the enhancement is applied
after the calculation.

MR. TOBIN:  After, and that's what determines that.

U.S. PROBATION:  If look at paragraph 36 -- I don't
want to -- hold on one second.  The Probation Office has
outlined what the calculation would have been had 2G2.1 been
used, and it would have been a 38, which is less than 44.

MR. TOBIN:  Okay, that I understand, but right now the
total offense level is 45 versus 44.

U.S. PROBATION:  The total offense level is 43.  The
adjusted offense level -- it's 43 no matter what because you
can't be higher than 43.

MR. TOBIN:  That's true.  No, I understand.  I just
wanted to make sure the record was clear and we were using the
correct section of the guidelines.

U.S. PROBATION:  Yes.

THE COURT:  Okay?

So the defense is overall looking for an adjusted base
offense level of 36 instead of 43, and that is because they
don't want the two-point enhancement for the relative, which

1    we've now converted to a two-point enhancement for a vulnerable

2    victim.  Whatever the issues may have been with the relative

3    enhancement, I think that, given the age of his niece at the

4    time that this happened, the vulnerable victim enhancement is

5    permissible -- is appropriate.  Sorry.

6              And he did testify, it was testimony that was found to

7    be false by the jury, which warrants the two-point enhancement

8    for obstruction.  And we've already gotten rid of the repeated

9    and dangerous conduct, which I think was your third objection,

09:27 10   right?

11             MR. SIMONS:  I think that was the third objection that

12   we briefed, yes.

13             THE COURT:  So does anybody think there's any

14   objections that that conversation does not resolve?

15             MR. TOBIN:  No, Your Honor.

16             MR. SIMONS:  Again, I just generally want to make sure

17   that the objection is noted for any of the enhancements that

18   the court finds and rely on the previously submitted brief for

19   that argument.

09:28 20            THE COURT:  Yes.  All right.  So in terms of the

21   calculations, where that -- give me a second here.  So it's a

22   base offense level of 22.  It's increased by two levels because

23   there were images of minors that were prepubescent or had not

24   yet attained the age of 12, plus four points for sado or

25   masochistic images, plus five points for the pattern, two

1    points for the computer, five points for the number of images,

2    two points for the vulnerable victim, two points for

3    obstruction, which gets us to a 44, and that is dropped to a

4    43.  Do I have that right?

5            U.S. PROBATION:  Yes, Your Honor.

6            THE COURT:  I'm going to pause at each stage here

7    because this is a complicated one.  Mr. Tobin?

8            MR. TOBIN:  We agree.

9            THE COURT:  Mr. Simons?

09:29 10            MR. SIMONS:  Disagree, but I understand what the court

11    is saying.

12            THE COURT:  You're preserving your objections but

13    you're agreeing to my math.

14            MR. SIMONS:  I agree the math is correct.

15            THE COURT:  He has zero criminal history points, which

16    puts him in Criminal History Category I, and that results in

17    basically a guideline range of 840 months, which is the

18    statutory maximum; a supervised release range of five years to

19    life; a fine range of $250,000 for each count, but 50,000 to

09:29 20    $250,000 under the guidelines; restitution, which I think has

21    been requested for a total of $17,500, which is $7,500 on the

22    Best Necklace series and 10,000 on the Tara series; special

23    assessment of $300, and then there's also other special

24    assessments available under the JVTA or AVAA.  Do I have that

25    right?

1          U.S. PROBATION:  Yes, Your Honor.

2          THE COURT:  Mr. Tobin?

3          MR. TOBIN:  Yes, Your Honor, yes.

4          THE COURT:  Mr. Simons.

5          MR. SIMONS:  Yes, Your Honor.

6          THE COURT:  All right.  So I've read the sentencing

7    memorandums filed by both parties, but I'm happy to hear you,

8    Mr. Tobin or Ms. Soto.

9          MR. TOBIN:  Your Honor, sentencing is in my opinion

09:30 10   always difficult.  It is never easy to stand up and ask the

11   court to imprison someone.  It is more difficult in many ways

12   when we're asking for a sentence of 30 years.  The gravity of

13   this situation is not lost on me or Ms. Soto.  In a perfect

14   world we wouldn't have to do these things, but the world is not

15   perfect, and our duty requires us to request a sentence that is

16   fair and just and takes all of the sentencing factors into

17   consideration.

18          I want the court also to know that despite what some

19   defense attorneys think, not my brother or sister, we don't

09:31 20   just ask for the highest sentence possible, and we don't ask

21   for the highest sentence that we think the court will give.  I

22   know that after 36 years, when I'm fashioning a sentencing

23   argument, I try to do what I believe a judge, a good judge,

24   what you would do, is consider all the factor under 3553(a),

25   all of the particulars of the defendant in his life, and come

1    up with something that meets the needs of sentencing.

2         But I think the first thing we need to focus on here

3    -- and I know this is not lost on you -- is the gravity and the

4    significance and really the horror of the defendant's crime.

5    And I know I don't need to preach to you.  Sometimes, though,

6    in my business, we're around this horribleness so often, I hate

7    to say this, but sometimes it can lose its impact.  But this

8    defendant collected at this point -- well, 427 videos and

9    pictures of children being abused.

09:32 10        As the court knows, because as you pointed out you sat

11   through the trial, the videos and the images were so disturbing

12   that I don't feel comfortable even discussing them in open

13   court, and I don't have to.  They're so bad, we were so

14   concerned about the jurors that we showed them tiny snippets so

15   they didn't get sick or they weren't haunted by this.

16        Images -- and again, I'll try to be as less

17   descriptive as possible, but numerous, scores, hundreds of

18   images of children being raped and brutalized, bondage,

19   sadomasochism of young children.  That's what the defendant

09:33 20   collected.  That's what he was interested in.  And you know

21   because you've received in the past and in this case letters

22   from victims whose images have been traded or looked at, like

23   the more than 400 that the defendant collected, and that is new

24   pain, new suffering, new agony for the victims.

25        You know, the possession and receipt counts of child

1    pornography that the defendant is guilty of are not victimless

2    crimes.  We obviously know that, but sometimes we have to

3    remember just how agonizing it can be for those children to

4    know that their images, their abuse, their rape is causing

5    sexual pleasure to a defendant.

6        Now, the most significant count here of course is the

7    production count.  And it is almost unfathomable to us that an

8    uncle who was trusted and beloved would betray the trust that

9    his family members and essentially his niece, at seven, placed

09:34 10    in him.  He took advantage of that for his own prurient sexual

11    interest.  He took pictures of that girl, many of them focusing

12    on her vagina, not on her head, not on her face, but close-ups

13    of her vagina and her anus because that is what sexually turned

14    him on, and he added those to his collection.  These crimes are

15    abhorrent and horrible, I would suggest made even worse by the

16    betrayal of trust that the defendant engaged in by targeting in

17    his own home a family member.

18        Now, every defendant -- and this is axiomatic,

19    American men and women have gone to war to protect our rights.

09:35 20    Every defendant has the right to plead not guilty, to go to

21    trial, and say to the government, "Prove it."  No objection to

22    that, no issue with that whatsoever.  But as we pointed out in

23    our sentencing memo, a defendant doesn't have the right to take

24    the stand and lie.  I understand two points have been added,

25    but I believe that's an aggravating factor when totaling up

really what the sentence should be.  But he went beyond just

lying, didn't he?  He actually suggested, if you will, tried

to, opened up the possibility that his three-year-old son was

responsible for the photographs.

Think what he was trying to or what could have

happened with that.  This boy, who will be deprived of his

father for X number of years, if he learns of this, he will

think, Oh, my goodness, my father claims he didn't do this and

he's in prison because of me.  What kind of trip is he trying

to put that child on?  What is he trying to do that to child?

The defendant lied, the defendant tried to blame what he could

on his three-year-old son.  That is terrible, and I think that

tells you a little bit about the defendant.

Now, I read very closely the letters written by the

defendant's wife and family members, and I must say none of

them surprised me.  Some people think that an individual who

exploits a child sexually wears a dirty raincoat, stands in the

bushes outside of an elementary school.  Those of us who have

been in this business long enough, the court has been handling

these cases enough to realize that is never or almost never the

case.

How many of the defendants who have stood before you

with child sex crimes were like the defendant?  Married, a

father, a college graduate, a successful engineer, civil

engineer, an employee, probably well-respected.  All of those

1  letters may well be true.  That is how those people perceive

2  him, but what they don't know and what he's refused to

3  acknowledge, which, again, he doesn't have to, is that there is

4  a part of him that gets sexual pleasure from children.  That

5  believe it or not -- well, take "believe it or not" out.  That

6  is not a crime.  The crime is acting on his sexual interest in

7  children, and it's a crime because it hurts kids.  The children

8  in the over 400 videos and still images that he downloaded,

9  those children are hurt.  They are victimized by him.  And

09:38  10  little Arianna, his seven-year-old niece, most significantly

11  has been victimized by him.

12      So we shouldn't be surprised that he appears to be the

13  kind of guy you would run into at a neighborhood barbecue.  But

14  there's a side of him that's dangerous that is not apparent

15  because people don't sit around the water cooler at work and

16  say, Hey, I'm interested in children being raped, what about

17  you?  But that's the reality of who this individual is.

18      Now, we understand that the Federal Bureau of Prisons

19  has programs to work with sex offenders.  Your Honor, he

09:39  20  steadfastly denies any of these crimes.  He is not amenable to

21  treatment, if it ever works, but he is certainly not amenable.

22  Will he be after some period of time?  We don't know.  But

23  right now this man is not amenable to treatment because he

24  won't admit -- and I understand legally and the defense

25  attorney is going to say he can't admit because there's an

appeal, I understand all of that.  But to get on the stand and
to lie and say, I've never seen child pornography, or I've
never collected it or downloaded it, I never moved it from one
machine to another to another, outright lie, he is not
amenable, I would suggest, at this time and possibly ever, to
the treatment that may be available.

Now, the guidelines in this case from a purely sort of
legalistic pattern are really very, very interesting.  Now,
obviously the guideline here is 70 years.  I think it was Judge
Stearns who once commented on a sentence like that, that even
Methuselah wouldn't be able to serve out that sentence.  And we
are not asking for 70 years.  But as the court knows, the court
is required to calculate the guidelines.

I mean, we have a total offense level of 43 and it --
well, it's a total offense level of 43.  It's off the charts,
quite literally, and 70 years is the guidelines.  But I think
what's more beneficial and more helpful, and I know that in a
recent sentencing Judge Talwani had commented that when she is
trying to avoid unwarranted disparity, she doesn't look so much
at the GSR, but she looks at the JSON data because the JSON
data tells us similarly situated defendants around the country
what learned judges have typically or on average or by median
have meted out for a similar situation.

But the JSON data in this case is very interesting,
isn't it?  Because under the revised calculations, we are

1    sentencing the defendant under 2G2.2.  And if you look at that,

2    and I have it here, that is not the guideline for production.

3    That is the guideline for receipt and for possession.  So even

4    though this calculation, using 2G2.2, gives us a higher total

5    offense level, or at least it had given us a higher offense

6    level, the JSON data that we use now is essentially for

7    different crimes.

8            But having said that, the median sentence, and this is

9    a group of 105 defendants that are in Criminal History Category

09:42 10    I, no criminal history, who under 2G2.2, and at least the JSON

11    data as it's read here, the median sentence was 300 months,

12    which is 25 years, and the average sentence was 26 and a half

13    years, 320 months.  That's in 105 different cases over the last

14    few years.

15            But I would suggest what's more probative and what's

16    more illuminating is the guideline for production.  Because I

17    think we would all agree the production of child pornography is

18    significantly more heinous than merely possessing, trading or

19    having the pictures and the videos.  And under 2G2.1, which was

09:43 20    the original calculation for production, there were 824

21    defendants, 824 defendants in the last handful of years that

22    were sentenced that have zero criminal history and that have

23    production offenses, the median sentence was 360 months, 30

24    years, and the average sentence was 348 months, 29 years.

25            So the government's sentence is focusing on the JSON

data.  The government's sentence is looking at judges around
the country, for production, 824 different cases, what are
other judges giving for defendants without a criminal history?
And I'm going to suggest that our recommendation of 30 years is
in the heartland.

So the question becomes, the defendant has asked for
15 years.  The government respectfully believes that that is
woefully inadequate.  That would be half the sentence that is
average, about half the sentence that is the median.  And what
is there about the defendant that would take him out of the
heartland of these cases, these 824 or 105 cases around the
country, what is it that takes him out of the heartland of
that?  And quite simply and quite honestly, I suspect, nothing.

And again, the fact that he's married, you know, we
spent a lot of time in this past year in the U.S. Attorney's
Office -- not a lot but we spent some on conscious bias.
People that look like us, people that have our background, we
tend to, even if we don't think we're doing it, have a more
favorable opinion of these folks.  And contrary or opposite of
that is for people that don't look like us we are more likely
to give them the benefit of the doubt.

The defendant looks like us.  As I said earlier, not
half-jokingly, not jokingly at all, he's somebody who could be
our neighbor, our friend, our colleague.  But we must treat him
as the unique individual he is, and we have to ensure that we

1    treat him the same we would treat somebody who is without an

2    education, without a job, who isn't mainstream.

3         Yes, every defendant in every case must be judged on

4    his or her own situation, own life.  Obviously all of that is

5    accurate.  But just because he looks like a middle-class

6    individual who family loves doesn't take away the monstrosity

7    of what he's done, the violation of trust that he's done.

8         I look at the 3553(a) factors.  I suspect the court

9    could recite them in her sleep.  I think at this point I

09:46 10   probably could too.  And they're all important.  And we all

11   give different weights to the different factors I suppose.  But

12   the ones that I look at are deterrence, general and specific.

13        When people hear about this case and when people learn

14   about this case, that an individual who betrayed the trust his

15   family put on him and sexually exploited his seven-year-old

16   niece, the lesson should be you're looking at 30 years in

17   prison.  And in fact, that is the lesson around the country in

18   most of these cases.

19        The other thing is I look at the specific deterrence

09:47 20   to keep the defendant from re-offending.  And we'd all like to

21   think that, Oh, goodness, no.  He's learned his lesson.  He's

22   been caught.  He would never do this again.  He can go to sex

23   offender training.  I suggest to you that no training in the

24   world is going to take away the defendant's sexual attraction

25   to children the way conversion therapy doesn't take homosexuals

1    and make them heterosexuals.  He will always be attracted

2    sexually attraction to children.  The question is will he be

3    able to reign in those attractions?  Will he be able to not act

4    on them?  Well, we have no reason to believe that he's going to

5    be able to do that.  If this is an obsession, the sexual

6    attraction, how will it rear its head in the future?

7            Every sentencing, Your Honor, is a bit of a gamble,

8    isn't it?  For every sentence, the court tries and does in

9    their best to give a sentence that meets all the needs of

09:48 10    sentencing and that we hope is sufficient to keep a defendant

11    from re-offending to protect society.  But it's always a

12    gamble.  It's always a bet.  But on one side, we have the

13    defendant, and on the other side, we have children.  We can't

14    gamble with the safety of children who will be at risk once

15    he's back in the community.

16            We believe that 30 years is an appropriate sentence.

17    That will mean he will be in his 70s when he gets out of

18    prison.  Hopefully at that point he will not be the same threat

19    that I believe he will be up until that point.

09:49 20            Now, if I had all the eloquence in the world, and I

21    don't, I don't think that I could capture the poignancy of the

22    statement made by Arianna's mother, and I know you've read it,

23    but I just want to read it into the record.  This is written

24    by, actually, it's John and Amy, the mother of seven-year-old

25    victim in this case, Arianna, who was the defendant's niece by

1  marriage.

2          She writes, or they write, "This summer we found that

3  someone we trusted to be a guiding adult in our child's life

4  not only took advantage of her presence in his home to take

5  intimate images of her but that those images were then found

6  filed alongside an extensive child pornography collection.

7  Shock and betrayal are the least of the emotions we feel.

8          "Being a part of the legal proceedings was really hard

9  emotionally.  It was so hard to sit with all the hurt and all

09:50 10  the sadness and to know they were the result of the actions of

11  someone we had been close to.  Ultimately, our choice to

12  participate was based on our hope that we could prevent our

13  niece or any other child from being taken advantage of like our

14  daughter was.

15          "Patrick's inability to accept the damaging

16  consequences of his actions worries us.  If he finds it

17  excusable to violate his niece's privacy and it's okay to

18  prolong the confusing and emotionally painful limbo his family

19  is in, what's not okay?  Where are the limits of acceptable

09:51 20  behavior?"

21          Again, those were the sentiments of the mother and

22  father of one of his victims.  "Ultimately, our choice to

23  participate was based on our hope that we could prevent our

24  niece or any other child from being taken advantage of like our

25  daughter was."

1    It's the job of the government.  It's the job of the

2    court to protect children from the defendant.  And I would ask

3    you to impose the 30-year sentence and the five years of

4    supervised release and the other provisions that we asked for

5    in our sentencing memo.  Thank you.

6    THE COURT:  Mr. Tobin, is the restitution going to be

7    limited to the 17.5 that you've already asked for, or do you

8    anticipate additional restitution?

9    MR. TOBIN:  Yes, Your Honor, yes.

09:52 10    THE COURT:  Mr. Simons.

11    MR. SIMONS:  Your Honor, whatever sentence you impose

12    today is going to promote deterrence and is going to provide

13    for punishment.  And I would implore the court to consider that

14    15 years is a long time.  I can't imagine that anybody looking

15    at this case and seeing, as I'm sure the government is going to

16    put out a press release, and whatever it is, if it's 15 years,

17    if it's 30 or somewhere else that the court lands, it's a

18    significant sentence.  And I suggest to you that not only for

19    Mr. Baxter himself but for the public at large, seeing that

09:52 20    sort of sentence is going to deter, to the extent we can ever

21    deter somebody from potential criminal activity.

22    And as the government did, I'd like to compare

23    Mr. Baxter's case to some other cases both in this court and

24    out.  There were a number of cases that we had found where

25    defendants were convicted of sexual exploitation of a minor and

 1    were sentenced to 15 years.  I'll just read them for what it's

 2    worth, first the names and then I'll talk about a couple of

 3    examples one is *U.S. v. McNicol*, 12-CR-10092; *U.S. v. Hiersche*,

 4    12-CR-30017; *U.S. v. Lacompte*, 16-CR-30050; *U.S. v. Saywer*,

 5    16-CR-30031, and *U.S. v. Wong*, 14-CR-30029.  Those are all

 6    cases where defendants have been sentenced to 15 years, which,

 7    as the court knows, is the minimum mandatory.

 8         I'll acknowledge that those were cases that were

 9    resolved by plea as opposed to trial, as Mr. Baxter elected to

09:53 10    go to trial in this case.  But I would hate for there to be a

11    15-year trial penalty, for lack of a better word.  As the

12    government notes, everybody has a right to trial.

13         And Mr. Tobin noted in a way how positive Mr. Baxter

14    comes here.  He comes here with a number of family members and

15    friends who are supporting him who are in the courtroom today.

16    As the court may have remembered, his parents had come to court

17    either every time or nearly every time, both in the pretrial

18    proceedings and at trial, to support him.  I've been in contact

19    with them and his wife, Vanessa.  And as horrific as the

09:54 20    allegations are or the convictions are, as you must find as the

21    facts are, his wife who knows him the best and who has the

22    biggest interest in protecting her own children, their own

23    children, continued to stay by his side because she knew who he

24    was as a person.

25         And of course good people can do bad things, just as

Mr. Tobin said.  But that is part of his character.  You have
to consider the background that he's had not only being a good
father, an active father, somebody who has helped raise his
children, who are still young, they're only six and nine years
old as we stand here today.  He's the type of father that, when
he lost his job because this case ended up with a press release
and some sort of news, his employer found out.  He had a good
job.  He was a civil engineer for the City of Cambridge.  And
when he lost his job, he did what a good father do.  Even with
an open criminal case and limited opportunities, he took a
20-dollar-an-hour job, a big downgrade, but he did so because
he's the type of guy who would do whatever he could to protect
and to raise his children.

          So let me go back to one of these cases I mentioned,
Derek Lecompte.  In 2017, Derek Lecompte had pleaded guilty to,
I believe it was three counts of sexual exploitation of a
minor.  And upon doing some digging, including a press release
from the U.S. Attorney's Office, this was a 27-year-old man who
had physically sexually assaulted a ten-year-old boy, who had
actually developed a relationship with this ten-year-old-boy
over some time, had not only physically sexually assaulted him
but recorded those sexual encounters.  And that was the basis
for those production counts.

          Now, if you contrast what the facts were in this case
and what the jury found was that Mr. Baxter had taken

1    photographs and videos of his niece.  And I'm not trying to say

2    that these were excusable or that this was in any way okay, but

3    what I'm saying is when you compare the two, for example,

4    touching physically and emotionally developing some sort of a

5    bond and really messing up a child and really having a heavy

6    impact versus the conduct that Mr. Baxter was convicted of in

7    his case, it seems that all evidence points to this girl not

8    even -- either not knowing that he was taking pictures or

9    videos or seeing it and thinking nothing of it.  This is not

09:57 10    something that traumatized the girl in the moment.  He didn't

11    touch the girl.  He didn't do anything to have her pose, at

12    least as far as I know and as far as the evidence showed.

13         So again, in the scale of things, this is a bad case,

14    these are bad convictions, but they're nowhere near, for

15    example, what this other gentleman did.  And there are a number

16    of examples like that.

17         In my own experience, I had a case last year in state

18    court.  I know it's apples and oranges, completely different

19    systems, but just by way of an example, I had a gentleman who

09:57 20    was not a stepfather but had a relationship with the mother, a

21    woman, and then there was a child under 14 years old.  And this

22    person was accused, went to trial, was convicted of sexually

23    assaulting her, touching her vaginal area, touching her with

24    his penis.  Not quite rape but pretty egregious stuff.

25         In fact, at that trial, it was in Dorchester District

1    Court, she went on the stand.  The actual victim herself

2    testified.  Further, you could argue, traumatizing her by

3    having to go on the stand.  He was convicted of three out of

4    the seven counts, and he got five years in jail.  Again, I

5    understand, completely different system, even different

6    charges.  But to think that somebody who actually physically

7    assaults a child could get less time than the government is

8    asking in this case and, frankly, less time that we're asking

9    in this case because we're limited in what we can ask for, is

09:58 10   already a discrepancy in justice.

11         You know, I have a friend that says perspective is

12   everything.  Reality is based on your own perspective, so it's

13   never a fully objective sentence.  But as I'm thinking about

14   this, I can only imagine not only the impact it would have on

15   Mr. Baxter of course, as the court has to impose a sentence and

16   will punish him, how this will impact his children.  A

17   nine-year-old and a six-year-old, 15 years later, they're going

18   to be adults.  He's going to miss out on the ability to raise

19   them, but more importantly, they're going to miss out on the

09:59 20   ability to have a father.

21         In 15 years, if he gets out, he'll be roughly 60.

22   That will be some time to try to salvage a career, to have some

23   relationship, to try to do some good in the world.  And I think

24   there's some real hope that, if he gets out, he will be able to

25   do good in the world.  There will be some sort of

rehabilitation here.  But if he gets 30 years, Your Honor, he's
going to be in his mid 70s.  Not to say that life is over by
any means, but that's a long time.  There's no real productive
relationship he's going to be able to get with his children or
to do much good in the world when he's starting from ground
zero in his mid 70s.

I went to a football -- sorry -- a basketball game
last night.  My daughter is 15.  She's a cheerleader.  And I
couldn't help, watching the game, trying to be present, but as
in this profession it's always a hard to keep your mind present
when you have something very important and you're representing
someone's life and everything, their family, their livelihood,
their freedom, and I couldn't help but think about all the
things that I've done and experienced with my daughter in the
last 15 years, from meeting her to teaching her to walk,
teaching her to eat, the bad things, the good things, teaching
her to play catch, all of the things that we've experienced and
the things that, 15 years, if I had missed out on that, it
seems like a lifetime in my mind.  And Mr. Baxter is going to
be missing out on his kids, and they're going to miss out on
him, going to college, entering high school, dating, all the
things that a father should be able to guide their children and
they should be able to rely on.  But he, again, is not going to
do that.

Your Honor, I think 15 years is a long time.  And I

just want to touch on two of the enhancements that the court
found. I know I objected, but two points for computer seems
arbitrary. I understand there's obviously reasons behind the
Sentencing Commission. But if you're producing child
pornography, whether it's on a computer or whether you're doing
it just by -- it's hard to imagine that there wouldn't be a
computer involved in some way. It's hard to imagine a case
where you wouldn't have a computer involved.

And with regard to the videos, the number of
photographs and the conversion of 75 photographs per video in
order to come up with this preposterous calculation, it seems
arbitrary. You could have a one-minute video, a 45-minute
video, and according to the guidelines, they're all equal to 75
photographs. It seems utterly arbitrary in this case.

Your Honor, I'm asking for 15 years because I think
it's reasonable. I think it's not greater than necessary, and
I think it provides adequate punishment for Mr. Baxter, and I
think it provides some measure of relief for the family in this
case, for the people who are impacted. And I think it allows
for some possibility that Mr. Baxter comes out and learns from
this experience, becomes somewhat of a help to his family and
becomes a good, decent person. But beyond that I think would
be too much. It would be an injustice. And for those reasons
I'm asking that you adopt our recommendation.

And as far as the restitution, Your Honor, I'm asking

1    that you impose the minimum, I believe it's $3,000 per claim.

2    And the reason I'm asking for you to impose the minimum is

3    Mr. Baxter, again, had been historically a breadwinner in his

4    family, even though the past year or so he had this lesser job.

5    But he's going to be going away.  His wife, soon-to-be ex-wife

6    is going to be raising these children on her own on one income,

7    and it's going to be only impacting them really.  It's not

8    going to impact him, whatever fine or restitution you impose.

9    Ultimately, he's going to end up with nothing and they're going

10:03 10    to end up with the consequences of the financial impositions.

11           So for all those reasons, I'm asking that you adopt

12    it.  And also, I don't have a designation.  I would ask that

13    the court consider allowing me until Monday to propose or to

14    ask the court to consider making a recommended designation for

15    prison.  And I would ask the court to consider letting

16    Mr. Baxter self-report as well, as he's complied with all

17    conditions, come to court, even today knowing that he's going

18    to go into jail, prison for a long time, he has still come

19    here.

10:03 20           THE COURT:  The $3,000 per count, is that mandatory?

21           MR. TOBIN:  No.

22           U.S. PROBATION:  Restitution to the victims?

23           THE COURT:  No.  The restitution, the 17.5, I will

24    impose that.  But the $3,000 under or the $5,000 under the

25    JVTA, that's discretionary, right?

1           U.S. PROBATION:  It's discretionary, yes.

2           THE COURT:  And the same with the AVAA?

3           U.S. PROBATION:  Yes.  One you're imposing restitution

4    not for actual victims.

5           MR. TOBIN:  May I be heard on that, Your Honor?

6           THE COURT:  Yes.

7           MR. TOBIN:  The court does have some discretion with

8    regards to those two, what I would call special, special

9    assessments.

10:04 10          THE COURT:  Yes.

11          MR. TOBIN:  However, for the court to have any real

12   discretion, they have to find that the defendant is indigent or

13   not capable of paying.  And Probation has done a wonderful job.

14   The defendant's assets are close to, on the plus side of the

15   ledger, close to a million dollars.  So I just don't know how

16   the court could find that he's indigent or incapable of paying.

17   We all feel terrible for his wife and kids, but our feelings

18   can't affect the way I think we read the law and read the facts

19   in this case.

10:04 20          THE COURT:  Mr. Tobin, while I have you, any other

21   victims, other victim impact statements?

22          MR. TOBIN:  I believe there were two from the victims

23   seeking the restitution.  I know that Probation has provided

24   those to you.

25          THE COURT:  I don't think I saw those.

1          U.S. PROBATION:  They were submitted with the file,

2     Your Honor.  I'm happy to pull up my email and try to forward

3     them.

4          MR. TOBIN:  Your Honor, they were submitted with the

5     original PSR.  I don't know --

6          U.S. PROBATION:  I reattached them to the second.

7          MR. TOBIN:  You did?  Okay.

8          THE COURT:  I did not read these.  I didn't see them,

9     so I'm going to take a second to read them now.  That said, I

10    am going to impose the restitution amounts that they've

11    requested.  So I'm not sure how material these are, but let me

12    just take a second to look at it.

13          All right.  Mr. Baxter, you have the right to allocute

14    before I sentence you if you want to.

15          MR. SIMONS:  Your Honor, I spoke with Mr. Baxter about

16    that, and he would respectfully decline the opportunity.

17          THE COURT:  Is that correct, Mr. Baxter?

18          THE DEFENDANT:  That's correct, yes.

19          THE COURT:  All right.

20          So thanks to counsel for the work you've put into

21    this.  You've all obviously done a good job for your respective

22    constituencies, and I appreciate that.  These sentencings are

23    never easy, but they're easier when both parties are so

24    competently represented that you have a full accounting of the

25    facts and the situation before you, so I thank you all for

1    that.

2          I also want to thank Mr. Baxter's family and friends

3    for showing up because I fully understand how difficult this is

4    to be here and to listen to this and have to live through it.

5    And in some respects, the family and friends of a defendant,

6    especially in a case like this, are as much victims as the

7    victim impact statements that I just read.  So I know it's

8    difficult to be here.  And I appreciate you coming, and I want

9    to thank those of you that wrote letters because they're

10:08 10   helpful to see another dimension of Mr. Baxter.

11          Now it's time for me to sentence him.  And again, it's

12   not an easy job under these circumstances.  I have considered

13   all the things that I'm supposed to consider in fashioning an

14   appropriate sentence.  That's the advisory guideline sentencing

15   range, the nature and circumstances of the offenses, the

16   defendant's personal characteristics, his lack of a criminal

17   history, as well as the institutional needs for the sentence to

18   reflect the seriousness of the offense, promote respect for the

19   law, just punishment, serve as an adequate deterrent, both

10:09 20   general and specific.  I've also considered the need to avoid

21   unwarranted sentencing disparities and all of the other factors

22   set forth at 18 U.S.C. 3553(a).

23          I understand for the record that I'm not bound by the

24   sentencing guidelines, that they are discretionary, but I have

25   considered them.  All of this said with the understanding that

1   my job here is to figure out what is enough but not too much of

2   a sentence under the circumstances.

3           Mr. Tobin, you relied fairly heavily on JSON data, so

4   let me just tell you how I think about the JSON data.  I use it

5   as sort of a gut-check, right?  I don't sentence to the JSON

6   data, but when I come up with what I think an appropriate

7   sentence is, I will look to the JSON data to see and make sure

8   I'm in the ballpark.  So it's more of a gut-check than a

9   lighthouse, so to speak, just so you understand.

10:09 10           MR. TOBIN:  Thank you.

11           THE COURT:  And also I want the parties to understand

12   how I came to the sentence in this case.  And what I did was I

13   decided to consider Counts One and Two and then consider Count

14   Three separately.  So rather than -- I know the guidelines sort

15   of push us to a monolithic number, but I stepped back from that

16   in this case and did a rough guideline calculation on Counts

17   One and Two and will essentially be giving what I think is a

18   guideline sentence on Counts One and Two, keeping in mind the

19   mandatory minimum on Count Two.

10:10 20           In terms of Count Three, Congress has said that the

21   appropriate sentence for Count Three is between 15 and 30

22   years.  So my job was to figure out where in that range it was

23   appropriate to sentence Mr. Baxter and with obviously the

24   bottom of that range being 15 years.  And as I was thinking

25   about it, to my mind, as I've already said, there was enough

1    evidence to support the jury verdict.  But that said, this

2    wasn't totally in the heartland of what I view a production

3    charge to be, or put another way, what sort of production

4    activities would warrant a 30-year sentence.

5        And I want to just focus on some of those.  There's

6    the enhancement for sort of repeated episodes.  And here I

7    think that the conduct satisfied how the guidelines think about

8    repeated episodes of conduct.  But that said, it was a fairly

9    discrete period of time.  It wasn't sort of maybe the heartland

10:11 10   of what the episodic enhancement takes into account.  He didn't

11   pose the child.  He didn't touch the child.  I think that what

12   Mr. Simons says about the child not being traumatized in the

13   moment, we'll see what happens going forward, but is accurate.

14   And I don't understand there to have been any effort -- excuse

15   me.  I don't understand there to have been any effort to

16   distribute or upload the images of the niece out to the wide

17   world or to profit by it in any way, which is more how I think

18   of the production charges that warrant the 30-year sentence.

19       So pursuant to the Sentencing Reform Act of 1984 and

10:12 20   having considered the sentencing factors enumerated at 18

21   U.S.C. 3553(a), it is the judgment of the court that the

22   defendant, Patrick Baxter, is hereby committed to the custody

23   of the Bureau of Prisons to be imprisoned for a term of 240

24   months.  That's 20 years.  This term consists of 14 years on

25   Counts One and Two, to be served concurrently, and a term of 20

1    years on Count Three, to be served concurrently to the terms on

2    Counts One and Two.

3         So I told you how I got to it.  Another way to look at

4    it is the mandatory minimum on each count served consecutively.

5    And I just want to point out, Mr. Simons, that I understand,

6    when I'm thinking about how old someone needs to be to not be

7    at risk of recidivating versus what gives them some chance at

8    repairing relationships, and you talked about being around 60

9    with good time, that puts you pretty much in that same range

10:13 10   that you were talking about.  So I hope -- and I say that

11   because I hope that the age at which he'll be released on this

12   sentence is an incentive for him to both behave in prison and

13   take what he can from the experience but also to engage in the

14   therapy that might help him be successful when he has an

15   opportunity to put his career and his relationships with his

16   kids in a better place.

17        I'm going to make a judicial recommendation that he be

18   designated to an institution commensurate with his security

19   needs where he can participate in sex offender treatment.  I'm

10:14 20   reluctant to do something more specific than that.  I take it

21   what you were thinking was you wanted him someplace close to

22   home, so I'm going to say a facility as close to home as

23   possible that has sex offender treatment available.

24        Upon release from imprisonment, supervised release for

25   five years.  Within 72 hours of release from custody, he'll

1    report in person to the district where he's released.  I'm

2    going to order the $17,500 requested in restitution, that's

3    7,500 for the Best Necklace series, 10,000 to Tara, and any

4    payment that is not made in full will be divided proportionally

5    among the parties named.

6         Payment of the restitution shall begin immediately and

7    shall be made according to the requirements of the Federal

8    Bureau of Prisons' Inmate Financial Responsibility Program

9    while he's incarcerated and according to a court-ordered

10:14 10    repayment schedule during the term of supervised release,

11    restitution payments to the clerk of the court for them to

12    transfer to the victims.  The defendant, while that financial

13    obligation is pending, will have to notify the U.S. Attorney's

14    Office within 30 days of any change of mailing or residential

15    address so that they know where to come to get the money.

16         I'm not going to impose an additional fine because I

17    want to do right by his kids also who are as much victims in

18    this as anybody else.  I've already granted the government's

19    order for preliminary forfeiture and will see that process

10:15 20    through.

21         While under the Probation Office's supervision for the

22    five years of supervised release the defendant shall comply

23    with the following terms and conditions:  He may not commit

24    another federal, state, or local crime.  He may not unlawfully

25    possess a controlled substance.  I'm not going to require drug

1    testing as I think he poses a low risk of substance abuse.

2    He'll have to cooperate in the collection of a DNA sample and

3    comply with any other standard conditions that have been

4    adopted by the court.

5         He will also have to comply with the requirements of

6    the Sex Offender Registration and Notification Act as directed

7    by the Probation Office, the Bureau of Prisons, and any state

8    sex offender registration agency that's applicable to where he

9    might live, work, wherever he might be.

10:16 10        In terms of special conditions, he'll have to pay the

11   balance of any restitution imposed according to a court-ordered

12   repayment schedule.  No new credit card charges or additional

13   lines of credit without the permission of Probation while that

14   financial obligation is pending, and he'll have to provide

15   Probation with access to any requested financial information,

16   which they can share with the U.S. Attorney's Office to

17   facilitate collection of the restitution.

18        Pursuant to the Adam Walsh Child Protection and Safety

19   Act, you'll have to register as a sex offender not later than

10:16 20   three days from release.  You'll have to keep the registration

21   current in every jurisdiction where you reside, work, or are a

22   student.  You must, not later than three days after each change

23   of name, residence, or employment or student status, appear in

24   person in one jurisdiction in which you're registered and let

25   that jurisdiction know about the changes in your status.

1   Failure to do that will be a violation of this supervised

2   release condition but could also be a separate offense

3   punishable by additional time in prison.  And you will have to

4   read and send the offender notice and acknowledgment of duty to

5   register as a sex offender per the Adam Walsh Child Protection

6   and Safety Act.

7         While on supervised release, you will have to

8   participate in sexual specific evaluation or sex offender

9   specific treatment conducted by a sex offender treatment

10:17 10  provider as directed and approved by the Probation Office.  I

11  will leave all the details of what type of sex offender

12  treatment program you will be subject to to Probation, but it

13  may include things such as psychological and physiological

14  testing, and that can include polygraph testing and the visible

15  reaction time assessment with the Abel screen and any other

16  screening.

17        You'll have to submit to periodic polygraph testing to

18  make sure that you're in compliance with the requirements of

19  your supervision and a treatment program.  When submitting to a

10:18 20  polygraph exam, you do not waive your Fifth Amendment rights,

21  and your exercise of such rights will not give rise to a

22  violation proceeding.  And any results of a polygraph will not

23  be used by the court as evidence to prove a violation, but it

24  can be used by Probation and by your treatment providers to

25  make sure you're getting the appropriate treatment and to

 1    perhaps some modification of release conditions.

 2          You'll have to allow the installation of computer

 3    internet monitoring software on any internet devices that you

 4    have.  You will be able to use a computer for work purposes as

 5    long as that's approved by Probation.  The programs that will

 6    be on your computer will be designed to identify for the

 7    Probation Office if you're doing anything inappropriate or of a

 8    sexual nature.  You may not attempt to remove or otherwise

 9    defeat those systems, and you'll have to allow the Probation

10:19 10    Office to examine your computer and receive data from it at any

11    reasonable time.

12          You have to tell anyone that you're sharing a device

13    with that the devices are being monitored by the Probation

14    Office.  You cannot possess any computer or internet-capable

15    device without permission from the Probation Office.  And

16    obviously, you should not be using any device to knowingly

17    access or view sexually explicit materials.

18          You'll have to let Probation know all the account

19    information and anything they want to know about what's on your

10:19 20    computer.  That's user names, passwords.  And again, you'll

21    have to share with them any software on your computer if they

22    ask, and that can include billing information so they can

23    figure out for themselves what's on your computer to help

24    facilitate the monitoring of your usage.

25          And, lastly, you'll have to give the Probation Office

1    access to any requested financial information, again, to look

2    at billing information and how you're spending your money,

3    whether it's being done inappropriately with regards to

4    pornography.

5         No contact, direct or through a third party, with

6    children under the age of 18 unless approved by Probation or in

7    the presence of a responsible adult who has been approved by

8    Probation and who understands your past criminal history.  You

9    may not knowingly have any contact with your niece or any other

10:20 10   victim without prior approval of the Probation Office.  That

11   includes letters, communication devices, visits, social

12   networking, third party, no communication.

13        If you do go back to work when you're released from

14   prison, you'll have to consent to third-party disclosure to any

15   employer or potential employer concerning computer-related

16   restrictions that are imposed on you unless the Probation

17   Office says that's not necessary.  You may not be employed in

18   any capacity that requires direct contact with children unless

19   that employment has been approved in advance by the Probation

10:20 20   Office.

21        No volunteer activity that causes you to come into

22   contact with children unless approved by the Probation Office.

23   And when I say "contact," that means face to face, over the

24   telephone, mail, internet, and through a third party.

25        Probation will have to approve any form of employment

1    that you seek in order to assess the level of risk to the

2    community.  And all this treatment that we've ordered, if you

3    can afford to help pay for it or there's a third-party

4    provider, you'll have to contribute.  But if not, it will be

5    taken care of.

6            Special assessment of $300 due immediately.  And your

7    rights to appeal, as I'm sure your attorney knows, are fully

8    intact.

9            Anything else from Probation?

10:21  10            U.S. PROBATION:  No.  Just to address the remand to

11   custody.

12           THE COURT:  Yes.  Anything besides remand?

13           MR. TOBIN:  Yes, Your Honor, and you may have already

14   covered this.  I'm sorry, there was just a lot.  We still have

15   to come and the court still has to impose or make findings with

16   regard to the JVTA assessment of $5,000 and the AVAA assessment

17   of $50,000 for a combined total of $55,000.

18           And it's interesting, there's different standards.

19   With regard to the JVTA assessment of 5,000, the defendant

10:22  20   bears the burden of proving indigence or that he's indigent.

21   And again, based on the fine work of Probation, he has hundreds

22   of thousands of dollars and asks that he's not.  With regard to

23   the 50,000, he has yet to put forward any evidence of his

24   inability to afford such a fee.

25           So while I would love to see that money put into a

1   college fund for his two children, I don't think there's any

2   wiggle room there because of his financial situation.  But

3   something has to be addressed with that.  Other than that, I

4   have nothing else.

5          THE COURT:  I'm going to make the findings that he

6   does not have the ability to pay and will not have the ability

7   to pay, and that is predicated on the fact he's going to be in

8   prison for 20 years, and he is leaving behind two minor

9   children, and his income has been necessary to support them in

10:23 10  a reasonable way.

11          So those are the findings I'm prepared to make,

12  Mr. Tobin.  I understand the government also has the right to

13  appeal if they don't like what I've done here, but I feel like

14  a million dollars sounds like a lot, but it's tied up in

15  assets, including the house where the kids live.

16          MR. TOBIN:  Your Honor, I understand, and whether or

17  not my office will choose to appeal, I don't know.  But I do

18  believe that I should lodge and I have to most respectfully

19  lodge an objection to the findings of the court and the failure

10:23 20  or the choosing not to impose those, but thank you.

21          THE COURT:  Okay.  I'm concerned about the victims

22  here, so I've ordered their restitution in the full amount that

23  they have requested.  And I'm concerned about his own children

24  who are already going to have significant fallout from the

25  situation, and I want to make sure that, where a fine is

1    discretionary, that I'm not dooming them to poverty in favor of

2    a fine going to the government coffers someplace without any

3    direct impact on a human being.

4         MR. TOBIN:  I agree -- I can't say that I agree but I

5    understand, and thank you very much for the explanation.

6         THE COURT:  Again, you have the right to appeal that

7    also.  Other than remand, Mr. Simons, anything else?

8         MR. SIMONS:  No, Your Honor.

9         THE COURT:  Okay.  What's the government's position?

10:24 10   He's asked for release -- he's asked for the ability to

11   self-report.

12         MR. TOBIN:  Your Honor, most respectfully, we would

13   ask you, this is not the kind of case in which he should

14   self-report.  The court was most generous upon conviction when

15   the government moved for immediate detention.  The court -- and

16   I understand and I empathize with the defendant's family, but I

17   believe that the statute requires it, it's mandatory given the

18   conviction that he go into custody immediately.  I think that

19   probably should have taken place 12 weeks ago.

10:24 20        And I want to make sure we get this right.  The

21   standard isn't, it is not can you find by clear and convincing

22   evidence that he's not a flight risk or a danger.  One, I don't

23   think you can, but that's not the standard.  The standard is in

24   the following paragraph that says there have to be

25   extraordinary circumstances.  And quite simply, there are just

not extraordinary circumstances.  Here is an individual, yes,
he has a wife; yes, he has two children; yes, he's going away
for an awfully long time, but you were so charitable and so
kind and you let him be out for the last 12 weeks.

The jury has spoken.  The sentence has been given.  It
really needs to start today.  And I would respectfully suggest
there is no legal justification for granting that motion at
this point.

MR. SIMONS:  Well, I agree with Attorney Tobin that
the court was charitable but I think reasonable in allowing
Mr. Baxter to have some time with his family and finding that
he is not a flight risk and not a danger.  And I think in this
circumstance he certainly understands the court may well remand
him today, but I am imploring the court to consider giving him
a self-report date.

Again, the children are going to have significant
fallout.  I can share, I mean, they're so young.  They don't
know the gravity of what's occurred, and I'm not sure what the
family is going to do in communicating with him.  But one way
or the other, the kids aren't going to see their farther for a
very long time.  Although he certainly has prepared and
understands he could go away today, I don't think it would
promote justice necessarily just to have him arbitrarily go
today and serve in some temporary custody.  There's always some
amount of time and difficulty in transferring and going from

1    one place to another versus simply self-reporting once there's

2    a designation made by the Bureau of Prisons.

3         Again, he's been exemplary both in his pretrial

4    release terms and since he's been convicted, walking in today

5    understanding that the government was asking for 30 years and

6    that the court would give him at least 15, walking in, on time,

7    respecting the court in every single way that he could

8    physically show, notwithstanding I understand the dispute

9    between the parties over the testimony.  But he's come to

10:27 10  court.  He's done everything he's supposed to do.  And for all

11   those reasons, I would ask the court to consider giving him a

12   30-day self-report date.

13        THE COURT:  So I don't disagree with you that he has

14   behaved very well and has showed up, and I don't necessarily

15   view him to be either a risk of flight or a danger to the

16   community in an imminent kind of way.

17        That said, I was required to take him into custody

18   following the verdict and I didn't, and I gave him the 12 weeks

19   plus, actually, to facilitate an orderly transition out of his

10:27 20  children's life.  And I'm already somewhat out on a limb doing

21   that, and the government was kind enough not to make an issue

22   of it beyond the courtroom on that day.  But I can't.  He needs

23   to be taken into custody today.  The statute requires it.

24   There's no -- I don't have any justification for not remanding

25   him today, so I am going to remand him today.  So I appreciate

1    the request, I understand it, but it's denied.

2            MR. SIMONS:  Thank you for your consideration.

3            THE COURT:  Anything else from Probation?

4            U.S. PROBATION:  No, Your Honor.  Thank you.

5            THE COURT:  Government?

6            MR. TOBIN:  No, Your Honor.  Thank you.

7            MR. SIMONS:  No, thank you.

8            THE COURT:  Thanks, everyone.  We're recessed.

9            (Adjourned, 10:27 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Kelly Mortellite, Registered Professional

 4    Reporter, Registered Merit Reporter and Certified Realtime

 5    Reporter, in and for the United States District Court for the

 6    District of Massachusetts, do hereby certify that the foregoing

 7    transcript is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter to the best of my skill and ability.

10                        Dated this 29th day of January, 2025.

11

12                        /s/ Kelly Mortellite

13                        _____

14                        Kelly Mortellite, RPR, RMR, CRR

15                        Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```